### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KEYWELL L.L.C., | ) | Case No. 13-37603 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |
| | ) | |

### DECLARATION OF J. MARK LOZIER IN SUPPORT OF
### CHAPTER 11 PETITION AND FIRST-DAY MOTIONS

I, J. Mark Lozier, under penalties as provided by law pursuant to 28 U.S.C. § 1746, hereby certify that the following is true and correct to the best of my knowledge, information and belief (the **"Declaration"**):

1.      I am the President and Chief Executive Officer of Keywell L.L.C. (**"Keywell"** or the **"Company"**). I have served in such capacity for 17 years. Keywell is a privately held limited liability company organized and existing under the laws of the State of Illinois. The Company's principal place of business and principal office are located at 11900 South Cottage Grove Avenue, Chicago, Illinois (the **"Headquarters"**). On September [24], 2013 (the **"Petition Date"**), Keywell filed a voluntary case under Chapter 11 of the Bankruptcy Code in the above-referenced court (the **"Chapter 11 Case"**).

2.      The Company is managed by KCL Management Corp., an Illinois corporation (the **"Keywell Manager"**). The Keywell Manager has managed Keywell since 2005. I am the President and Chief Executive Officer of the Keywell Manager. I have served in such capacity for 8 years. Prior to 2005, Keywell Corporation, a Michigan Corporation, served as the manager of Keywell. I was the President and Chief Executive Office of Keywell Corporation from 1996 to 2005. Keywell's ownership is held or controlled by current and former employees of the

Company and former employees of the Company's predecessors. The filing of the Chapter 11

Case was authorized by the Board of Directors of the Keywell Manager and a supermajority vote

of its members (*i.e.*, a vote of holders of more than sixty-six and two-thirds percent (66-2/3%) of

Keywell's outstanding membership interests).

3.     I have been associated with Keywell for over 30 years and am very familiar with

the Company's prior and current day-to-day operations, business affairs, and books and records.

I work closely with a core management team that has an average of over 25 years of experience

in the industry.  That team includes:

    a.     Thomas P. Bertrand, Executive Vice President – Production Management;

    b.     Edward J. Newman, Executive Vice President – Titanium & HTA Commercial;

    c.     Michael J. Pugliese, Executive Vice President – Purchasing;

    d.     Michael C. Sheffieck, Executive Vice President – CFO, Treasurer and Assistant Secretary;

    e.     Karen A. Beninato, Senior Vice President – Controller; and

    f.     Ronald G. Gostek, Senior Vice President – Corporate Services and Operations.

4.     I am also a co-manager and co-owner of NK Management, LLC, an entity that

manages (i) NewKey Group, LLC, a Delaware limited liability company ("**NewKey I**"), and (ii)

NewKey Group II, LLC ("**NewKey II**," and together with NewKey I, the "**Lenders**"), in

connection with the secured financial accommodations discussed below.  I am also a manager

and member of an entity that owns interests in each of the Lenders.

5.     I am familiar with Keywell's existing secured indebtedness, the proposed use of

the Lenders' cash collateral, the Company's restructuring efforts, cash management systems and

employee wages, healthcare and other benefits, all of which are the subjects of the various "first-

day motions" filed in this Chapter 11 Case by the Company (collectively, the **"First-Day Motions,"** and individually, a **"First-Day Motion"**).  As a result of my familiarity with these matters, as well as my personal experience with Keywell and in the scrap-metal recycling business, I have formed opinions regarding the necessity for the relief sought in the First-Day Motions, especially to the extent that such relief will enable the Company to continue to operate in the ordinary course of its business as it pursues a sale of substantially all of its assets.

6.    I have been authorized to, and hereby submit this Declaration in support of the First-Day Motions described below, as well as other motions and applications that the Company expects to file in the first several weeks of the Chapter 11 Case.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records, and/or my opinion based upon my experience and knowledge of the Company's operations and financial condition.  If I am called upon to testify, I can and will testify to the facts and matters set forth herein.  Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

7.    Based on my personal knowledge and the review discussed above, I believe that the relief sought by Keywell in the First-Day Motions is necessary to enable its bankruptcy estate to be administered effectively and to give Keywell its best chance to effect a sale and maximize the recovery to creditors of the estate.  Failure to grant such relief would have a serious negative effect on the Company's efforts to continue operating during its Chapter 11 Case pending a sale of its assets.  For example, the Company must utilize cash collateral to purchase scrap, process same and operate its business in the ordinary course.  The inability to utilize cash collateral and pay ordinary course business expenses will result in substantial and irreparable harm to the going

concern value of the Company and would otherwise not be in the best interests of this estate and its creditors.

8.     Part I of this Declaration describes the business of the Company, its debt structure and the circumstances surrounding the filing of the Chapter 11 Case, including Keywell's efforts to market its business to prospective investors and buyers. Part II sets forth the relevant facts in support of the Company's First-Day Motions, and the documents filed concurrently therewith. Part III addresses the proposed sale of a substantial portion of Keywell's assets and the retention of an investment banker in connection with the sale. Part IV provides information with respect to additional pleadings that will be filed in the beginning of the Chapter 11 Case, for which Keywell will not seek immediate entry of an order.

## I.     BACKGROUND

### A.     Nature of the Business

9.     Based in Chicago, Illinois, Keywell is a leading supplier of recycled titanium, high-temperature alloys (HTA), and stainless steel in North America. Keywell's customers include specialty steel mills and foundries, as well as producers of titanium and other HTA. Using its deep understanding of these metals, Keywell has established itself as a trusted partner to aerospace metals and specialty steel producers. Those customers rely upon the Company's supply relationships and metallurgical expertise to produce highly engineered metal grades that meet demanding end-user requirements.

10.     Aerospace metals and specialty steel customers look to Keywell to supply scrap that meets their specific requirements for chemistry, pliability, rigidity, corrosion resistance, and heat resistance. By capitalizing on its extensive network of more than 1,000 scrap yards, industrial plants, governmental agencies, and large mills located in North America, Europe and

Asia, the Company has developed a reliable stream of raw materials to meet its customers' just-in-time requirements for specialty scrap metal. The Company's well-trained staff utilizes x-ray fluorescence analyzers, spectroscopes, spectrometers and other analytical devices to identify thousands of unique types of metals and their trace elements. After the chemical and physical descriptions of each lot of scrap metal processed is transmitted into the Company's computer system and proprietary optimization software suite, unique blends — sometimes using over 100 different lots of materials — are created that ensure that no contaminants compromise the integrity of the finished metal when it is melted by the customer.

11.   Keywell has developed an expertise in a range of services related to scrap processing, including but not limited to materials recycling, toll processing, and purchasing services:

a.   <u>Materials Recycling</u>.  Keywell is a leading processor of recycled stainless steel and vacuum-quality HTA and titanium in its markets. The Company purchases recycled stainless steel and a wide spectrum of titanium and other HTA; sorts the material according to grade; prepares it to strict quality, size, and packaging specifications (often preparing it in special blends); then transports the finished product to specialty steel mills and foundries (customers) for re-melting purposes.

b.   <u>Toll Processing</u>.  As a service to its customers, Keywell performs "toll processing" services, which involve preparing the customers' own material for remelting in the titanium and HTA business. This preparation is rather involved. It includes chemical analysis, cutting, shotblasting, baling, cleaning, and packaging the customers' recycled material for delivery to their melting furnaces. This service allows titanium and HTA customers, at a relatively modest cost, to remelt their own material after it has been processed and certified to be within specification.

c.   <u>Purchasing Services</u>.  Keywell often serves as a purchasing agent, arranging specific sales to certain customers and generating sales without corresponding investments in inventory.  In 2012, the Company arranged 10,000 tons for purchasing and delivery, almost exclusively stainless steel exported to Asia and chrome steel shipped to a domestic customer.

B.    **History of the Business**

12.    Keywell was founded in 1924 by Samuel and Barney Keywell in Detroit, Michigan. The two brothers were among the first entrepreneurs to recognize the potential of scrap iron and steel recycling and built the business in its early years by supplying scrap carbon-based steel to Detroit-area steel mills. As the industry grew, the Company pioneered an industry trend toward stainless steel recycling in the 1950's and management began to evolve the Company toward its current position as a recycler dedicated only to stainless steel and other specialty metals.

13.    In 1979, the Keywell family sold the Company to Key International Manufacturing, a public, diversified manufacturing company. Keywell operated as a division of Key International Manufacturing and expanded its Midwest base by opening a facility in Chicago in 1984. In 1986, Keywell was spun out of Key International Manufacturing and taken private, largely by its current ownership. Since then, the Company has expanded its collection and processing locations to stay close to its customers and suppliers, and has worked continually to increase its technological and processing capabilities to solidify its market leadership. Over time, the Company has infused its stainless steel business with the best practices and exacting standards of its titanium and HTA business, distancing itself from other stainless processors and driving increased end-user applications for recycled products.

14.    Keywell grew and evolved into an industry leader in providing specialty scrap metals including stainless steel, high speed steel, nickel, chrome, molybdenum, tungsten, cobalt, specialty alloy scrap and other HTA to a variety of industries. The facilities utilized by Keywell have achieved demanding ISO 9001 certification, an internationally recognized standard for quality management systems. The ISO 9001 certification requires a company to meet or exceed

stringent processing and quality assurance standards accepted worldwide, and thereafter maintain those standards through a documented quality-controlled system. The facilities also utilize state of the industry technology equipped with inbound and outbound radiation monitors, x-ray analyzers and other sophisticated equipment for precise detection and identification of every piece of metal processed.

### C.   Location of the Business

15.   Keywell operates nine processing and recycling facilities in the United States that are strategically located in six areas near major customers and suppliers and all of which are ISO 9001 certified (collectively, the "**Keywell Facilities**"). These facilities are located in Chicago, Illinois; Atlanta, Georgia; Fairless Hills and West Mifflin, Pennsylvania; Frewsburg and Falconer, New York; and Monroe (2 facilities) and Indian Trail, North Carolina.[1] Keywell owns the facilities in Chicago and Frewsburg and one in Monroe, and leases the remaining facilities. In addition, the Company owns a 24-acre vacant parcel in Monroe, North Carolina purchased in March 2009.

16.   Keywell also handles scrap trading activities at a home office in Stanhope, New Jersey.[2] In addition, the Company operates a data processing center located in Southfield, Michigan, which is leased by the Company.

---

[1] Keywell formerly operated a leased facility in Carson, California, but Keywell exited the premises pursuant to an early lease termination agreement executed with the landlord prior to the Petition Date. Keywell is in the process of disposing of the assets located at the Carson facility and/or transferring such assets to its West Mifflin, PA location or to another California location subject to a short-term lease. In addition, Keywell formerly operated a leased facility in Wayne, Michigan, but Keywell terminated the month-to-month lease prior to the Petition Date.

[2] Two former employees operated out of their respective home offices in Agency, Missouri and Jerusalem, Israel; one former employee operated out of an office in Baltimore, Maryland, and one former employee operated out of an office in Northville, Michigan.

17.     The Company's West Mifflin facility is the main processing center for oversized recycled stainless steel and chrome-nickel alloys. The Frewsburg plant exclusively processes the Company's stainless steel and HTA turnings.   The Falconer and Indian Trail facilities exclusively handle titanium solids for sale or toll processing.   The Monroe facilities provide toll processing services for HTA solids.   Satellite facilities in Atlanta, Chicago, and Fairless Hills either ship directly to customers or transfer oversized and certain select grades of material to West Mifflin or Frewsburg. The facilities in Frewsburg, Falconer, Indian Trail and Monroe perform all of the final processing of the Company's titanium and HTA material.

**D.     Employees**

18.     Keywell employs approximately 119 people (collectively, "**Employees**"), of which 76 are non-union ("**Non-Union Employees**") and 43 are union ("**Union Employees**"). Keywell's key employees have an average tenure of approximately 17 years with a very low turnover rate.   Approximately 46 employees are salaried and approximately 73 employees are hourly.   In addition, the Company provides its employees with benefits packages that include paid time off, health and dental insurance, medical savings and dependent care assistance plans, short- and long-term disability insurance, group life insurance, and a 401(k) program.

19.     In connection with its employment of the Union Employees, the Company is signatory to four collective bargaining agreements (the "**Collective Bargaining Agreements**") with the following unions (the "**Unions**"):

> a.     United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC on behalf of Local Union 5852-23 (for West Mifflin);
>
> b.     United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC on behalf of USW Local 9367 (for Frewsburg and Falconer);

    c.    Teamsters Local Union No. 731 (for Chicago); and

    d.    International Union of Operating Engineers AFL-CIO Local Union 542-C (for Fairless Hills).

20.    Hourly production employees for the Company's Frewsburg, Falconer, West Mifflin, Chicago, and Fairless Hills facilities are subject to the Collective Bargaining Agreements. Of these facilities, only the Falconer facility is part of the Stalking Horse Offer, as defined and discussed below.

**E.**    **Financial Condition of the Business and Value of the Assets**

21.    In recent years, the Company sold approximately 140,000 tons of scrap annually to a variety of customers which generated annual sales of approximately $330 million. In the eight months ended August 31, 2013, the Company sold approximately 73,000 tons of scrap and generated revenues of approximately $142 million.

22.    As of the Petition Date, the Company has approximately $5.5 million in cash.

23.    As of the Petition Date, the Company has accounts receivable of approximately $5.3 million (the "**Outstanding Accounts Receivable**"). Due to strong management and collection efforts, the Company has not had a bad debt write-off in the past 10 years. Approximately 2% of the accounts receivable are subject to offsets or other contras. Accordingly, based on historical collections, the Company is likely to collect more than 95% of the Outstanding Accounts Receivable.

24.    As of the Petition Date, Keywell owns approximately $5.3 million of inventory (the "**Keywell Inventory**"), consisting of:

    a.    Stainless steel scrap;

    b.    HTA and titanium scrap; and

    c.    Other metal scrap.

25.    Approximately $500,000 of the Keywell Inventory is obsolete, tainted or otherwise not saleable in the ordinary course of business and will likely be sold for considerably less than its purchase price.  Approximately $3.5 million of Keywell Inventory is stainless steel scrap awaiting melting at or near the Company's largest customers pursuant to existing contracts. In addition, approximately $1.1 million of Keywell Inventory is HTA and titanium scrap awaiting final processing and shipment to or use by customers pursuant to existing contracts. The Company expects to generate gross revenue of approximately $5.3 million from the sale of all Keywell Inventory (including the obsolete, tainted or not saleable inventory discussed above) and incur related disposition costs estimated to be between $100,000 and $150,000.   If the Keywell Inventory was liquidated in bulk or outside the existing contracts, I believe the net revenues would be substantially less than $5.1 million.

26.    As of the Petition Date, the Company had property, plant and equipment with an aggregate net book value of approximately $16 million.   The estimated market value of these assets will be determined as the Company proceeds through the Chapter 11 process.

F.    **Financing and Other Indebtedness Prior to the Chapter 11 Case**

1.    **Payment in Full of Secured Debt of Bank of America, N.A.**

27.    Prior to the Petition Date, Keywell had entered into a series of secured financing transactions with Bank of America, N.A. ("**BOA**").  In addition to various term notes issued over the last ten years to finance, among other things, general operations and equipment acquisitions, Keywell had a revolving line of credit with BOA secured by a lien on substantially all of the assets of the Company (collectively, with the term notes and all other prepetition agreements and instruments between BOA and the Company, the **"BOA Loan Documents"**).

28.     As of March 15, 2013, the total revolver commitment to BOA was $55 million, with an outstanding balance of $30,270,882 (the **"BOA Indebtedness"**).

29.     While Keywell delivered audited financial statements to BOA for 2009, 2010 and 2011, the Company was unable to timely deliver audited financial statements for 2012, leading BOA to declare a default on or about April 8, 2013.  Thereafter, Keywell worked closely with BOA in order to pay down the BOA Indebtedness.

30.     The BOA Indebtedness was paid in full on or about August 22, 2013.

**2.      Secured Indebtedness of the Lenders**

31.     On or about March 20, 2009, Keywell issued a $3.5 million convertible subordinated secured promissory note (the "**NewKey Loan**") to NewKey, which is controlled by certain shareholders and officers of the Company. The NewKey Loan includes a continuing and unconditional security interest in property of the Company pursuant to that certain Security Agreement dated as of March 20, 2009 (collectively, the "**NewKey Loan Documents**").  The NewKey Loan had an original maturity date of March 20, 2011 that was extended to June 20, 2015.[3]

32.     On or about October 18, 2011, Keywell issued an additional $5 million convertible subordinated secured promissory note (the "**NewKey II Loan**," and together with the NewKey Loan, the "**Prepetition Loans**") to NewKey II, which is controlled by certain shareholders and officers of the Company.  The NewKey II Loan includes a continuing and unconditional security interest in property of the Company pursuant to that certain Security

---

[3] The extension of the NewKey Loan is evidenced by, *inter alia*, that certain Second Amended and Restated 12% Subordinated Secured Convertible Promissory Note dated November 21, 2011 in the principal amount of $3,500,000, which note is secured by, among other things, a grant of a continuing and unconditional security interest in and to property of the Company pursuant to that certain Amended and Restated Security Agreement dated as of November 21, 2011.

Agreement dated as of October 18, 2011 (the "**NewKey II Loan Documents**," and together with the NewKey Loan Documents, the "**Prepetition Loan Documents**"). The NewKey II Loan had an original maturity date of October 18, 2013 that was later extended to October 18, 2015.[4]

33.     Of the $8,500,000 in aggregate proceeds from the Prepetition Loans: (a) approximately $1.5 million of the NewKey Loan proceeds were used to purchase the 24-acre vacant parcel in Monroe mentioned in Paragraph 15 above, for a future expansion of the Company's HTA and titanium business; (b) approximately $2 million of the NewKey Loan proceeds were used by Keywell in March 2009 to pay down the then-existing senior indebtedness to BOA and to secure a waiver from BOA on a then-existing default under the BOA Loan Documents; and (c) approximately $5 million in NewKey II Loan proceeds were used to pay down the then-existing senior indebtedness to BOA.

34.     On or about August 28, 2013, Keywell received letters from each of the Lenders notifying Keywell of certain defaults under the Prepetition Loan Documents and demanding payment from the Company.

35.     As of September 22, 2013, the outstanding balance owed by Keywell to NewKey under the NewKey Loan Documents was $4,538,177.23, plus attorneys' fees, with interest continuing to accrue at a per diem rate of $2,333.33, and the outstanding balance owed by Keywell to NewKey II under the NewKey II Loan Documents was $5,920,000.00, plus attorneys' fees, with interest continuing to accrue at a per diem rate of $3,333.33 (collectively, the "**Prepetition Indebtedness**").

---

[4] The extension of the NewKey II Loan is evidenced by, *inter alia*, that certain Amended and Restated 12% Junior Subordinated Secured Convertible Promissory Note dated November 21, 2011 in the principal amount of $5,000,000, which note is secured by, among other things, a grant of a continuing and unconditional security interest in property of the Company pursuant to that certain Amended and Restated Security Agreement dated as of November 21, 2011.

36.    The security interests granted to the Lenders were originally junior to the BOA Indebtedness.  Upon payment in full of the BOA Indebtedness, the Lenders' security interests in Company assets assumed first- and second-priority positions to secure the Prepetition Indebtedness (the "**Prepetition Security Interests**").

37.    The Prepetition Security Interests cover a substantial portion of Keywell's assets and property (the "**Prepetition Collateral**")[5], which would include any "cash collateral" as that term is defined in Section 363(a) of the Code (the "**Cash Collateral**").

### 3.    Other Secured Indebtedness

38.    In addition to the secured indebtedness with the Lender, Keywell has the following other secured indebtedness:

| SECURED CREDITOR | COLLATERAL |
| --- | --- |
| PNC Bank, N.A. | 114 rail cars |
| PNC Equipment Finance LLC | Hydraulic baler, vapor degreaser and titanium cobbler |
| Wells Fargo Equipment Finance, Inc. | Two lift trucks |
| Banc of America Leasing & Capital, LLC | 93 rail cars |

### 4.    Unsecured Indebtedness

39.    Keywell has a network of more than 1,000 regular suppliers, including regional and local recycling yards, industrial plants, governmental agencies, and large mills.  All told, Keywell currently has approximately 550 trade and other creditors with general unsecured claims

---

[5] It has not yet been determined whether the Lenders have perfected security interests in rail cars owned by the Company.

totaling approximately $28,000,000, subject to the resolution of claims for leases and executory contracts.

### 5.    Executory Contracts and Unexpired Leases

40.    In addition to the leased Keywell Facilities described above, the Company also leases or owns a fleet of 400 high-capacity rail cars used to transport the majority of its stainless steel scrap metal orders to customers, as well as various heavy-equipment leases used for processing and handling scrap metal.[6]

### G.    Events Leading to the Chapter 11 Case

41.    Given the cyclicality of metal markets and the current depressed state of the global economy, the recycling industry and the Company are experiencing historic lows in demand, volume and price.

42.    Demand for Keywell's recycled materials is driven by a broad range of industries. Titanium and HTA demand is driven primarily by the commercial aerospace and power generation industries, and secondarily from defense, chemical processing, oil and gas, and medical industries. Stainless steel demand is largely driven by an even wider range of industries, including household goods, food production, chemical processing, and oil and gas, with additional demand from the automotive, communications equipment, commercial aerospace, computers, construction, electronics, machine and cutting tools, marine, mining, office equipment, power generation, and rail and transportation industries.

43.    With the collapse of the financial markets in 2008, uncertainty in the marketplace reigned and capital spending froze. This had a direct effect on many of Keywell's largest

---

[6] Keywell's management and counsel are in the process of analyzing the Company's various contracts for use of railcars and other equipment to determine if they are true leases or secured financing agreements under the Uniform Commercial Code, and the references herein to "leases" or "secured financing" are not intended as a legal determination by the Company.

customers. Consequently, the Company's shipments dropped from an annual rate of 214,000 tons through May 2008 to an annual rate of 129,000 tons for the last seven months of 2008, remaining at that reduced shipment rate throughout 2009.

44.   Exacerbating the financial downturn for scrap processors such as Keywell was a sharp drop in the price of nickel. About 65% of the nickel consumed in North America is used to make stainless steel. Keywell's performance is directly impacted by the price of stainless steel scrap, which is largely correlated to the price of nickel. Nickel is the predominant value component in the production of stainless steel. The price of nickel increased from $2.10 per pound in 1998 to more than $23.00 per pound in May 2007. In 2008, however, nickel prices dropped dramatically, finishing the year at an average of $4.39 per pound as the financial markets went into extreme stress. This roller coaster rise and fall in the price of nickel combined with the near elimination of all demand to generate operating losses of approximately $30 million during the last seven months of 2008. While prices have risen somewhat since then, nickel values are nowhere near the previous highs from 2007; the current trading range is approximately $6.25-$6.75 per pound.

45.   After the disastrous plunge of 2008 and 2009, Keywell's business appeared to recover, albeit slowly and unevenly. The Company believed the duration of the market downturn would follow that of prior economic recessions – no more than 24 months. As a result, Keywell began making plans for what it hoped would be a strong economic recovery and it appeared that a recovery was beginning. Average nickel prices rose in 2010 to $9.89 per pound and in 2011 to $10.40 per pound; however, fourth quarter 2011 prices declined to an average of $8.30 per pound. Nickel prices stayed in a tighter band in 2012, averaging $7.95 per pound for the year.

46.    Company shipments averaged a modest 143,000 tons in the 2010 to 2012 period, a 33% reduction from historic norms and continued to decline slightly each year during the period. Capital expenditures totaled $8.1 million in these three years, $2.7 million of which was for the Company's expansion of its then-existing California facility. Still in anticipation of the economic recovery, at the beginning of this period, additional employees were added and overtime was incurred as expansion, start-up issues and irregular customer orders made planning challenging.

47.    The Company's plans for additional investments in growth opportunities in the Asian market from a new stainless facility in California and additional HTA and titanium processing capacity in New York and North Carolina were proceeding.  Ongoing repairs to old equipment, reduced material margins caused by fluctuating prices, higher supply costs related to the titanium and HTA business, and additional rent from new facilities in California, New York and North Carolina, all contributed to depress the Company's bottom line in 2011 and 2012; but the anticipation of a robust economic recovery after the Presidential election was still present. Based on this climate and bullish forecasts from the Company's key customers, Keywell believed the first quarter of 2013 would definitely be the beginning of the recovery.  Nickel prices even rose in December 2012 in what appeared to be an expectation of improving demand.

48.    Then, in 2013, nickel prices started the year relatively steady, only to fall to approximately $6.25 per pound in July, representing a 21.4% decline from the average price of $7.95 per pound in 2012. Operating results in the first quarter were quite weak, contrary to prior years and the customers' strong projections.  The Company's judgment at that time was that the usual beginning-of-the-year volume increase was just being pushed into the second quarter. Unfortunately, no increase was to come, as all of the Company's customers extended deliveries

to later in the year. Keywell's 2013 sales volume dropped by 27.8% to 73,000 tons through the end of August compared to 101,000 tons over the same period in 2012, spread across all of the Company's customers. Especially damaging to Keywell's financial situation was the delivery delays at the Company's largest stainless steel customers, where loaded rail cars of material sat ready for melting for extended periods. Significant operating losses ensued as no economic recovery materialized even after 4+ years of a downturn. Sales were not sufficient to support the Company's strategic plans and resulting cost structure.

49.    As noted in Section H below, at this time efforts increased to find investors for Keywell's business. The Company then implemented the first of several significant cost reduction measures, including the layoff of salaried and hourly employees from late June through early August that would save over $1.5 million in annual costs. In addition, the Company sold excess rail cars from its fleet, generating $557,000 of additional operating funds. As sales continued to slow, dropping from 6,900 tons in July to 4,500 tons in August, the prospects for near-term sales improvements dimmed dramatically. Keywell took additional actions to reduce its costs by more than $3.9 million annually, laying off employees and closing facilities from late August through mid-September. Despite the Company's attempts to save its business, the lack of volume was too much for Keywell to overcome, resulting in efforts to maximize the value of the Company's assets by a sale as a going concern and the filing of the Chapter 11 Case.

H.    **The Company Seeks Financing, Investors and/or Buyers**

50.    While Keywell had been reaching out informally to prospective lenders, investors, and financial buyers prior to its default to BOA in April 2013, the Company decided that more formal and aggressive efforts were required.

51.    On May 1, 2013, Keywell retained the services of Eureka Capital Markets, LLC ("**Eureka**"), an investment banker with extensive expertise in the metals and metal services industry, in order to ramp up prior efforts to locate funding for the Company, as well as to undertake an extensive, international effort to solicit prospective purchasers of some or all of the Company's business. Since 2007, Eureka has, from time to time, advised Keywell on its options for strategic growth and debt restructuring. Given Eureka's familiarity with Keywell's business, Keywell determined that retaining Eureka ensured that the marketing campaign could commence immediately, without the need for an investment banker to "get up to speed" with respect to Keywell's operations or the scrap metal industry.

### 1.    Prospective Financial Buyers and Capital Sources

52.    Under Keywell's direction, Eureka immediately began the process of seeking investment capital and/or a strategic disposition by targeting a select group of financial investors focused on distressed investments. By the second week of May 2013, Eureka and the Company had:

    a.    Set up an online data room and populated it with documents provided by Keywell to facilitate investor due diligence. New and/or updated documents were uploaded to the data room as they became available.

    b.    Drafted a short business description – a "Teaser" – and obtained a non-disclosure agreement ("**NDA**") from the Company. Eureka also updated the Confidential Information Memorandum ("**CIM**") prepared by the Company.

    c.    Reached out to 36 financial investors, including 28 during the week of May 6, and 8 additional investors later in the sale process. Eureka followed up with calls to confirm receipt of NDAs and Teasers and to gauge the interest of the prospective investors.

53.    By the end of the third week in May, eleven (11) potential financial parties executed NDAs.  Nine (9) additional NDAs were executed thereafter.  CIMs and financial projections prepared by Keywell were provided to financial parties upon execution of the NDA.

54.    During the last week of May through the first week of June, a financial party ("**Inquirer A**") expressed interest in making an equity investment in Keywell.  Eureka arranged a meeting between Inquirer A and Keywell to discuss the Company's business, outlook and the proposed transaction.  On May 29, Inquirer A submitted a Letter of Intent ("**LOI**") outlining proposed financing for the Company's recapitalization.   The prospective party was granted access to the Company's data room.  On June 6, 2013, Keywell submitted a response to Inquirer A's LOI.  Upon further due diligence and after further negotiations, Inquirer A informed Eureka on June 18, 2013 that it had decided not to proceed.

55.    On June 19, 2013, Eureka received an Indication of Interest from another financial party ("**Inquirer B**") to sponsor Keywell through a plan of reorganization pursuant to Chapter 11.  Eureka arranged a call with Keywell and granted Inquirer B access to the data room. Upon further due diligence, Inquirer B decided not to proceed.

56.    During the last week of July and first two weeks of August, access to the Company's data room was granted to two additional financial parties, but neither prospective party decided to pursue a potential purchase any further.

57.    In total, Eureka contacted thirty-six (36) financial parties, of whom twenty (20) signed NDAs and reviewed the CIMs, four (4) of whom were granted data room access, and two (2) of whom submitted indications of interest and conducted further due diligence, after which they decided not to proceed with an equity infusion or other transaction.

### 2.   Prospective Strategic Buyers and Investors and Stalking Horse Negotiations

58.   Beginning the week of May 20, 2013, under Keywell's direction, Eureka expanded its marketing efforts to seek strategic investors for Keywell's business.

59.   Eureka researched and identified sixty-four (64) potential strategic buyers/investors involved in the metal recycling, stainless steel manufacturing or other related industries, including twenty-nine (29) headquartered in the U.S. or Canada, seventeen (17) in Europe, sixteen (16) in Asia, and two (2) in Australia. Eight (8) additional strategic buyers/investors, including seven (7) in the U.S. and one (1) in Asia, were contacted later in the process.

60.   Eureka followed up with calls to potential strategic buyers/investors to confirm receipt of the NDAs and Teasers and to gauge their interest. Eureka's Mandarin-speaking employee followed up with companies in Asia.

61.   On July 2, 2013, Cronimet Holdings, Inc. (or its designee, "**Cronimet**") submitted an LOI to acquire substantially all of Keywell's assets. Subsequently, Cronimet was granted data room access to facilitate further due diligence, and various conference calls were held between Keywell, Cronimet, their respective counsel, and Eureka.

62.   From May through July, 2013, the Company was in contact with senior executives of a strategic investor involved in the stainless steel, HTA and titanium industry ("**Inquirer C**") concerning a potential investment. On July 30, in a call between the Company and Inquirer C's chief financial officer and other officers, Inquirer C informed the Company it was unable to pursue an investment in Keywell at that time.

63.   On August 2, Eureka received an Indication of Interest from a strategic buyer ("**Inquirer D**") to purchase the Frewsburg and Falconer facilities in New York, and the Monroe

and Indian Trail facilities in North Carolina. Inquirer D was granted data room access to facilitate further due diligence. On August 14, Inquirer D submitted a revised Indication of Interest to purchase Keywell's Falconer facility and the facilities in Monroe and Indian Trail. Various follow-up conversations were held with Inquirer D's management and attorneys to discuss the next steps in the sale process.

64.    After extensive negotiations between Keywell and Cronimet, a Memorandum of Understanding ("**MOU**") was signed by the parties on August 12, 2013 to purchase a substantial portion of Keywell's assets.

65.    During the last week of August and the first week of September and again during the third week of September, Inquirer D toured Keywell's facilities in Frewsburg, Falconer, and Monroe. On September 3, Inquirer D met with Edward J. Newman. Keywell's Executive Vice President for Titanium & HTA Commercial. Keywell responded to various due diligence inquiries of Inquirer D. Keywell is hopeful that Inquirer D will participate in the Section 363 sale process.

66.    Keywell, its counsel, and Eureka conducted extensive negotiations with Cronimet as a potential stalking horse bid for a substantial portion of the Company's assets, which eventually led to Keywell's execution, subject to Court approval, of the following agreements dated September 21, 2013: (a) Asset Purchase Agreement; (b) Rail Car Asset Purchase Agreement; and (c) Term Sheet for Contingent Payments Agreement (collectively, the "**Stalking Horse Offer**").[7]

---

[7] While Keywell and Cronimet entered into three separate contracts at Cronimet's request, they are mutually interdependent and are therefore considered by the parties to represent a single, integrated transaction.

67.     In total, Eureka contacted seventy-two (72) strategic buyers/investors, of whom eight (8) executed NDAs and reviewed CIMs, four (4) of whom were granted data room access, and two (2) of whom submitted serious indications of interest.

### I.     The Filing of the Chapter 11 Case

68.     As a condition of the Stalking Horse Offer, Keywell filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this District on September 24, 2013.  Subsequent thereto, Keywell has continued to manage and operate its business and affairs as a debtor in possession under the supervision of this Court pursuant to Sections 1107 and 1108 of the Code.

69.     Keywell has been preparing, and continues to prepare, for the sale of a substantial portion of its assets to Cronimet in order to maximize the recovery for the Company's creditors. In order to enable Keywell to operate effectively and to avoid the adverse effects that the Chapter 11 Case might otherwise have on its business while it undertakes the sale process, Keywell has requested various types of relief in the First-Day Motions filed with this Court on the Petition Date.

### II.     FIRST-DAY MOTIONS

70.     A critical element in Keywell's attempt to maximize the benefit to its creditors and to realize the highest and best price for the sale of its assets is approval of each of Keywell's First-Day Motions submitted concurrently herewith.  In furtherance of these objectives, Keywell respectfully requests that "first-day" orders of the types mentioned below be entered.  Factual information in support of such first-day orders is provided below and in the First-Day Motions filed concurrently herewith.

A.      **Cash Collateral**

71.    I understand and believe that the description of the financing arrangements and current indebtedness to the Lenders discussed herein and in the relevant motion is accurate.

72.    As explained above, under the Prepetition Loan Documents, Keywell's Prepetition Indebtedness is approximately $10.5 million as of September 22, 2013.

73.    With the exception of certain liens in connection with financing of specific rail cars and other equipment, and the possible exception of rail cars owned by the Company, the Lenders' Prepetition Security Interests cover the Company's assets and property, which would include any "cash collateral" as that term is defined in Section 363(a) of the Code.

74.    Keywell continues to serve its HTA and titanium customers from its Frewsburg, Falconer, Monroe and Indian Trail facilities.  In addition, the Company continues to serve its stainless steel customers from its West Mifflin facility.  If Keywell's use of the Lenders' Cash Collateral were to be abruptly discontinued, its operations would be severely disrupted, and it would be unable to pay operating expenses and unable to operate its business in an orderly manner, thereby severely impairing its ability to operate as a going concern, collect its accounts receivable, process and sell its inventory and maximize the value of its other assets in a sale. Accordingly, I believe that Keywell and its estate will suffer immediate and irreparable harm unless the Company is immediately authorized to use the Cash Collateral on an interim basis pursuant to the terms and conditions set forth in the proposed Cash Collateral Order.

75.    Respective counsel to the Lenders and Keywell conducted lengthy, good faith negotiations with respect to the terms and conditions of the Cash Collateral Order and the interim budget attached thereto (the "**Budget**").  Joel Tauber, a co-manager and co-owner of the managing entity for the Lenders, worked with the Lenders' counsel in negotiating terms with

Keywell's counsel.  The provisions of the Cash Collateral Order have been negotiated at arms' length and in good faith.  In addition, I believe the provisions of the Cash Collateral Order are fair and reasonable under the circumstances.

### B. Cash Management

76.    Keywell's cash management system is managed by responsible individuals under my direction at the Headquarters in Chicago.  Through utilization of the cash management system, Keywell is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect collection, disbursement, and movement of cash.  I believe that the movement of funds through the Company's cash management system as described herein and in the relevant motion is accurate.

77.    As part of its cash management system, the Company has established disbursement and deposit accounts in the operation of its business (the **"Bank Accounts"**).  All Bank Accounts are maintained at BOA.

78.    I believe that the Bank Accounts constitute an integral component of Keywell's operations, and that Keywell should seek a waiver of the United States Trustee's requirement that such accounts be closed and that new postpetition bank accounts be opened.  If enforced, I believe the requirement will cause unnecessary disruption to Keywell's ability to maximize the value of its estate.  If such relief is not granted, Keywell will suffer significant harm resulting from the termination of the present system and the inherent delay in establishing postpetition systems and procedures governing the use and application of Company funds.  In addition, because of Keywell's integrated financial structure, it would not be possible to establish a new

system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the bankruptcy estate.

79.     To protect against inadvertent payment of prepetition claims, Keywell's personnel and the personnel at BOA with whom Keywell customarily deals will be instructed how to distinguish readily between prepetition and postpetition obligations without closing existing accounts and opening new ones.  To ease the task of distinguishing between prepetition date and postpetition date checks, I believe that Keywell will be able to: (i) leave a "gap" in its check numbers such that check numbers preceding the gap will be readily identifiable as prepetition checks and the check numbers following the gap will be readily identifiable as postpetition checks; or (ii) otherwise utilize its existing software to implement a monitoring system which has the same effect.

80.     I believe that due to the nature and scope of Keywell's business and the numerous suppliers of goods and services and others with whom Keywell transacts business, the Company must also seek authority to continue its use of existing business forms, correspondence and checks without alteration or change.  Changing correspondence and business forms would be unnecessary, would be burdensome to Keywell's estate, would result in undue expense and would be disruptive to the Company's ongoing business operations.

81.     If Keywell is not permitted to continue to use its existing business forms, the resulting prejudice will include significant delay in the administration of Keywell's business operations and the imposition of an unnecessary cost to Keywell's estate to print new business forms.

82.     Similarly, Keywell must seek authority to continue to use its existing books and records to minimize expense to the estate.  I believe that opening new books and records would

be burdensome to the estate and disruptive to Keywell's business operations. Keywell has fully-functioning systems that thoroughly and accurately account for all cash and track the Company's financial performance. Changing the current system would be costly and would greatly increase the potential for error.

C.     **Prepetition Wages, Benefits and Insurance Coverage**

83.     I understand and believe that the description of the prepetition wage claims, benefits and related employee obligations discussed herein and further set forth in detail in the relevant motion is accurate.

84.     There exists a critical need for Keywell immediately to pay certain prepetition wage claims of the Company's Employees, including outstanding wages and wage-related benefits, all related withholdings and taxes, accrued reimbursable business expenses and prepetition claims arising in connection with the Company's employee health, disability, and life insurance (collectively, the "**Prepetition Employee Obligations**"). The satisfaction of these Prepetition Employee Obligations is critical to the Company's ability to retain qualified employees to continue to operate its business for the benefit of the creditors and other interested parties in this Chapter 11 Case. As noted above, as of the Petition Date, Keywell employs 119 employees, 43 of which are union employees covered by the Collective Bargaining Agreements.

85.     In total, as of the Petition Date, there was approximately $92,000 of Prepetition Wage Claims owing to the Employees, approximately $10,300 in employer and employee federal, state and local withholding and payroll-related taxes relating to prepetition periods, and approximately $6,000 in reimbursable business expenses incurred prepetition. The total amount of the Prepetition Employee Obligations, inclusive of the Prepetition Wage Claims, is

approximately $125,400. These estimated amounts are included in anticipated disbursements allocated in the Budget, which is an exhibit to the Cash Collateral Order.

86.    In addition, medical and dental premiums and claim payments, short-term disability insurance premiums, long-term disability insurance premiums, group life insurance premiums and approved short-term disability claims (collectively, the **"Insurance Premiums and Claims"**) are due by October 1, 2013 and periodically thereafter. The estimated Insurance Premiums and Claims are included in anticipated disbursements allocated in the Budget. Keywell intends to maintain the medical and dental, disability, and life insurance coverage for its Employees during the pendency of this Chapter 11 Case. Keywell believes that the payment of the foregoing sums is critical to retaining its Employees in order to maintain the Company's going concern value as it undertakes the marketing and sale of its assets in this Chapter 11 Case.

87.    No Employees are owed in excess of the $12,475 limits provided under Sections 507(a)(4)-(5) of the Code.

## III.    PROPOSED ASSET SALE AND RETENTION OF INVESTMENT BANKER

### A.    Asset Sale and Bidding Procedures

88.    As described above, Keywell has been unable to obtain alternative sources of working capital from conventional lenders or otherwise attract investors in its present condition. Without such capital, and given the competition in Keywell's industry, the Company is faced with the likely and imminent erosion of its valuable customer base and the almost certain deterioration of the going concern value of its business and assets. After evaluating various strategic alternatives, Keywell has concluded that the best mechanism for maximizing the value of the assets is through a sale on a going concern basis pursuant to Section 363 of the Code.

89.     With the help of its investment banker, Eureka, and its prepetition counsel, the Company has considered a wide array of options for possibly selling its assets.  Keywell believes that the Stalking Horse Offer by Cronimet is the highest and best offer to purchase the subject assets received to date and provides the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of current purchase price and establishing a market for a public auction).

90.     The Stalking Horse Offer is subject to the approval of this Court and the submission of higher and better offers and is conditioned in part upon Cronimet receiving certain bid protections, all as more fully described in the relevant motion to approve the sale process, bidding procedures, public auction and assumption and assignment of executory contracts, which the Company is filing shortly after the First-Day Motions.

91.     Subject to the approval of this Court, Keywell has continued, and will continue, to market its assets and business through Eureka in an effort to solicit further interest from other strategic and financial buyers and investors pursuant to the bidding process described in the relevant motion.

92.     I believe that exigent circumstances warrant the sale of Keywell's assets and business as a going concern on an expedited basis pursuant to the proposed bidding process. A sale of Keywell's assets pursuant to Section 363 of the Code appears to be the best mechanism to maximize the value of Keywell's estate and the distribution to creditors in this Chapter 11 Case. As prospective purchasers are likely to pay the highest purchase price for the subject assets if they can benefit from the continuation of Keywell's highly valuable workforce, customer relationships and pending and upcoming customer orders, I believe that it is therefore essential to offer the subject assets for sale promptly as a going concern.

**B.**      **Retention of Eureka to Maximize Value and Facilitate the Sale Process**

93.      Keywell has selected Eureka as its investment bankers in the Chapter 11 Case. As detailed above, Eureka has provided substantive and beneficial services to the Company prior to the Petition Date and is very familiar with its business operations.

94.      The resources, capabilities and experience of Eureka in advising the Company has been essential during the months leading to the Petition Date and will continue to be crucial to the success of the Company's negotiations for the sale of its assets and the Chapter 11 Case. An experienced investment banking firm such as Eureka fulfills a critical service that complements the services provided by the Company's other professionals. As will be discussed in further detail in the relevant motion, Eureka will concentrate on the marketing of Keywell's business as a going concern to interested parties in an effort to secure a buyer and effectuate a Section 363 sale. For the aforementioned reasons, the Company requires the services of a capable and experienced investment banker such as Eureka.

95.      I believe that Eureka already has substantial familiarity and experience with Keywell's assets and business operations as set forth above and in the motion. Eureka has extensive experience in the metals and metal services industry as well as experience in Chapter 11 cases. They are therefore well qualified to aid Keywell in this Chapter 11 Case. Eureka should be retained to assist Keywell in all aspects surrounding the sale of Keywell's assets and business consistent with the Company's powers and duties as debtor in possession.

96.      Given the time it may take to establish and approve a sale process, and in light of the Company's current financial pressures and its desire to maximize the value of its estate, the retention of Eureka is critical to ensure that Eureka has ample opportunity to continue to aggressively market the Company's business to prospective purchasers. While Eureka continues

with marketing efforts initiated prepetition and described in more detail above, Eureka's formal retention at the beginning of the Chapter 11 Case will be critical to ensuring that Keywell secures the highest and best sale price possible, which will ultimately benefit the Company's estate and its creditors.

## IV.   RETENTION MOTIONS FOR KEYWELL'S OTHER PROFESSIONALS

97.     In addition to the First-Day Motions and sale-related motions, Keywell will be requesting the appointment of various other professionals to aid in the administration of the Chapter 11 Case.   I believe the retention of these professionals is essential to a successful Chapter 11 Case and to Keywell's ability to maximize the value of its estate for the benefit of its creditors.

### A.     Adelman & Gettleman, Ltd.

98.     Keywell has selected the law firm of Adelman & Gettleman, Ltd. as its insolvency and restructuring counsel in the Chapter 11 Case.   Prior to the Chapter 11 Case, Keywell retained Adelman & Gettleman to assist the Company in analyzing its alternatives and effectuating a course of action to address the Company's financial difficulties.   I believe the continued representation of Keywell by Adelman & Gettleman is critical to the success of the Chapter 11 Case because, among other things, the firm is familiar with the Company's business and legal affairs leading into the Chapter 11 Case.

99.     Keywell selected Adelman & Gettleman as its attorneys because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Code, and now comprehensive experience with and knowledge of Keywell and its business and the goals of the Chapter 11 Case.   Accordingly, I

believe Keywell should seek to retain Adelman & Gettleman under a general retainer for their professional counseling and legal services in connection with the Chapter 11 Case.

**B.      Patzik, Frank & Samotny Ltd.**

100.    Keywell has selected the firm of Patzik, Frank & Samotny Ltd. to serve as special counsel for a variety of legal issues.  Patzik, Frank & Samotny is very familiar with Keywell's business and legal affairs, having provided a broad array of legal services to the Company since 1995.  Patzik, Frank & Samotny is familiar with various outstanding and continuing legal issues involving, among other things, corporate, tax, real estate and employment matters (collectively, the "**Special Counsel Matters**"), and has been involved with the active negotiations with Cronimet on behalf of Keywell, during the months leading up to the Petition Date.

101.    I believe that Patzik, Frank & Samotny has considerable experience in connection with the Special Counsel Matters, and that accordingly, Keywell should seek to retain the firm to represent it in connection therewith.

**C.      Conway MacKenzie**

102.    Keywell has selected Conway MacKenzie as its financial advisors in the Chapter 11 Case.  Conway MacKenzie has provided substantive and beneficial services to the Company for over eighteen months prior to the Petition Date, and is very familiar with its business operations.

103.    Conway MacKenzie was first retained by Keywell in February 2012.  Since then, Conway MacKenzie has assisted Keywell with analyzing cash flow and providing other crisis management services.  Conway MacKenzie also advised the Company with respect to various restructuring options and initiatives, creditor recoveries and financial planning. An experienced

financial consulting firm such as Conway MacKenzie fulfills a critical service that complements the services provided by the Company's employees and other professionals.

104.   As discussed further in the relevant motion, Conway MacKenzie will concentrate its efforts on assisting and guiding Keywell with the preparation of, among other things, cash flow budgeting and management, the analysis of creditor recoveries, the analysis of certain preference actions and other financial planning services as deemed appropriate by the Company's management.   In addition to assisting Keywell with preparation of the numerous exhibits required as part of the First-Day Motions, Conway MacKenzie has assisted and will continue to assist Keywell during the Chapter 11 Case in preparing the Company's bankruptcy schedules and statement of financial affairs ("**SOFA**").   Keywell's bankruptcy schedules and SOFA are detailed and complex, requiring the expertise, familiarity and resources of Conway MacKenzie in preparing such documents in a timely and cost-efficient manner.

105.   I believe that Conway MacKenzie already has substantial familiarity and experience with Keywell's assets and business operations as set forth above and in the motion. Therefore, said financial advisors, who have had considerable experience in Chapter 11 cases as well as corporate and commercial matters, are well qualified to aid it in this Chapter 11 Case.

## V.   CONCLUSION

106.   In order to minimize any loss to the value of Keywell's business and to maximize the benefit to the Company's creditors and estate, the Company's immediate objective is to engage in business as usual following the commencement of the Chapter 11 Case, with as little interruption to its operations as possible.   This will allow Keywell to increase the amount and quality of offers to acquire a substantial portion or substantially all of the Company's assets as a going concern.   I believe that if the Court grants the relief requested in each of the First-Day

Motions and other motions to follow, the prospect for achieving these objectives will be significantly enhanced.

Dated: _9-24-13_


J. MARK LOZIER