## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KEYWELL L.L.C., | ) | Case No. 13-37603 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |
| | ) | Hearing Date: September 26, 2013 |
| | ) | Hearing Time: 9:30 a.m. |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on September 26, 2013 at 9:30 a.m., we shall appear before the Honorable Eugene R. Wedoff of the United States Bankruptcy Court, Northern District of Illinois, in Courtroom 744 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, and then and there present the **EMERGENCY MOTION OF DEBTOR FOR ENTRY OF ORDER AUTHORIZING USE OF CASH COLLATERAL AND FOR RELATED RELIEF**, a copy of which is hereby served upon you.

> HOWARD L ADELMAN, ESQ. (ARDC# 0015458)
> ERICH S. BUCK, ESQ. (ARDC #6274635)
> ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
> ADELMAN & GETTLEMAN, LTD.
> 53 West Jackson Blvd., Suite 1050
> Chicago, Illinois 60604
> Tel (312) 435-1050
> Fax (312) 435-1059
> **Proposed Counsel for Keywell L.L.C.**

### CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certify that true and correct copies of this notice and motion were served upon the parties listed on the service list attached hereto via ECF, hand delivery or overnight mail as indicated below, on September 24, 2013.

> By:  /s/ Howard L. Adelman

## SERVICE LIST

*U.S. Trustee – Via ECF*

**Patrick S Layng**
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604

*Secured Creditor – Via Overnight Delivery*

NewKey Group, LLC
NewKey Group II, LLC
c/o Gordon E. Gouveia, Esq.
Steven B. Towbin, Esq.
Shaw Fishman Glantz & Towbin LLC
321 N. Clark Street, Suite 800
Chicago, IL 60654

*Secured Creditor –*
*Via Overnight Delivery*

AFCO Premium Credit LLC
4501 College Boulevard
Suite 320
Leakwood, KS 66211

Banc of America Leasing &
Capital, LLC/B
125 Dupont Drive
Providence, RI 02907

Midwest Railcar Corporation
4949 Autumn Oaks Drive
Suite B
Maryville, IL 62062

Millis Industries Inc.
Attn: Robert Valchuis
1372 Main Street
Millis, MA 02054

PNC Bank, NA
One Financial Parkway
Kalamazoo, MI 49009

PNC Equipment Finance, LLC
4100 West 150th Street
Cleveland, OH 44135

Wells Fargo Equipment Finance, Inc.
1801 Parkview Drive
Shoreview, MN 55125

Wells Fargo Equipment Finance, Inc.
300 Tri-State International
Suite 400
Lincolnshire, IL 60069

*20 Largest Unsecured Creditors –*
*Via Overnight Delivery*

A&L Iron and Metal, Inc.
Attn: Bret Bandt
2000 Milbocker Road
Gaylord, MI 49735

AIM Ontario
Attn: Serge Thibault
75 Windermere Road
Hamilton, ON  L8H 3Y2
Canada

Caledonian Alloys Greenville
Attn: Sheila Biblis
99 Crestview Drive Extension
Transfer, PA 16154

Cinelli I & M Co.
Attn: Dave Barteck
290 Secaucus Road
Secaucus, NJ 70940

1

CMC Recycling
Attn: Donna Humphrey
6565 N. MacArthur Blvd., #800
Irving, TX 75039

Columbus Metal Industries
Attn: Sam Jacobs
3440 15th Street East
Columbus, NE 68601

DH Griffin Wrecking Co., Inc.
Attn: David Griffin
4716 Hilltop Road
Greensboro, NC 27407

FPT Cleveland
Attn: Greg Brock
8550 Aetna Road
Cleveland, OH 44105

Franklin Iron & Metal Corp.
Attn: Greg Clouse
1939 E. First Street
Dayton, OH 45403

John Zubick Limited
Attn: Matt Zubick
105 Clark Side Road
London, ON N5W 5C9
Canada

Joseph Freedman Co.
Attn: Ernie Gagnon
115 Stevens Street
Springfield, MA 11040

Loeb Metal Recycling Co.
Attn: John Morgan
Div. Loeb Industries Inc.
1111 S. Tenth Street, PO Box 229
Watertown, WI 53094

Mervis Industries
d/b/a Sol Tick & Company
Attn: Tom Faiender
1180 N. 22nd Street
Decatur, IL 62521

Newell Recycling of Atlanta Inc.
Attn: Tim Smallwood
1359 Central Avenue
East Point, GA 30344

Omnisource Corporation
Attn: Joseph Castellana
Stainless Steel and Allow Div.
7575 W. Jefferson Blvd.
Fort Wayne, IN 46804

SA Recycling
Attn: Bruce Kiezler
12428 Center Avenue
Southgate, CA 90280

Schnitzer Steel
Attn: Chris Yocom
906 Adamson Street
Atlanta, GA 30315

Schupan & Sons
Attn: Marc Rose
2619 Miller Road
Kalamozoo, MI 49001

SOS Metals Inc.
Attn: Sandy Shadrow
201 E. Gardena Blvd.
Gardena, CA 90248

Terrapin Metals Recycling LLC
Attn: Greg Rochlin
7600 Rolling Mill Road
Baltimore, MD 21224

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KEYWELL L.L.C., | ) | Case No. 13-37603 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |
| | ) | Hearing Date: September 26, 2013 |
| | ) | Hearing Time: 9:30 a.m. |

**EMERGENCY MOTION OF DEBTOR FOR ENTRY OF ORDER
AUTHORIZING USE OF CASH COLLATERAL AND FOR RELATED RELIEF**

NOW COMES, Keywell L.L.C. (the "**Debtor**"), an Illinois limited liability company, debtor and debtor in possession, by and through its undersigned counsel and pursuant to Sections 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.*, Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule of Bankruptcy Procedure 4001-2, with the consent of its secured lenders, NewKey Group, LLC ("**NewKey**") and NewKey Group II, LLC ("**NewKey II**" and together with NewKey, the "**Lenders**"), hereby moves this Court for entry of an order in the form filed herewith (together with attachment(s) thereto, the "**Cash Collateral Order**") authorizing the Debtor (1) to use cash collateral on an interim basis and after a final hearing to the extent necessary to operate the Debtor's business as a going concern and thereby maintain and preserve the Debtor's assets, and (2) to provide adequate protection to the Lenders to the extent the Lenders' prepetition liens and security interests encumber the cash collateral sought to be used (the "**Motion**"). In support of the Motion, the Debtor states as follows:

**I.      FED. R. BANKR. PROC. 4001(b)(1)(B) AND L.R. 4001-2 DISCLOSURES**

    1.      The following disclosures are made pursuant to Bankruptcy Rule 4001(b)(1)(B):

1

a.  The only entities that potentially have an interest in the cash collateral are the Lenders.

b.  The Debtor requires the use of the Lenders' cash collateral in order to continue its business operations and to maintain and preserve the going concern value of its assets pending new investment into the Debtor or a sale. Accordingly, pursuant to 11 U.S.C. § 363(c)(2)(B), the Debtor requests authority to use cash collateral in accordance with the provisions of the Cash Collateral Order to pay ongoing expenses incurred in the ordinary course of its business and associated with the maintenance and preservation of the Debtor's assets. These expenses include, without limitation, payroll, employee-related expenses, scrap metal, maintenance and shipping costs, supplies, lease expenses, taxes, and insurance.

c.  The material terms of the Debtor's use of cash collateral are set forth in the Cash Collateral Order and the budget attached thereto as Exhibit A (the "**Budget**"). The Debtor requests authority to use cash collateral for a duration of fourteen (14) days.

d.  Pursuant to 11 U.S.C. §§ 361 and 363(e), the Debtor requests authority to grant certain adequate protection to the Lenders on account of their prepetition liens and security interests.

2.  The following disclosures of certain terms contained the Cash Collateral Order are made pursuant to Local Bankruptcy Rule 4001-2(A)(2):

a.  The Cash Collateral Order does not contain any provisions that grant cross-collateralization protection (other than adequate protection) to the Lenders.

b.  The Cash Collateral Order contains findings of fact that bind the estate with respect to the validity, perfection or amount of the Lenders' prepetition liens or debts or the waiver of claims against the Lenders. The Order also contains findings of fact that the Debtor is unaware of any factual basis for the avoidance or subordination of the Lenders' prepetition liens. See Cash Collateral Order ¶¶ E, G & H. However, the Cash Collateral Order gives (i) the creditors' committee, if formed, sixty (60) days from the date of its formation, or (ii) parties in interest, if no committee is formed, seventy-five (75) days from entry of the Cash Collateral Order, to investigate and object to such matters. See id. ¶ 8.

c.  The Cash Collateral Order does not waive any rights the estate may have under 11 U.S.C. § 506(c).

d.  The Cash Collateral Order does not grant to the Lenders any liens on the Debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545,

2

547, 548 or 549 (the "**Avoidance Claims**").  The Final Order (defined below) would grant the Lenders liens on the Avoidance Claims to the extent the replacement liens do not adequately protect the Lenders from any diminution in value of the Lenders' interests in the Prepetition Collateral (defined below).

e.  The Cash Collateral Order does not deem the Lenders' respective prepetition secured debt to be postpetition debt or use postpetition loans from the Lenders to pay part or all of their respective prepetition debt, other than as provided in 11 U.S.C. § 552(b).

f.  The Cash Collateral Order does not provide for different treatment of professionals relative to one another or limit a committee counsel's use of a professional fee carve-out.

g.  The Cash Collateral Order does not prime any secured lien.  The priority of prior liens is preserved to the extent that they are valid and enforceable.

h.  The Cash Collateral Order does not contain a declaration that it does not impose lender liability on any secured creditor, including the Lenders.

i.  The Cash Collateral Order does not grant the Lenders expedited relief from the automatic stay, nor relief from the automatic stay without further order of the Court.

3.  Pursuant to Local Bankruptcy Rule 4001-(2)(A)(3) and (A)(4), and to the extent not otherwise described herein, the following is a summary of other essential provisions of the Cash Collateral Order:

a.  <u>Interim Use</u> – The Debtor seeks authority to use cash collateral on an interim basis from the Petition Date through and including October 10, 2013, subject to subsequent modification or extension by further order of the Court.  <u>See</u> Cash Collateral Order ¶ 2.

b.  <u>Protections</u> – The Lenders will receive replacement liens, commensurate with their respective priority positions, in the Postpetition Collateral (defined below) to secure the diminution in value of the Prepetition Collateral from the Petition Date to a date to be determined.  <u>See</u> Cash Collateral Order ¶ 3(a).

c.  <u>The Budget</u> – Subject to the terms and conditions of the Cash Collateral Order, the Debtor seeks authority to use the cash collateral in amounts not to exceed 103% of the amounts set forth in each line-item expenditure in Budget, provided, however, the Debtor may exceed such 3% line-item variance so long as, in the aggregate, payments under the Budget do not exceed 110% of the total Budget.  <u>See</u> Cash Collateral Order ¶ 2.

3

## II.   FACTUAL BACKGROUND

### A.   The Debtor's Chapter 11 Case

4.   On September 24, 2013 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Code**"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to operate its business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108 in the above-captioned case (the "**Chapter 11 Case**").

5.   There has not been a trustee or a committee of unsecured creditors appointed in the Chapter 11 Case.

6.   The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are Sections 361, 362 and 363 of the Code and Bankruptcy Rule 4001.

7.   In addition to obtaining the benefits of the automatic stay pursuant to 11 U.S.C. § 362, the Debtor believes that this Chapter 11 Case will provide it with the most efficient platform upon which to maximize the value of its assets as a going concern in order to sell those assets with the benefit of competitive bidding procedures, the protection afforded to potential buyers under 11 U.S.C. § 363, and the relief available under 11 U.S.C. § 365.

8.   The nature of the Debtor's business and the factual background relating to the Debtor's commencement of this Chapter 11 Case is set forth in detail in the *Certification and Statement of J. Mark Lozier in Support of Chapter 11 Petition and First-Day Motions* [Docket Entry No. 6] (the "**Lozier Declaration**") filed on the Petition Date and incorporated herein by reference.

**B.**      **The Loan Documents and Financing with the Lenders**

       **1.**      **Payment in Full of Secured Debt of Bank of America, N.A.**

     9.      Prior to the Petition Date, the Debtor had entered into a series of secured financing transactions with Bank of America, N.A. ("**BOA**"). In addition to various term notes issued over the last ten years to finance general operations, equipment acquisitions and shareholder distributions, the Debtor had a revolving line of credit with BOA secured by a lien on substantially all of the assets of the Debtor (collectively, with the term notes and all other prepetition agreements and instruments between BOA and the Debtor, the "**BOA Loan Documents**").

     10.      As of March 15, 2013, the total revolver commitment to BOA was $55 million, with an outstanding balance of $30,270,882 (the "**BOA Indebtedness**").

     11.      While the Debtor delivered audited financial statements to BOA for 2009, 2010 and 2011, the Company was unable to timely deliver audited financial statements for 2012, leading BOA to declare a default on or about April 8, 2013. Thereafter, the Debtor worked closely with BOA in order to pay down the BOA Indebtedness.

     12.      The BOA Indebtedness was paid in full on or about August 22, 2013.

       **2.**      **Secured Indebtedness of the Lenders.**

     13.      On or about March 20, 2009, the Debtor issued a $3.5 million convertible subordinated secured promissory note (the "**NewKey Loan**") to NewKey, which is controlled by certain shareholders and officers of the Debtor. The NewKey Loan includes a continuing and unconditional security interest in property of the Debtor pursuant to that certain Security Agreement dated as of March 20, 2009 (collectively, the "**NewKey Loan Documents**"). The

NewKey Loan had an original maturity date of March 20, 2011 that was extended to June 20, 2015.[1]

14.     On or about October 18, 2011, the Debtor issued an additional $5 million convertible subordinated secured promissory note (the "**NewKey II Loan**," and together with the NewKey Loan, the "**Prepetition Loans**") to NewKey II, which is controlled by certain shareholders and officers of the Debtor.   The NewKey II Loan includes a continuing and unconditional security interest in property of the Debtor pursuant to that certain Security Agreement dated as of October 18, 2011 (the "**NewKey II Loan Documents**," and together with the NewKey Loan Documents, the "**Prepetition Loan Documents**"[2]). The NewKey II Loan had an original maturity date of October 18, 2013 that was later extended to October 18, 2015.[3]

15.     Of the $8,500,000 in aggregate proceeds from the Prepetition Loans: (a) approximately $1.5 million of the NewKey Loan proceeds were used to purchase a 24-acre parcel in Monroe, North Carolina in March 2009 for a future expansion of the Debtor's high temperature alloy and titanium business; (b) approximately $2 million of the NewKey Loan proceeds were used by the Debtor in March 2009 to pay down the then-existing senior indebtedness to BOA and to secure a waiver from BOA on a then-existing default under the

---

[1] The extension of the NewKey Loan is evidenced by, *inter alia*, that certain Second Amended and Restated 12% Subordinated Secured Convertible Promissory Note dated November 21, 2011 in the principal amount of $3,500,000, which note is secured by, among other things, a grant of a continuing and unconditional security interest in property of the Debtor pursuant to that certain Amended and Restated Security Agreement dated as of November 21, 2011.

[2] A true and correct copy of the Prepetition Loan Documents and the financing statements filed in connection therewith are attached hereto as Exhibit 1 and incorporated herein by reference.

[3] The extension of the NewKey II Loan is evidenced by, *inter alia*, that certain Amended and Restated 12% Junior Subordinated Secured Convertible Promissory Note dated November 21, 2011 in the principal amount of $5,000,000, which note is secured by, among other things, a grant of a continuing and unconditional security interest in property of the Debtor pursuant to that certain Amended and Restated Security Agreement dated as of November 21, 2011.

BOA Loan Documents; and (c) approximately $5 million in NewKey II Loan proceeds were used to pay down the then-existing senior indebtedness to BOA.

16.    On August 28, 2013, the Lenders each sent letters to the Debtor providing notice of certain defaults under the Prepetition Loan Documents and demanding payment from the Debtor.

17.    As of September 22, 2013, the outstanding balance owed by the Debtor to NewKey under the NewKey Loan Documents was $4,538,177.23, plus attorneys' fees, with interest continuing to accrue at a per diem rate of $2,333.33, and the outstanding balance owed by the Debtor to NewKey II under the NewKey II Loan Documents was $5,920,000.00, plus attorneys' fees, with interest continuing to accrue at a per diem rate of $3,333.33 (collectively, the "**Prepetition Indebtedness**").

18.    The security interests granted to the Lenders were originally junior to the BOA Indebtedness.  Upon payment in full of the BOA Indebtedness, the Lenders' security interests in the Debtor's assets assumed first- and second-priority positions to secure the Prepetition Indebtedness (the "**Prepetition Security Interests**").

19.    The Prepetition Security Interests cover a substantial portion of the Debtor's assets and property (the "**Prepetition Collateral**")[4], which would include any "cash collateral" as that term is defined in Section 363(a) of the Code (the "**Cash Collateral**").

**C.    The Debtor's Objective(s) in the Chapter 11 Case**

20.    As explained in more detail in the Lozier Declaration, the Debtor has been unable to obtain alternative sources of working capital from conventional lenders or otherwise attract

---

[4] It has not yet been determined whether the Lenders have perfected security interests in rail cars owned by the Debtor.

investors in its present condition. Without such capital, and given the competition in the Debtor's industry, the Debtor is faced with the likely and imminent erosion of its valuable customer base and the almost certain deterioration of the going concern value of its business and assets. After evaluating various strategic alternatives, the Debtor has concluded that the best mechanism for maximizing the value of the assets is through a sale on a going concern basis pursuant to Section 363 of the Code.

21.    The Debtor has determined that the foregoing represent its best options to maximize the value of its assets and preserve value for its estate. The Debtor also believes that were it to have initiated a Chapter 7 case in lieu of the Chapter 11 Case, such action would have virtually eliminated any possibility of a recovery for unsecured creditors.

22.    Use of the Cash Collateral is critical to the Debtor's ability to operate in the ordinary course and maintain its going concern value as the Debtor seeks the best and highest price possible for a substantial portion or substantially all of its assets.

### III.    AUTHORITY TO USE CASH COLLATERAL

23.    By virtue of the Prepetition Loan Documents, the Lenders assert first- and second-priority, non-avoidable, perfected, valid and enforceable liens on and security interests in a substantial portion of the Debtor's assets, including the Cash Collateral.

24.    The Debtor requires the use of the Lenders' Cash Collateral in order to continue its business operations and to maintain and preserve the going concern value of its assets pending a sale. Accordingly, pursuant to 11 U.S.C. § 363(c)(2)(B), the Debtor requests authority to use cash collateral in accordance with the provisions of the Cash Collateral Order to pay ongoing expenses incurred in the ordinary course of its business and associated with the maintenance and preservation of the Debtor's assets. These expenses include, without limitation, payroll,

employee-related expenses, scrap metal, maintenance and shipping costs, supplies, lease

expenses, taxes, and insurance.

25.    Without the ability of use cash collateral to pay for expenses associated with the

Debtor's postpetition operation of its business and the maintenance and preservation of the

Debtor's assets pending a final hearing on this Motion, the going concern value of the Debtor's

assets is certain to deteriorate.  As a result, and pursuant to 11 U.S.C. § 363(c)(3), Bankruptcy

Rule 4001(b)(2), and Local Bankruptcy Rule 4001-2(B), the Debtor requests interim authority to

use cash collateral otherwise in compliance with the Cash Collateral Order.  Such interim use is

necessary to avoid immediate and irreparable harm to the value of the Debtor's assets and its

estate pending a final resolution of this Motion.

## IV.    ADEQUATE PROTECTION

26.    Pursuant to 11 U.S.C. §§ 361 and 363(e) and as set forth in the attached Cash

Collateral Order, the Debtor requests authority to provide certain adequate protection to the

Lenders on account of their respective prepetition liens on and security interests in the Cash

Collateral (the "**Adequate Protection Liens**").  As stated above, the Debtor submits that the

Lenders will be adequately protected by virtue of replacement liens and security interests, in

accordance with their respective priority positions, on all existing and hereafter acquired assets

of the Debtor (excluding, on an interim basis, the Debtor's claims and causes of action arising

under Chapter 5 of the Code) (the "**Postpetition Collateral**").

27.    The Adequate Protection Liens granted to the Lenders will secure payment of

their prepetition secured claims in an amount equal to the aggregate diminution of the value of

their respective interests in the Cash Collateral since the Petition Date resulting from the

Debtor's use of such collateral.

28.     Section 361(2) of the Code expressly authorizes the granting of replacement liens as adequate protection to a secured creditor:

> When adequate protection is required under Section 362, 363 or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> . . .
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property.

11 U.S.C. § 361(2).

29.     As additional adequate protection, the Debtor requests authority to pay the Lenders accrued and accruing interest at the default rate under the Prepetition Loan Documents and to reimburse the Lenders for their prepetition and postpetition attorneys' fees and costs, which fees and costs shall be subject to review and the right to object by the Debtor, any Committee, and the Office of the United States Trustee.  Moreover, any such payments of interest and/or attorneys' fees and costs shall be provisional until such time as the Lenders' secured claims are allowed in accordance with the terms of the Cash Collateral Order.

30.     In the event and the Adequate Protection Liens do not adequately protect the Lenders from any diminution in value of the Lenders' interests in the Prepetition Collateral, the Debtor further requests that the Lenders be granted an allowed administrative expense claim superior to all other unsecured claims of the estate save for any quarterly fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

31.     In addition, with respect only to the Final Order, the Debtor requests that the Adequate Protection Liens be extended to include the Avoidance Claims and all rail cars owned by the Debtor.

10

32.     For all of the foregoing reasons, the Debtor requests authorization to use the Cash Collateral on an agreed basis as provided in the Cash Collateral Order and Budget thereto.

## V.      **REQUEST FOR FINAL HEARING**

33.     The Debtor further requests that the Court set a final hearing (the "**Final Hearing**") on the Motion pursuant to Bankruptcy Rule 4001(c)(2) to consider the entry of a final order that, subject to the addition of language addressing paragraph 31 above, is substantially in the form of the Cash Collateral Order (the "**Final Order**").

## VI.     **NOTICE**

34.     Notice of the filing of this Motion and the hearing scheduled therefor has been provided by overnight delivery, facsimile transmission or ECF to: (a) the Office of the United States Trustee for the Northern District of Illinois; (b) counsel to the Lenders; (c) the Debtor's 20 largest unsecured creditors pursuant to Bankruptcy Rule 1007(d); (d) all known parties with liens of record on assets of the Debtor as of the Petition Date; and (e) all other parties who have requested notice and service of pleadings.   The Debtor submits that adequate notice and opportunity for a hearing has been given for the approval of the Cash Collateral Order on a limited basis, pursuant to the provisions of Section 363 of the Code, Bankruptcy Rules 4001 and 9014, and any other applicable law, and no further notice relating to the entry of the Cash Collateral Order is necessary or required.

35.     The Debtor further requests that the Court schedule the Final Hearing and authorize it to serve a copy of the signed Cash Collateral Order, which fixes the time and date for the filing of objections, and a copy of the proposed Final Order, by first-class mail upon: (a) the Office of the United States Trustee for the Northern District of Illinois; (b) counsel to the Lenders; (c) the Debtor's 20 largest unsecured creditors pursuant to Bankruptcy Rule 1007(d); (d) all known parties with liens of record on assets of the Debtor as of the Petition Date; and (e)

all other parties who have requested notice and service of pleadings. The Debtor submits that adequate notice and opportunity for a hearing has been given for the approval of the Cash Collateral Order on a limited basis, pursuant to the provisions of Section 363 of the Code, Bankruptcy Rules 4001 and 9014, and any other applicable law, and no further notice relating to the entry of the Cash Collateral Order is necessary or required.

WHEREFORE, Keywell L.L.C., debtor herein, respectfully requests that this Court enter an order, substantially in the form filed herewith: (i) authorizing the Debtor to use the Lenders' cash collateral on an interim basis, but otherwise in compliance with the terms of the Cash Collateral Order and Budget thereto, pending a final hearing on this Motion; (ii) authorizing the Debtor to provide adequate protection in favor of the Lenders in the manner and to the extent described herein; (iii) scheduling the Final Hearing to consider approval of the Final Order; and (iv) granting such other and further relief as the Court deems just and proper.

<div style="text-align: right;">

Respectfully Submitted:

KEYWELL L.L.C.

By: /s/ Howard L. Adelman
One of its proposed attorneys

</div>

HOWARD L ADELMAN, ESQ. (ARDC# 0015458)
ERICH S. BUCK, ESQ. (ARDC #6274635)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059
**Proposed Counsel for Keywell L.L.C.**

# EXHIBIT 1

# NewKey Group, LLC Loan Documents

NEITHER THIS NOTE NOR THE CLASS B SHARES (AS HEREIN DEFINED) ISSUABLE UPON CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW. FURTHER, THE CLASS B SHARES ISSUABLE UPON CONVERSION OF THIS NOTE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE OPERATING AGREEMENT (AS DEFINED HEREIN) OF THE COMPANY (AS DEFINED HEREIN).

PAYMENT OF ANY AMOUNT UNDER THIS NOTE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL IN CASH OF CURRENT AND FUTURE INDEBTEDNESS OF THE COMPANY TO THE EXTENT AND IN THE MANNER PROVIDED HEREIN.

THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN AMENDED AND RESTATED SUBORDINATION AND INTERCREDITOR AGREEMENT DATED AS OF NOVEMBER 21, 2011 AMONG HOLDER (AS DEFINED HEREIN), NEWKEY GROUP II, LLC, THE COMPANY (AS DEFINED HEREIN) AND BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION ("AGENT"), (AS SAME MAY HEREAFTER BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT") TO THE INDEBTEDNESS (INCLUDING INTEREST) OWED BY THE COMPANY PURSUANT TO THAT CERTAIN SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT DATED AS OF JUNE 18, 2010 (AS THE SAME HAS BEEN AND MAY HEREAFTER BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SENIOR LOAN AGREEMENT") AMONG THE COMPANY, AGENT AND THE LENDERS FROM TIME TO TIME PARTY THERETO AND TO INDEBTEDNESS REFINANCING THE INDEBTEDNESS UNDER THAT AGREEMENT AS CONTEMPLATED BY THE SUBORDINATION AGREEMENT; AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

$3,500,000                                                    November 21, 2011

## KEYWELL L.L.C.
### SECOND AMENDED AND RESTATED
### 12% SUBORDINATED SECURED CONVERTIBLE PROMISSORY NOTE

KEYWELL L.L.C., an Illinois limited liability company (the "Company"), for value received, hereby promises to pay to NewKey Group, LLC, a Delaware limited liability company, or its registered assigns ("Holder") the principal sum of Three Million Five Hundred Thousand Dollars ($3,500,000), plus interest accrued on such amount at a rate specified herein until the Company's obligation with respect to the payment of such principal sum shall be discharged as herein provided, such principal amount and interest to be payable as provided herein.

1.    Payments.

(a)    The unpaid principal amount of this Second Amended and Restated 12% Subordinated Secured Convertible Promissory Note (this "Note"), together with accrued and unpaid interest thereon, to the extent not sooner paid as provided herein, shall be due and payable on the later of (i) June 20, 2015, or (ii) in the event the Company borrows funds from Trafigura AG or any affiliate thereof and issues a promissory note as evidence thereof, the maturity date of such promissory note (whether by its terms or by its acceleration) (such repayment date, the "Maturity Date").

(b)    Interest shall accrue on the principal balance remaining from time to time unpaid under this Note at the rate of twelve percent (12%) per annum, cumulative but not compounding, and no less than forty-five percent (45%) of the annual interest shall be paid on March 20th of each year (each, an "Interest Payment Date"); provided, however, that, upon the occurrence of and during the continuation of a Default (as defined herein), interest shall accrue at the rate of twenty-four percent (24%) per annum. Interest shall be computed on the basis of a year consisting of three hundred sixty (360) days and twelve (12) months of thirty (30) days each.

(c)    Principal and interest shall be payable in cash or, at the election of Holder, in Class B Shares – 2008 Series of the Company ("Class B Shares") as described below in Section 3 below.

2.    Prepayment. The principal and interest under this Note may be prepaid by the Company, in whole or in part without premium or penalty, at any time prior to the Maturity Date upon fifteen (15) days' written notice. Upon any prepayment of any part of the principal amount of this Note, all accrued but unpaid interest shall be paid to Holder on the date of prepayment. All prepayments shall be applied first toward accrued interest and then toward unpaid principal.

3.    Conversion.

(a)    In lieu of payment in cash of any principal amount or accrued and unpaid interest due and payable under this Note, (i) Holder may elect to convert such principal or accrued and unpaid interest in whole or in part into Class B Shares immediately prior to the earliest to occur of any of the following: (A) the repayment of all or any portion of the principal amount of this Note, in which case this Note may be converted in whole or in part, as applicable, (B) a Change of Control (as defined herein), and (C) the Maturity Date and (ii) Holder may elect to convert accrued and unpaid interest to be paid on an Interest Payment Date in whole or in part into Class B Shares by notice from Holder to the Company at any time prior to an Interest Payment Date (each event referred to in this sentence, a "Conversion Event"). This Note (or the converted portion thereof) shall be converted into Class B Shares at the price of Three Dollars ($3.00) per Class B Share. Upon conversion, in whole or in part, of this Note into Class B Shares, Holder (or applicable Holder's shareholder(s)) shall execute, and such Class B Shares shall otherwise be subject to the terms and conditions of, the First Amended and Restated Operating Agreement of the Company, as amended or modified from time to time (the

2

"Operating Agreement"), and a Class B Shareholder Agreement Class B Shares – 2008 Series, as amended or modified from time to time (the "Shareholder Agreement"). For purposes hereof, a "Change of Control" means any transaction or occurrence (or series of transactions or occurrences) which results in any of the following: (i) the members of the Company on the date hereof beneficially owning in the aggregate less than fifty and one-tenth percent (50.1%) of the issued and outstanding equity interests or voting power of the Company, (ii) a consolidation, reorganization, merger or other business combination of the Company with or into any other person or persons if, after such transaction the members of the Company on the date hereof beneficially own in the aggregate less than fifty and one-tenth percent (50.1%) of the equity interest or voting power of the surviving entity in such transaction, or (iii) a sale conveyance or other disposition of all or substantially all of the assets of the Company outside of the ordinary course of business; provided, however, that a Change of Control shall not include (A) any consolidation or merger effected exclusively to change the domicile of the Company, (B) any conversion of the Company to another form of entity, (C) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof, or (D) any transfer of the assets of the Company to a direct or indirect wholly owned subsidiary of the Company or an entity with the same beneficial owners as the Company.

(b)      No fractional Class B Shares shall be issued upon any conversion of this Note. If Holder shall have converted all of this Note other than a principal amount so small that less than a whole Class B Share would be available for issue upon conversion thereof, the Company may elect to prepay such balance, with interest accrued thereon to the date fixed for prepayment, or leave the same outstanding until the maturity of this Note.

(c)      If the Company shall at any time subdivide its outstanding Class B Shares (or other securities at the time receivable upon the exercise of this Note) by recapitalization, reclassification or split-up thereof, or if the Company shall declare a stock dividend or distribute Class B Shares to its members, the number of shares of Class B Shares into which this Note is convertible immediately prior to such subdivision shall be proportionately increased, and if the Company shall at any time combine the outstanding Class B Shares by recapitalization, reclassification or combination thereof, the number of Class B Shares into which this Note is convertible immediately prior to such combination shall be proportionately decreased. Any such adjustment and adjustment to the conversion price pursuant to this Section 3(c) shall be effective at the close of business on the effective date of such subdivision or combination or if any adjustment is the result of a stock or interest dividend or distribution then the effective date for such adjustment based thereon shall be the record date therefore.

4.      Subordination.  By accepting this Note, Holder agrees that all payments on account of the indebtedness, liabilities and other obligations of the Company to Holder, including, without limitation, all amounts of principal, interest accrued hereon, and all other amounts payable by the Company to Holder under this Note or in connection herewith shall be subordinated and subject in right of payment, to the extent and manner set forth in (a) the Subordination Agreement and (b) if applicable, any subordination agreement entered into with Trafigura AG or its affiliates in connection with any loan made by Trafigura AG or its affiliates

3

to the Company, and to the prior payment in full in cash or cash equivalents of indebtedness and
other obligations of the Company under future secured indebtedness, including mortgage loans,
lines of credit, bank credit agreements and equipment lease financings, of the Company
(collectively, "Senior Indebtedness").

5.    Security.   The payment of this Note is secured by that certain Amended and
Restated Security Agreement (as the same may hereafter be amended, supplemented or
otherwise modified from time to time, the "Security Agreement") dated as of the date hereof and
executed by the Company in favor of Holder and granting to Holder a security interest in all of
the Company's assets.

6.    Payment Restrictions.   The Company may not make any distributions to any
holders of any class of equity shares or interests in the Company, or redeem any such shares or
interests, until all principal and accrued and unpaid interest under this Note has been either (a) paid
in full or (b) converted into Class B Shares. Notwithstanding the foregoing, the Company may (i)
make distributions to the Company's equity holders in an amount sufficient for such holders to pay
any federal, state and local taxes allocated to them in respect of their equity interest in the Company
and (ii) redeem Class B Shares in accordance with the terms of the Shareholder Agreements, Class
B Shares – 1997 Series in accordance with the terms of the Amended and Restated Class B
Shareholder Agreement Class B Shares – 1997 Series, Class B Shares – 1998 Series in accordance
with the terms of the Amended and Restated Class B Shareholder Agreement Class B Shares –
1998 Series and Class C Shares in accordance with the terms of the Amended and Restated Class C
Shareholder Agreements; provided that the Company may not make any payments in respect of any
such redemption until this Note has been paid in full.

7.    Default and Remedies.   The occurrence of any one or more of the following events
shall constitute a default by the Company under this Note (a "Default"):

(a)    If the Company fails to pay any of the Company's liabilities or obligations
to Holder hereunder and such failure continues for ten (10) days following the date such payment
is due;

(b)    If the Company otherwise fails to perform, keep or observe any material
term, provision, condition, covenant, warranty or representation contained in this Note or the
Security Agreement which is required to be performed, kept or observed by the Company, which
failure continues following thirty (30) days written notice from Holder to Company thereof;

(c)    If the Company defaults under any Senior Indebtedness to which this Note
is subordinate pursuant to Section 4 above, which default is not cured within the applicable cure
period, if any; or

(d)    If the Company shall have entered against it by a court having jurisdiction
thereof a decree or order for relief in respect to the Company in an involuntary case under any
applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a receiver,
liquidator, assignee, custodian, trustee, sequestrator or other similar official shall be appointed
for the Company or for any substantial part of the Company's property, or the winding up or

4

liquidation of the Company's affairs shall have been ordered; or the Company shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or consent to the entry of an order for such relief in an involuntary case under any such law, or any such involuntary case shall commence, and not be dismissed within sixty (60) days, or the Company shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for the Company or for any substantial part of the Company's property, or make any general assignment for the benefit of creditors.

Upon the occurrence of a Default then, (i) at Holder's option, and without notice by Holder to the Company except as otherwise expressly required herein, the principal amount of this Note, together with all accrued and unpaid interest thereon, shall be due and payable forthwith, and (ii) Holder may resort to every other right or remedy available at law or in equity. Holder's remedies under this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against the Company.

8.   Other Representations, Warranties and Covenants.

(a)   The Company agrees to (i) use commercially reasonable efforts to provide Holder with at least fifteen (15) days' advance written notice of the occurrence of a Change of Control, and (ii) at the request of and as directed by Holder, to issue cash and/or Class B Shares directly to the members of Holder in respect of the obligations hereunder, in which case this Note shall be deemed to have been repaid by the Company in the amount of the cash and/or Class B Shares issued to such members of Holder.

(b)   Holder, on behalf of itself and its successors and assigns (i) represents and warrants that it has purchased this Note and any Class B Shares acquired hereunder for investment and not with a view to the resale or other distributions hereof or thereof, except as expressly contemplated herein; (ii) confirms that it has had the opportunity to review this Note and the Operating Agreement with its lawyer and/or accountant prior to its execution of this Note; (iii) confirms that it understands that this Note and any Class B Shares acquired hereunder have not been registered under the Securities Act of 1933, as amended, that there is no market for this Note or such Class B Shares, and that, accordingly, this Note and such Class B Shares may have to be held for an indefinite period of time; (iv) confirms that it has purchased this Note and any Class B Shares acquired hereunder without the benefit of any representation, warranty, or other assurance with respect to the financial condition or prospects of the Company; and (v) confirms that it is the sole owner of this Note and any Class B Shares acquired hereunder and has not previously transferred this Note or such Class B Shares to any person or entity, except as expressly provided for in this Note or the Operating Agreement.

9.   Usury. The obligation evidenced by this Note constitutes a business loan within the purview of Illinois Compiled Statutes, 815 ILCS 205/4. All agreements between the Company and Holder, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever, whether by acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid, to Holder for the use, forbearance or detention of the money to be loaned hereunder or otherwise, exceed the maximum amount permissible under applicable law. If, from any circumstances whatsoever, fulfillment of

any provision of this Note, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstances Holder shall ever receive anything of value as interest or deemed interest by applicable law under this Note an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing under this Note or on account of any other indebtedness of the Company to Holder relating to this Note, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of this Note, such excess shall be refunded to the Company. In determining whether or not the interest paid or payable with respect to any indebtedness of the Company to Holder, under any specific contingency, exceeds the highest lawful rate, the Company and Holder shall, to the maximum extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) amortize, prorate, allocate and spread the total amount of interest throughout the full term of such indebtedness so that the actual rate of interest on account of such indebtedness is uniform throughout the term thereof, and/or (c) allocate interest between portions of such indebtedness, to the end that no such portion shall bear interest at a rate greater than that permitted by law. The terms and provisions of this Section 8 shall control and supersede every other conflicting provision of all agreements between the Company and Holder.

10.   Miscellaneous.

(a)   Principal and interest paid in cash shall be payable in lawful money of the United States of America.

(b)   If any payment on this Note shall become due on a Saturday, Sunday or a bank or legal holiday, such payment shall be made on the next succeeding business day.

(c)   Holder shall not, by virtue hereof, be entitled to any rights of a member in the Company, whether at law or in equity, until its conversion as described herein, and the rights of Holder are limited to those expressed in this Note.

(d)   The parties hereto intend and believe that each provision in this Note comports with all applicable law. However, if any provision of this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such provisions shall be given full force and effect to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of the Company and Holder under the remainder of this Note shall continue in full force and effect.

(e)   This Note shall be construed and enforced in accordance with the laws of the State of Illinois without regard to the conflicts of law principles thereof. The parties hereby irrevocably (i) agree that any suit, action, or other legal proceeding relating to this Note or the Class B Shares may be brought only in the state or federal courts in or about Chicago, Illinois; (ii) consent to the jurisdiction of each such court in any such suit, action, or proceeding; (iii)

6

waive any objection based on lack of jurisdiction or inconvenient or improper venue, and (iv) waive any right to trial by jury.

      (f)    All notices hereunder shall be in writing. Notices shall be deemed to have been delivered either (i) three (3) business days after the date when postmarked by registered or certified mail, postage prepaid, return receipt requested; or (ii) one (1) business day after delivery by hand; or (iii) otherwise upon receipt. Notices shall be addressed as follows or at such other addresses that a party may designate by written notice delivered to the other:

|  |  |
|---|---|
| If to the Company: | Keywell L.L.C.<br>11900 South Cottage Grove Avenue<br>Chicago, Illinois 60628<br>Attn:  President and CEO |
| If to Holder: | NewKey Group, LLC<br>c/o NK Management, LLC<br>11900 South Cottage Grove Avenue<br>Chicago, Illinois 60628<br>Attn:  President and CEO |

      (g)    The Company shall administer and interpret this Note in the event of any ambiguities or questions hereunder. The Company shall be authorized to amend this Note without the consent of Holder to resolve any such ambiguities or questions. The Company, with the consent of Holder, shall also be authorized to amend any of the terms of this Note including, without limitation, any time periods, manner or amount of payment provided for herein.

**This Second Amended and Restated 12% Subordinated Secured Convertible Promissory Note amends and restates that certain Amended and Restated 12% Subordinated Secured Convertible Promissory Note dated as of November 21, 2011 in the principal amount of Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00) executed by the Company and payable to Holder (the "Prior Note"). The indebtedness evidenced by the Prior Note is continuing indebtedness evidenced hereby, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Prior Note, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of Holder against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.**

*[Execution Page Follows]*

7

IN WITNESS WHEREOF, the parties have caused this Note to be issued in its name on the date first set forth above.

COMPANY:

KEYWELL L.L.C.

By:    KCL Management Corp.,
       its Manager

By:    _____
Its:   _____


HOLDER:

NEWKEY GROUP, LLC

By:    NK Management, LLC
       its Manager

By:    _____
Its:   _____

8

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (hereinafter referred to as the "**Agreement**") is entered into effective as of the 21ˢᵗ day of November, 2011 by and between Keywell L.L.C., an Illinois limited liability company (the "**Company**"), on one hand, and NewKey Group, LLC, a Delaware limited liability company, or its registered assigns (the "**Secured Party**"), on the other hand.

## R E C I T A L S:

A.     The Secured Party previously made a loan to the Company, which such loan (the "**Loan**") was evidenced by a certain 12% Subordinated Secured Convertible Promissory Note dated as of March 20, 2009 (the "**Original Note**").

B.     As security for the Loan, the Company entered into a certain Security Agreement in favor of the Secured Party dated as of March 20, 2009 (the "**Original Security Agreement**").

C.     The Company's obligations pursuant to the Original Note have been twice amended and restated pursuant to that certain (i) Amended and Restated 12% Subordinated Secured Convertible Promissory Note dated October 18, 2011, and (ii) Second Amended and Restated 12% Subordinated Secured Convertible Promissory Note of even date herewith (the "**Note**").

D.     The Secured Party and the Company desire to amend and restate the Original Security Agreement in its entirety pursuant to this Agreement.

E.     This instrument and the rights and obligations evidenced hereby are subordinate in the manner and to the extent set forth in that certain Amended and Restated Subordination and Intercreditor Agreement dated of even date herewith (as the same may hereafter be amended, supplemented, replaced, or otherwise modified from time to time, the "**Subordination Agreement**") among the Company, the Secured Party, NewKey Group II, LLC, and Bank of America, N.A., a national banking association ("**Agent**") as agent for all senior lenders party to that certain Second Amended and Restated Loan and Security Agreement dated as of June 18, 2010 among the Company, Agent and the lenders from time to time party thereto (as the same has been and may hereafter be amended, supplemented, refinanced, replaced, or otherwise modified from time to time, the "**Senior Loan Agreement**").

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Security Interest. As security for the payment of the Loans, the Company does hereby pledge, assign, transfer and deliver to Secured Party and does hereby grant to Secured Party a continuing and unconditional security interest in and to any and all property of the Company, of any kind or description, tangible or intangible, whether now existing or hereafter arising or acquired, including, but not limited to, the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "**Collateral**"):

(a)     all property of, or for the account of, the Company now or hereafter coming into the possession, control or custody of, or in transit to, Secured Party or any agent or bailee for Secured Party or any parent, affiliate or subsidiary of Secured Party (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all earnings, dividends,

interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

(b)     the additional property of the Company, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together will all additions and accessions thereto, substitutions for, and replacements, products and proceeds therefrom (and all of the Company's books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of the Company's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media), identified and set forth as follows:

(i)     All Accounts and all Goods whose sale, lease or other disposition by the Company has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, the Company, or rejected or refused by an Account Debtor;

(ii)    All Inventory including, without limitation, raw materials, work-in-process and finished goods;

(iii)   All Goods (other than Inventory), including, without limitation, embedded software, Equipment, vehicles, furniture and Fixtures;

(iv)    All Software and computer programs;

(v)     All Securities, Investment Property, Financial Assets and Deposit Accounts;

(vi)    All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Supporting Obligations, notes secured by real estate, and General Intangibles, including Payment Intangibles; and

(vii)   All insurance policies and proceeds insuring the foregoing property or any part thereof, including unearned premiums.

All capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to them in the Uniform Commercial Code of the State of Illinois as in effect from time to time (the "**UCC**").

2.      Special Collateral. Promptly after the Company's receipt of that portion of the Collateral which is or becomes evidenced by an agreement, instrument and/or document, including, without limitation, promissory notes, trade acceptances, documents of title and warehouse receipts (the "**Special Collateral**"), the Company shall deliver the original thereof to Secured Party, together with appropriate endorsements or other specific evidence (in form and substance acceptable to Secured Party) of assignment thereof to Secured Party.

3.      Further Assurances. The Company shall execute and deliver to Secured Party, at any time hereafter, all supplemental documentation that Secured Party may reasonably request, in form and substance acceptable to Secured Party, and pay the costs of any recording or filing of the same. The Company agrees that a carbon, photographic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. At Secured Party's request, the Company, shall deliver promptly to Secured Party any and all evidence of ownership of any of the Equipment (including, without limitation, certificates of title and applications for title).

2

4.    <u>Other Actions as to any and all Collateral</u>.  Subject in all cases to the terms of the Subordination Agreement, the Company further agrees to take any other action reasonably requested by Secured Party to insure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in any and all of the Collateral, including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that the Company's signature thereon is required therefore, (b) once the "Senior Debt" (as defined in the Subordination Agreement) has been "Paid in Full" (as defined in the Subordination Agreement), causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the bank to enforce, Secured Party's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Secured Party to enforce, Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other Person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Secured Party (subject to Agent's prior rights to the Collateral), and (f) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction.

5.    <u>Collateral in the Possession of a Warehouseman or Bailee</u>.  If any of the Collateral at any time is in the possession of a warehouseman or bailee, the Company shall promptly notify Secured Party thereof, and if requested by Secured Party, shall promptly obtain an acknowledgment from the warehouseman or bailee, in form and substance satisfactory to Secured Party, that the warehouseman or bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party (subject to Agent's prior rights to the Collateral), without the further consent of the Company.

6.    <u>Letter-of-Credit Rights</u>.  If the Company at any time is a beneficiary under a letter of credit now or hereafter issued in favor of the Company, the Company shall promptly notify Secured Party thereof and, at the request and option of Secured Party, once the Senior Debt has been Paid in Full, the Company shall, pursuant to an agreement in form and substance satisfactory to Secured Party, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Secured Party of the proceeds of any drawing under the letter of credit, or (ii) arrange for Secured Party to become the transferee beneficiary of the letter of credit, with Secured Party agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement.

7.    <u>Commercial Tort Claims</u>.  If the Company shall at any time hold or acquire a commercial tort claim, the Company shall immediately notify Secured Party in writing signed by the Company of the details thereof and grant to Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Secured Party.

8.    <u>Electronic Chattel Paper and Transferable Records</u>.  If the Company at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in §16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, the Company shall promptly notify Secured Party thereof and, at the request of Secured Party, shall take such action as Secured Party may reasonably request to vest in Secured Party control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National

3

Commerce Act or, as the case may be, §16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

    9.    <u>Covenants of the Company</u>.  The Company hereby covenants as follows:

    (a)    The Company will keep the Collateral free from any lien, security interest, encumbrance or adverse claim of any kind whatsoever, whether or not prior to the lien created hereby, other than the liens granted pursuant to or permitted by the Senior Loan Agreement.

    (b)    [intentionally omitted]

    (c)    Without the consent of the Secured Party, at any time as there shall be any obligations remaining under the Note, the Company will not sell, offer to sell or otherwise transfer, exchange, dispose of, lease, or otherwise deal with the Collateral or any portion or interest therein except in the ordinary course of business and as permitted in the Senior Loan Agreement.

    (d)    The Company shall cause the Collateral to be maintained in good condition and repair at all times and to be kept insured at its own expense under one or more policies with such companies for such periods and amounts, against such risks and liabilities as the Company, in the exercise of its sound business judgment, deems appropriate and as to which the Secured Party, in its reasonable direction, shall approve.  The security interest of the Secured Party shall extend to any and all benefits received by the Company pursuant to such policies of insurance with respect to the Collateral.  The Company shall cause the Secured Party to be named as an additional insured under each such policy and each such policy shall provide for at least 30 days advance written notice to the Secured Party prior to termination or expiration.  At the Secured Party's request, true and correct copies of such insurance policies (and all riders and amendments thereto) shall be delivered to the Secured Party.

    (e)    The Company shall pay (i) prior to delinquency all taxes and assessments assessed against, levied upon, or placed against the Collateral, except as permitted by the Senior Loan Agreement, and (ii) all costs and expenses, including any applicable privilege tax, which the Secured Party, in its sole discretion, determine are necessary to protect and perfect its security interest and priority in the Collateral.

    (f)    The Company shall furnish promptly to the Secured Party such information concerning the Collateral as the Secured Party may from time to time request and shall permit, and hereby authorizes the Secured Party, its employees, agents and designees, upon reasonable prior notice and during the Company's customary business hours, to examine and inspect the Collateral.

    10.    <u>Preservation of Collateral by the Secured Party</u>.  Should the Company fail or refuse to make any payment, perform or observe any other covenant, condition or obligation, or take any other action which the Company is obligated hereunder to make, perform, observe, take or do, at the time or in the manner therein provided, then the Secured Party, in its sole discretion, upon reasonable prior notice to the Company but without releasing the Company from any obligation, covenant or condition hereof, may make, perform, observe, take or do the same in such manner and to such extent as the Secured Party may deem necessary to protect its security interest in and/or the value of the Collateral.  The foregoing shall include, without limitation, the ability to prepare and file any and all UCC financing statements, and continuations thereof, as the Secured Party deems necessary or advisable to protect its security interest in the Collateral. Furthermore, the Secured Party may, subject to the terms of the Subordination Agreement, commence,

4

defend, appeal or otherwise participate in any action or proceeding purporting to affect its security interest in or the value of the Collateral.

11.    <u>Default and Remedies</u>.  The failure of the Company to perform or observe any of the terms or conditions of this Agreement to be performed or observed by the Company and the continuation of such failure for a period of 10 days after notice thereof, or the occurrence of a default under the Note or any of the documents or instruments executed in connection therewith, shall constitute an **"Event of Default"** hereunder.  Upon the occurrence of an Event of Default, the Secured Party may, subject to the terms of the Subordination Agreement, at any time, at its election, without further notice, to the extent of its interest and as otherwise permitted by law:

(a)    Make such payments and do such acts as the Secured Party may deem necessary to protect its security interest in the Collateral, including without limitation, paying, purchasing, contesting or compromising any encumbrance, charge, claim or lien not permitted by this Agreement which is prior to or equal to the security interest granted hereunder, and, in exercising any such powers or authority, pay all expenses incurred in connection therewith.

(b)    Require the Company to assemble the Collateral, or any portion thereof, at any mutually convenient place or places designated by the Secured Parties, and promptly to deliver such Collateral to the Secured Party, or an agent or representative designated by it.

(c)    Publicly or privately sell, lease or otherwise dispose of the Collateral, without necessarily having the Collateral at the place of sale, lease or disposition, and upon terms and in such manner as the Secured Party may determine.  The Secured Party may be a purchaser or purchasers at any public sale.  The Secured Party shall give the Company reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made, and such notice, if given to the Company pursuant to the provisions of Paragraph 5 hereof at least 10 days prior to the date of any public sale or disposition or the date after which any private sale or disposition may occur, shall constitute reasonable notice of such sale, lease or other disposition.

(d)    Exercise any remedies of a secured party under the UCC or any other applicable law.

The proceeds of any sale or other disposition under this Section 11 shall be applied first to the payment of expenses of retaking, holding, preparing for sale, or other disposition of the Collateral, including reasonable attorneys' fees and legal expenses incurred by the Secured Party, then to any overdue or accrued interest upon the Note, then to the repayment of all or any portion of the principal sum of the Note at the time outstanding and then to the discharge of any other obligations of the Company to the Secured Party under the Note, in such order as the Secured Party shall determine.  Any funds remaining after payment of the foregoing shall be paid to the Company.

The Secured Party shall have the right to enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any further remedy which either may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Company until full payment of any deficiency has been made in cash.

12.    Notices.    All notices, demands and other communications given hereunder shall be in writing and shall be deemed to have been duly given (a) upon receipt if delivered in person or (b) three days after such notice is mailed by certified or registered mail, return receipt requested, postage prepaid, and addressed as follows:

If to the Company, to:           Keywell L.L.C.
                                 11900 South Cottage Grove Avenue.
                                 Chicago, Illinois 60628
                                 Attn:    President and CEO

If to the Secured Party, to:     NewKey Group, LLC
                                 c/o NK Management, LLC
                                 11900 South Cottage Grove Avenue
                                 Chicago, Illinois 60628
                                 Attn:    President and CEO

or such other addresses as may be specified by either party hereto pursuant to notice given by such party in accordance with the provisions of this Section 12.

13.    Governing Law.    The laws of the State of Illinois will govern all questions concerning the relative rights of the parties under this Agreement, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

14.    Severability.    Every provision hereof is intended to be severable.  If any provision of this Agreement is determined by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the balance of the provisions hereof which shall remain binding and enforceable.

15.    Benefit of the Agreement.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

16.    Headings.    The headings used in this Agreement are for convenience only, shall not be deemed to constitute a part hereof, and shall not be deemed to limit, characterize or in any way affect the provisions of this Agreement.

17.    Entire Agreement.    This Agreement, together with the Note and the other documents and instruments executed in connection therewith, contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and no other representations, promises, agreements or understandings regarding the subject matter hereof shall be of any force or effect unless in writing, executed by the party to be bound and dated on or subsequent to the date hereof.

18.    Gender and Number.    Wherever from the context it appears appropriate, each item stated in either the singular or the plural shall include the singular and the plural, pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender, and terms defined herein in either the singular or the plural may be used in either the singular or plural herein without otherwise changing the meaning thereof.

19.    Modification and Waivers.    No change, modification or waiver of any provision of this Agreement shall be valid or binding unless it is in writing dated subsequent to the date hereof and signed by

the parties intended to be bound. No waiver of any breach, term or condition of this Agreement by any party shall constitute a subsequent waiver of the same or any other breach, term or condition.

20.    _Counterparts._    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21.    _Subordination Agreement._

(a)    Notwithstanding anything herein to the contrary, in the event of any conflict between any provision in this Agreement and any provision in the Subordination Agreement, such provision in the Subordination Agreement shall control.

(b)    Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, (i) any obligation of the Company hereunder with respect to the delivery or control of any Collateral shall be deemed to be satisfied if the Company delivers or provides control of such Collateral to Agent in accordance with the requirements of the corresponding provision of the applicable "Senior Debt Document" (as defined in the Subordination Agreement), and (ii) the Secured Party shall not take any action otherwise permitted hereunder with respect to the Collateral (including, without limitation, any "Enforcement Action" (as defined in the Subordination Agreement)) until the Senior Debt has been Paid in Full.

22.    _Effect of Amendment and Restatement._    This Agreement amends and restates, and replaces in its entirety, the Original Security Agreement. Upon the execution and delivery of this Agreement, the Company's obligations under the Original Security Agreement shall continue in full force and effect, but shall now be governed by the terms and conditions set forth in this Agreement.

*[Execution Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

KEYWELL L.L.C.

By:    KCL Management Corp.,
       its Manager

By:
Its:  EVP + CFO

NEWKEY GROUP, LLC

By:    NK Management, LLC
       its Manager

By:
Its:  PRESIDENT + CEO

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)                LMH

Corporation Service Company
Suite 400
2711 Centerville Road
Wilmington, DE 19808

1 7 8 1 - 0 9 6   N e w K e y   L o a n
933151-1

**Facsimile of Filing Acknowledgment**
Jurisdiction: IL Secretary Of State
UCC Filing Section
Initial Filing Number: 14135251
Filed: 3/23/2009;

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |
|---|
| KEYWELL L.L.C. |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11900 S. COTTAGE GROVE AVE. | CHICAGO | IL | 60628 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | IL | 00048399   ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| NEWKEY GROUP LLC |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11900 S. COTTAGE GROVE AVE. | CHICAGO | IL | 60628 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED, WHEREVER LOCATED, AND ALL  PROCEEDS THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA 1781-096 SMP NewKey/Keywell Loan

IL-Secretary Of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## NewKey Group II, LLC Loan Documents

NEITHER THIS NOTE NOR THE CLASS B SHARES (AS HEREIN DEFINED) ISSUABLE UPON CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW. FURTHER, THE CLASS B SHARES ISSUABLE UPON CONVERSION OF THIS NOTE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE OPERATING AGREEMENT (AS DEFINED HEREIN) OF THE COMPANY (AS DEFINED HEREIN).

PAYMENT OF ANY AMOUNT UNDER THIS NOTE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL IN CASH OF CURRENT AND FUTURE INDEBTEDNESS OF THE COMPANY TO THE EXTENT AND IN THE MANNER PROVIDED HEREIN.

THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN AMENDED AND RESTATED SUBORDINATION AND INTERCREDITOR AGREEMENT DATED AS OF NOVEMBER 21, 2011 AMONG HOLDER (AS DEFINED HEREIN), NEWKEY GROUP, LLC, THE COMPANY (AS DEFINED HEREIN) AND BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION ("AGENT"), (AS SAME MAY HEREAFTER BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT") TO THE INDEBTEDNESS (INCLUDING INTEREST) OWED BY THE COMPANY PURSUANT TO THAT CERTAIN SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT DATED AS OF JUNE 18, 2010 (AS THE SAME HAS BEEN AND MAY HEREAFTER BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SENIOR LOAN AGREEMENT") AMONG THE COMPANY, AGENT AND THE LENDERS FROM TIME TO TIME PARTY THERETO AND TO INDEBTEDNESS REFINANCING THE INDEBTEDNESS UNDER THAT AGREEMENT AS CONTEMPLATED BY THE SUBORDINATION AGREEMENT; AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

$5,000,000                                                          November 21, 2011

## KEYWELL L.L.C.
### AMENDED AND RESTATED
#### 12% JUNIOR SUBORDINATED SECURED CONVERTIBLE PROMISSORY NOTE

KEYWELL L.L.C., an Illinois limited liability company (the "Company"), for value received, hereby promises to pay to NewKey Group II, LLC, a Delaware limited liability company, or its registered assigns ("Holder") the principal sum of Five Million Dollars ($5,000,000), plus interest accrued on such amount at a rate specified herein until the Company's obligation with respect to the payment of such principal sum shall be discharged as herein provided, such principal amount and interest to be payable as provided herein.

1.    Payments.

(a)    The unpaid principal amount of this Amended and Restated 12% Junior Subordinated Secured Convertible Promissory Note (this "Note"), together with accrued and unpaid interest thereon, to the extent not sooner paid as provided herein, shall be due and payable on the later of (i) October 18, 2015, or (ii) in the event the Company borrows funds from Trafigura AG or any affiliate thereof and issues a promissory note as evidence thereof, the maturity date of such promissory note (whether by its terms or by its acceleration) (such repayment date, the "Maturity Date").

(b)    Interest shall accrue on the principal balance remaining from time to time unpaid under this Note at the rate of twelve percent (12%) per annum, cumulative but not compounding, and no less than forty-five percent (45%) of the annual interest shall be paid on the first (1st) anniversary of the date hereof and on each following anniversary of such date (each, an "Interest Payment Date"); provided, however, that, upon the occurrence of and during the continuation of a Default (as defined herein), interest shall accrue at the rate of twenty-four percent (24%) per annum.  Interest shall be computed on the basis of a year consisting of three hundred sixty (360) days and twelve (12) months of thirty (30) days each.

(c)    Principal and interest shall be payable in cash or, at the election of Holder, in Class B Shares – 2008 Series of the Company ("Class B Shares") as described below in Section 3 below.

2.    Prepayment.  The principal and interest under this Note may be prepaid by the Company, in whole or in part without premium or penalty, at any time prior to the Maturity Date upon fifteen (15) days' written notice. Upon any prepayment of any part of the principal amount of this Note, all accrued but unpaid interest shall be paid to Holder on the date of prepayment. All prepayments shall be applied first toward accrued interest and then toward unpaid principal.

3.    Conversion.

(a)    In lieu of payment in cash of any principal amount or accrued and unpaid interest due and payable under this Note, (i) Holder may elect to convert such principal or accrued and unpaid interest in whole or in part into Class B Shares immediately prior to the earliest to occur of any of the following: (A) the repayment of all or any portion of the principal amount of this Note, in which case this Note may be converted in whole or in part, as applicable, (B) a Change of Control (as defined herein), and (C) the Maturity Date and (ii) Holder may elect to convert accrued and unpaid interest to be paid on an Interest Payment Date in whole or in part into Class B Shares by notice from Holder to the Company at any time prior to an Interest Payment Date (each event referred to in this sentence, a "Conversion Event"). This Note (or the converted portion thereof) shall be converted into Class B Shares at the price of Three Dollars ($3.00) per Class B Share.  Upon conversion, in whole or in part, of this Note into Class B Shares, Holder (or applicable Holder's shareholder(s)) shall execute, and such Class B Shares shall otherwise be subject to the terms and conditions of, the First Amended and Restated Operating Agreement of the Company, as amended or modified from time to time (the

2

"Operating Agreement"), and a Class B Shareholder Agreement Class B Shares – 2008 Series, as amended or modified from time to time (the "Shareholder Agreement"). For purposes hereof, a "Change of Control" means any transaction or occurrence (or series of transactions or occurrences) which results in any of the following: (i) the members of the Company on the date hereof beneficially owning in the aggregate less than fifty and one-tenth percent (50.1%) of the issued and outstanding equity interests or voting power of the Company, (ii) a consolidation, reorganization, merger or other business combination of the Company with or into any other person or persons if, after such transaction the members of the Company on the date hereof beneficially own in the aggregate less than fifty and one-tenth percent (50.1%) of the equity interest or voting power of the surviving entity in such transaction, or (iii) a sale conveyance or other disposition of all or substantially all of the assets of the Company outside of the ordinary course of business; provided, however, that a Change of Control shall not include (A) any consolidation or merger effected exclusively to change the domicile of the Company, (B) any conversion of the Company to another form of entity, (C) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof, or (D) any transfer of the assets of the Company to a direct or indirect wholly owned subsidiary of the Company or an entity with the same beneficial owners as the Company.

(b)    No fractional Class B Shares shall be issued upon any conversion of this Note. If Holder shall have converted all of this Note other than a principal amount so small that less than a whole Class B Share would be available for issue upon conversion thereof, the Company may elect to prepay such balance, with interest accrued thereon to the date fixed for prepayment, or leave the same outstanding until the maturity of this Note.

(c)    If the Company shall at any time subdivide its outstanding Class B Shares (or other securities at the time receivable upon the exercise of this Note) by recapitalization, reclassification or split-up thereof, or if the Company shall declare a stock dividend or distribute Class B Shares to its members, the number of shares of Class B Shares into which this Note is convertible immediately prior to such subdivision shall be proportionately increased, and if the Company shall at any time combine the outstanding Class B Shares by recapitalization, reclassification or combination thereof, the number of Class B Shares into which this Note is convertible immediately prior to such combination shall be proportionately decreased. Any such adjustment and adjustment to the conversion price pursuant to this Section 3(c) shall be effective at the close of business on the effective date of such subdivision or combination or if any adjustment is the result of a stock or interest dividend or distribution then the effective date for such adjustment based thereon shall be the record date therefore.

4.    Subordination.    By accepting this Note, Holder agrees that all payments on account of the indebtedness, liabilities and other obligations of the Company to Holder, including, without limitation, all amounts of principal, interest accrued hereon, and all other amounts payable by the Company to Holder under this Note or in connection herewith shall be subordinated and subject in right of payment, to the extent and manner set forth in (a) the Subordination Agreement and (b) if applicable, any subordination agreement entered into with Trafigura AG or its affiliates in connection with any loan made by Trafigura AG or its affiliates

3

to the Company, and to the prior payment in full in cash or cash equivalents of indebtedness and other obligations of the Company under future secured indebtedness, including mortgage loans, lines of credit, bank credit agreements and equipment lease financings, of the Company (collectively, "Senior Indebtedness").

5.    Security.  The payment of this Note is secured by that certain Amended and Restated Security Agreement (as the same may hereafter be amended, supplemented or otherwise modified from time to time, the "Security Agreement") dated as of the date hereof and executed by the Company in favor of Holder and granting to Holder a security interest in all of the Company's assets.

6.    Payment Restrictions.  The Company may not make any distributions to any holders of any class of equity shares or interests in the Company, or redeem any such shares or interests, until all principal and accrued and unpaid interest under this Note has been either (a) paid in full or (b) converted into Class B Shares.  Notwithstanding the foregoing, the Company may (i) make distributions to the Company's equity holders in an amount sufficient for such holders to pay any federal, state and local taxes allocated to them in respect of their equity interest in the Company and (ii) redeem Class B Shares in accordance with the terms of the Shareholder Agreements, Class B Shares – 1997 Series in accordance with the terms of the Amended and Restated Class B Shareholder Agreement Class B Shares – 1997 Series, Class B Shares – 1998 Series in accordance with the terms of the Amended and Restated Class B Shareholder Agreement Class B Shares – 1998 Series and Class C Shares in accordance with the terms of the Amended and Restated Class C Shareholder Agreements; provided that the Company may not make any payments in respect of any such redemption until this Note has been paid in full.

7.    Default and Remedies.  The occurrence of any one or more of the following events shall constitute a default by the Company under this Note (a "Default"):

    (a)    If the Company fails to pay any of the Company's liabilities or obligations to Holder hereunder and such failure continues for ten (10) days following the date such payment is due;

    (b)    If the Company otherwise fails to perform, keep or observe any material term, provision, condition, covenant, warranty or representation contained in this Note or the Security Agreement which is required to be performed, kept or observed by the Company, which failure continues following thirty (30) days written notice from Holder to Company thereof;

    (c)    If the Company defaults under any Senior Indebtedness to which this Note is subordinate pursuant to Section 4 above, which default is not cured within the applicable cure period, if any; or

    (d)    If the Company shall have entered against it by a court having jurisdiction thereof a decree or order for relief in respect to the Company in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official shall be appointed for the Company or for any substantial part of the Company's property, or the winding up or

4

liquidation of the Company's affairs shall have been ordered; or the Company shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or consent to the entry of an order for such relief in an involuntary case under any such law, or any such involuntary case shall commence, and not be dismissed within sixty (60) days, or the Company shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for the Company or for any substantial part of the Company's property, or make any general assignment for the benefit of creditors.

Upon the occurrence of a Default then, (i) at Holder's option, and without notice by Holder to the Company except as otherwise expressly required herein, the principal amount of this Note, together with all accrued and unpaid interest thereon, shall be due and payable forthwith, and (ii) Holder may resort to every other right or remedy available at law or in equity.  Holder's remedies under this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against the Company.

> 8.     Other Representations, Warranties and Covenants.

> (a)     The Company agrees to (i) use commercially reasonable efforts to provide Holder with at least fifteen (15) days' advance written notice of the occurrence of a Change of Control, and (ii) at the request of and as directed by Holder, to issue cash and/or Class B Shares directly to the members of Holder in respect of the obligations hereunder, in which case this Note shall be deemed to have been repaid by the Company in the amount of the cash and/or Class B Shares issued to such members of Holder.

> (b)     Holder, on behalf of itself and its successors and assigns (i) represents and warrants that it has purchased this Note and any Class B Shares acquired hereunder for investment and not with a view to the resale or other distributions hereof or thereof, except as expressly contemplated herein; (ii) confirms that it has had the opportunity to review this Note and the Operating Agreement with its lawyer and/or accountant prior to its execution of this Note; (iii) confirms that it understands that this Note and any Class B Shares acquired hereunder have not been registered under the Securities Act of 1933, as amended, that there is no market for this Note or such Class B Shares, and that, accordingly, this Note and such Class B Shares may have to be held for an indefinite period of time; (iv) confirms that it has purchased this Note and any Class B Shares acquired hereunder without the benefit of any representation, warranty, or other assurance with respect to the financial condition or prospects of the Company; and (v) confirms that it is the sole owner of this Note and any Class B Shares acquired hereunder and has not previously transferred this Note or such Class B Shares to any person or entity, except as expressly provided for in this Note or the Operating Agreement.

> 9.     Usury.  The obligation evidenced by this Note constitutes a business loan within the purview of Illinois Compiled Statutes, 815 ILCS 205/4.  All agreements between the Company and Holder, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever, whether by acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid, to Holder for the use, forbearance or detention of the money to be loaned hereunder or otherwise, exceed the maximum amount permissible under applicable law.  If, from any circumstances whatsoever, fulfillment of

5

any provision of this Note, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstances Holder shall ever receive anything of value as interest or deemed interest by applicable law under this Note an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing under this Note or on account of any other indebtedness of the Company to Holder relating to this Note, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of this Note, such excess shall be refunded to the Company. In determining whether or not the interest paid or payable with respect to any indebtedness of the Company to Holder, under any specific contingency, exceeds the highest lawful rate, the Company and Holder shall, to the maximum extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) amortize, prorate, allocate and spread the total amount of interest throughout the full term of such indebtedness so that the actual rate of interest on account of such indebtedness is uniform throughout the term thereof, and/or (c) allocate interest between portions of such indebtedness, to the end that no such portion shall bear interest at a rate greater than that permitted by law.  The terms and provisions of this Section 8 shall control and supersede every other conflicting provision of all agreements between the Company and Holder.

  10.   <u>Miscellaneous</u>.

    (a)   Principal and interest paid in cash shall be payable in lawful money of the United States of America.

    (b)   If any payment on this Note shall become due on a Saturday, Sunday or a bank or legal holiday, such payment shall be made on the next succeeding business day.

    (c)   Holder shall not, by virtue hereof, be entitled to any rights of a member in the Company, whether at law or in equity, until its conversion as described herein, and the rights of Holder are limited to those expressed in this Note.

    (d)   The parties hereto intend and believe that each provision in this Note comports with all applicable law.  However, if any provision of this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such provisions shall be given full force and effect to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of the Company and Holder under the remainder of this Note shall continue in full force and effect.

    (e)   This Note shall be construed and enforced in accordance with the laws of the State of Illinois without regard to the conflicts of law principles thereof.  The parties hereby irrevocably (i) agree that any suit, action, or other legal proceeding relating to this Note or the Class B Shares may be brought only in the state or federal courts in or about Chicago, Illinois; (ii) consent to the jurisdiction of each such court in any such suit, action, or proceeding; (iii)

waive any objection based on lack of jurisdiction or inconvenient or improper venue, and (iv) waive any right to trial by jury.

(f)    All notices hereunder shall be in writing.  Notices shall be deemed to have been delivered either (i) three (3) business days after the date when postmarked by registered or certified mail, postage prepaid, return receipt requested; or (ii) one (1) business day after delivery by hand; or (iii) otherwise upon receipt.  Notices shall be addressed as follows or at such other addresses that a party may designate by written notice delivered to the other:

<div style="padding-left:2em">

If to the Company:    Keywell L.L.C.
11900 South Cottage Grove Avenue
Chicago, Illinois 60628
Attn:   President and CEO


If to Holder:    NewKey Group II, LLC
c/o NK Management, LLC
11900 South Cottage Grove Avenue
Chicago, Illinois 60628
Attn:   President and CEO

</div>

(g)    The Company shall administer and interpret this Note in the event of any ambiguities or questions hereunder.  The Company shall be authorized to amend this Note without the consent of Holder to resolve any such ambiguities or questions.  The Company, with the consent of Holder, shall also be authorized to amend any of the terms of this Note including, without limitation, any time periods, manner or amount of payment provided for herein.

**This Amended and Restated 12% Junior Subordinated Secured Convertible Promissory Note amends and restates that certain 12% Junior Subordinated Secured Convertible Promissory Note dated as of November 21, 2011 in the principal amount of Five Million 00/100 Dollars ($5,000,000.00) executed by the Company and payable to Holder (the "Prior Note").   The indebtedness evidenced by the Prior Note is continuing indebtedness evidenced hereby, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Prior Note, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of Holder against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.**

*[Execution Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Note to be issued in its name on the date first set forth above.

COMPANY:

KEYWELL L.L.C.

By:    KCL Management Corp.,
       its Manager

By: _____
Its: _____

HOLDER:

NEWKEY GROUP II, LLC

By:    NK Management, LLC
       its Manager

By: _____
Its: _____

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (hereinafter referred to as the "**Agreement**") is entered into effective as of the 2(ˢᵗ day of November, 2011 by and between Keywell L.L.C., an Illinois limited liability company (the "**Company**"), on one hand, and NewKey Group II, LLC, a Delaware limited liability company, or its registered assigns (the "**Secured Party**"), on the other hand.

R E C I T A L S:

A.   The Secured Party previously made a loan to the Company, which such loan (the "**Loan**") was evidenced by a certain 12% Junior Subordinated Secured Convertible Promissory Note dated as of October 18, 2011 (the "**Original Note**").

B.   As security for the Loan, the Company entered into a certain Security Agreement in favor of the Secured Party dated as of October 18, 2011 (the "**Original Security Agreement**").

C.   The Company's obligations pursuant to the Original Note have been amended and restated pursuant to that certain Amended and Restated 12% Junior Subordinated Secured Convertible Promissory Note of even date herewith (the "**Note**").

D.   The Secured Party and the Company desire to amend and restate the Original Security Agreement in its entirety pursuant to this Agreement.

E.   This instrument and the rights and obligations evidenced hereby are subordinate in the manner and to the extent set forth in that certain Amended and Restated Subordination and Intercreditor Agreement dated of even date herewith (as the same may hereafter be amended, supplemented, replaced, or otherwise modified from time to time, the "**Subordination Agreement**") among the Company, the Secured Party, NewKey Group, LLC, and Bank of America, N.A., a national banking association ("**Agent**") as agent for all senior lenders party to that certain Second Amended and Restated Loan and Security Agreement dated as of June 18, 2010 among the Company, Agent and the lenders from time to time party thereto (as the same has been and may hereafter be amended, supplemented, refinanced, replaced, or otherwise modified from time to time, the "**Senior Loan Agreement**").

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   <u>Security Interest</u>. As security for the payment of the Loans, the Company does hereby pledge, assign, transfer and deliver to Secured Party and does hereby grant to Secured Party a continuing and unconditional security interest in and to any and all property of the Company, of any kind or description, tangible or intangible, whether now existing or hereafter arising or acquired, including, but not limited to, the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "**Collateral**"):

(a)   all property of, or for the account of, the Company now or hereafter coming into the possession, control or custody of, or in transit to, Secured Party or any agent or bailee for Secured Party or any parent, affiliate or subsidiary of Secured Party (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

(b)      the additional property of the Company, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together will all additions and accessions thereto, substitutions for, and replacements, products and proceeds therefrom (and all of the Company's books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of the Company's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media), identified and set forth as follows:

(i)      All Accounts and all Goods whose sale, lease or other disposition by the Company has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, the Company, or rejected or refused by an Account Debtor;

(ii)      All Inventory including, without limitation, raw materials, work-in-process and finished goods;

(iii)      All Goods (other than Inventory), including, without limitation, embedded software, Equipment, vehicles, furniture and Fixtures;

(iv)      All Software and computer programs;

(v)      All Securities, Investment Property, Financial Assets and Deposit Accounts;

(vi)      All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Supporting Obligations, notes secured by real estate, and General Intangibles, including Payment Intangibles; and

(vii)      All insurance policies and proceeds insuring the foregoing property or any part thereof, including unearned premiums.

All capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to them in the Uniform Commercial Code of the State of Illinois as in effect from time to time (the "**UCC**").

2.      <u>Special Collateral</u>. Promptly after the Company's receipt of that portion of the Collateral which is or becomes evidenced by an agreement, instrument and/or document, including, without limitation, promissory notes, trade acceptances, documents of title and warehouse receipts (the "**Special Collateral**"), the Company shall deliver the original thereof to Secured Party, together with appropriate endorsements or other specific evidence (in form and substance acceptable to Secured Party) of assignment thereof to Secured Party.

3.      <u>Further Assurances</u>. The Company shall execute and deliver to Secured Party, at any time hereafter, all supplemental documentation that Secured Party may reasonably request, in form and substance acceptable to Secured Party, and pay the costs of any recording or filing of the same. The Company agrees that a carbon, photographic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. At Secured Party's request, the Company, shall deliver promptly to Secured Party any and all evidence of ownership of any of the Equipment (including, without limitation, certificates of title and applications for title).

4.     <u>Other Actions as to any and all Collateral</u>.  Subject in all cases to the terms of the Subordination Agreement, the Company further agrees to take any other action reasonably requested by Secured Party to insure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in any and all of the Collateral, including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that the Company's signature thereon is required therefore, (b) once the "Senior Debt" (as defined in the Subordination Agreement) has been "Paid in. Full" (as defined in the Subordination Agreement), causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the bank to enforce, Secured Party's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Secured Party to enforce, Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other Person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Secured Party (subject to Agent's prior rights to the Collateral), and (f) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction.

5.     <u>Collateral in the Possession of a Warehouseman or Bailee</u>.  If any of the Collateral at any time is in the possession of a warehouseman or bailee, the Company shall promptly notify Secured Party thereof, and if requested by Secured Party, shall promptly obtain an acknowledgment from the warehouseman or bailee, in form and substance satisfactory to Secured Party, that the warehouseman or bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party (subject to Agent's prior rights to the Collateral), without the further consent of the Company.

6.     <u>Letter-of-Credit Rights</u>.  If the Company at any time is a beneficiary under a letter of credit now or hereafter issued in favor of the Company, the Company shall promptly notify Secured Party thereof and, at the request and option of Secured Party, once the Senior Debt has been Paid in Full, the Company shall, pursuant to an agreement in form and substance satisfactory to Secured Party, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Secured Party of the proceeds of any drawing under the letter of credit, or (ii) arrange for Secured Party to become the transferee beneficiary of the letter of credit, with Secured Party agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement.

7.     <u>Commercial Tort Claims</u>.  If the Company shall at any time hold or acquire a commercial tort claim, the Company shall immediately notify Secured Party in writing signed by the Company of the details thereof and grant to Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Secured Party.

8.     <u>Electronic Chattel Paper and Transferable Records</u>.  If the Company at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in §16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, the Company shall promptly notify Secured Party thereof and, at the request of Secured Party, shall take such action as Secured Party may reasonably request to vest in Secured Party control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, §16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

3

9.      <u>Covenants of the Company</u>.  The Company hereby covenants as follows:

(a)      The Company will keep the Collateral free from any lien, security interest, encumbrance or adverse claim of any kind whatsoever, whether or not prior to the lien created hereby, other than the liens granted pursuant to or permitted by the Senior Loan Agreement.

(b)      [intentionally omitted]

(c)      Without the consent of the Secured Party, at any time as there shall be any obligations remaining under the Note, the Company will not sell, offer to sell or otherwise transfer, exchange, dispose of, lease, or otherwise deal with the Collateral or any portion or interest therein except in the ordinary course of business and as permitted in the Senior Loan Agreement.

(d)      The Company shall cause the Collateral to be maintained in good condition and repair at all times and to be kept insured at its own expense under one or more policies with such companies for such periods and amounts, against such risks and liabilities as the Company, in the exercise of its sound business judgment, deems appropriate and as to which the Secured Party, in its reasonable direction, shall approve.  The security interest of the Secured Party shall extend to any and all benefits received by the Company pursuant to such policies of insurance with respect to the Collateral.  The Company shall cause the Secured Party to be named as an additional insured under each such policy and each such policy shall provide for at least 30 days advance written notice to the Secured Party prior to termination or expiration.  At the Secured Party's request, true and correct copies of such insurance policies (and all riders and amendments thereto) shall be delivered to the Secured Party.

(e)      The Company shall pay (i) prior to delinquency all taxes and assessments assessed against, levied upon, or placed against the Collateral, except as permitted by the Senior Loan Agreement, and (ii) all costs and expenses, including any applicable privilege tax, which the Secured Party, in its sole discretion, determine are necessary to protect and perfect its security interest and priority in the Collateral.

(f)      The Company shall furnish promptly to the Secured Party such information concerning the Collateral as the Secured Party may from time to time request and shall permit, and hereby authorizes the Secured Party, its employees, agents and designees, upon reasonable prior notice and during the Company's customary business hours, to examine and inspect the Collateral.

10.      <u>Preservation of Collateral by the Secured Party</u>.  Should the Company fail or refuse to make any payment, perform or observe any other covenant, condition or obligation, or take any other action which the Company is obligated hereunder to make, perform, observe, take or do, at the time or in the manner therein provided, then the Secured Party, in its sole discretion, upon reasonable prior notice to the Company but without releasing the Company from any obligation, covenant or condition hereof, may make, perform, observe, take or do the same in such manner and to such extent as the Secured Party may deem necessary to protect its security interest in and/or the value of the Collateral.  The foregoing shall include, without limitation, the ability to prepare and file any and all UCC financing statements, and continuations thereof, as the Secured Party deems necessary or advisable to protect its security interest in the Collateral. Furthermore, the Secured Party may, subject to the terms of the Subordination Agreement, commence, defend, appeal or otherwise participate in any action or proceeding purporting to affect its security interest in or the value of the Collateral.

4

11.    Default and Remedies.  The failure of the Company to perform or observe any of the terms or conditions of this Agreement to be performed or observed by the Company and the continuation of such failure for a period of 10 days after notice thereof, or the occurrence of a default under the Note or any of the documents or instruments executed in connection therewith, shall constitute an **"Event of Default"** hereunder.  Upon the occurrence of an Event of Default, the Secured Party may, subject to the terms of the Subordination Agreement, at any time, at its election, without further notice, to the extent of its interest and as otherwise permitted by law:

(a)    Make such payments and do such acts as the Secured Party may deem necessary to protect its security interest in the Collateral, including without limitation, paying, purchasing, contesting or compromising any encumbrance, charge, claim or lien not permitted by this Agreement which is prior to or equal to the security interest granted hereunder, and, in exercising any such powers or authority, pay all expenses incurred in connection therewith.

(b)    Require the Company to assemble the Collateral, or any portion thereof, at any mutually convenient place or places designated by the Secured Parties, and promptly to deliver such Collateral to the Secured Party, or an agent or representative designated by it.

(c)    Publicly or privately sell, lease or otherwise dispose of the Collateral, without necessarily having the Collateral at the place of sale, lease or disposition, and upon terms and in such manner as the Secured Party may determine.  The Secured Party may be a purchaser or purchasers at any public sale.  The Secured Party shall give the Company reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made, and such notice, if given to the Company pursuant to the provisions of Paragraph 5 hereof at least 10 days prior to the date of any public sale or disposition or the date after which any private sale or disposition may occur, shall constitute reasonable notice of such sale, lease or other disposition.

(d)    Exercise any remedies of a secured party under the UCC or any other applicable law.

The proceeds of any sale or other disposition under this Section 11 shall be applied first to the payment of expenses of retaking, holding, preparing for sale, or other disposition of the Collateral, including reasonable attorneys' fees and legal expenses incurred by the Secured Party, then to any overdue or accrued interest upon the Note, then to the repayment of all or any portion of the principal sum of the Note at the time outstanding and then to the discharge of any other obligations of the Company to the Secured Party under the Note, in such order as the Secured Party shall determine.  Any funds remaining after payment of the foregoing shall be paid to the Company.

The Secured Party shall have the right to enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any further remedy which either may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Company until full payment of any deficiency has been made in cash.

12.    Notices.  All notices, demands and other communications given hereunder shall be in writing and shall be deemed to have been duly given (a) upon receipt if delivered in person or (b) three days after such notice is mailed by certified or registered mail, return receipt requested, postage prepaid, and addressed as follows:

| | |
|---|---|
| If to the Company, to: | Keywell L.L.C.<br>11900 South Cottage Grove Avenue<br>Chicago, Illinois 60628<br>Attn:    President and CEO |
| If to the Secured Party, to: | NewKey Group II, LLC<br>c/o NK Management, LLC<br>11900 South Cottage Grove Avenue<br>Chicago, Illinois 60628<br>Attn:    President and CEO |

or such other addresses as may be specified by either party hereto pursuant to notice given by such party in accordance with the provisions of this Section 12.

13.    Governing Law. The laws of the State of Illinois will govern all questions concerning the relative rights of the parties under this Agreement, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

14.    Severability. Every provision hereof is intended to be severable. If any provision of this Agreement is determined by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the balance of the provisions hereof which shall remain binding and enforceable.

15.    Benefit of the Agreement. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

16.    Headings. The headings used in this Agreement are for convenience only, shall not be deemed to constitute a part hereof, and shall not be deemed to limit, characterize or in any way affect the provisions of this Agreement.

17.    Entire Agreement. This Agreement, together with the Note and the other documents and instruments executed in connection therewith, contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and no other representations, promises, agreements or understandings regarding the subject matter hereof shall be of any force or effect unless in writing, executed by the party to be bound and dated on or subsequent to the date hereof.

18.    Gender and Number. Wherever from the context it appears appropriate, each item stated in either the singular or the plural shall include the singular and the plural, pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender, and terms defined herein in either the singular or the plural may be used in either the singular or plural herein without otherwise changing the meaning thereof.

19.    Modification and Waivers. No change, modification or waiver of any provision of this Agreement shall be valid or binding unless it is in writing dated subsequent to the date hereof and signed by the parties intended to be bound. No waiver of any breach, term or condition of this Agreement by any party shall constitute a subsequent waiver of the same or any other breach, term or condition.

6

20.    Counterparts.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21.    Subordination Agreement.

(a)    Notwithstanding anything herein to the contrary, in the event of any conflict between any provision in this Agreement and any provision in the Subordination Agreement, such provision in the Subordination Agreement shall control.

(b)    Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, (i) any obligation of the Company hereunder with respect to the delivery or control of any Collateral shall be deemed to be satisfied if the Company delivers or provides control of such Collateral to Agent in accordance with the requirements of the corresponding provision of the applicable "Senior Debt Document" (as defined in the Subordination Agreement), and (ii) the Secured Party shall not take any action otherwise permitted hereunder with respect to the Collateral (including, without limitation, any "Enforcement Action" (as defined in the Subordination Agreement)) until the Senior Debt has been Paid in Full.

22.    Effect of Amendment and Restatement.    This Agreement amends and restates, and replaces in its entirety, the Original Security Agreement.  Upon the execution and delivery of this Agreement, the Company's obligations under the Original Security Agreement shall continue in full force and effect, but shall now be governed by the terms and conditions set forth in this Agreement.

*[Execution Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

KEYWELL L.L.C.

By:     KCL Management Corp.,
        its Manager

By:     _____
Its:    EVP & CFO _____


NEWKEY GROUP II, LLC

By:     NK Management, LLC
        its Manager

By:     _____
Its:    PRESIDENT & CEO _____

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)          DXE

    Corporation Service Company
    Suite 400
    2711 Centerville Road
    Wilmington, DE 19808
    N e w K e y   I l   L o a n   5 3 2 9 - 0 0 3
    963435-1

**Facsimile of Filing Acknowledgment**

Jurisdiction: IL Secretary Of State
UCC Filing Section
Initial Filing Number: 16730998
Filed: 10/31/2011;

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| KEYWELL L.L.C. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11900 S. COTTAGE GROVE AVE. | CHICAGO | IL | 60628 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | IL | 00048399    ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NEWKEY GROUP II, LLC | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11900 SOUTH COTTAGE GROVE AVENUE | CHICAGO | IL | 60628 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED, WHEREVER LOCATED, AND ALL  PROCEEDS THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA  5329-003 SMP
IL-Secretary Of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808