# EXHIBIT A
## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

between

**KEYWELL L.L.C.**, as the Seller

and

**KW METALS ACQUISITION LLC**, as the Buyer

dated as of

December 12, 2013

PFS:006682.0007.978248.1

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ................................................................................1

ARTICLE II PURCHASE AND SALE ...........................................................11

Section 2.01.   Purchase and Sale of Assets....................................11

Section 2.02.   Excluded Assets.......................................................12

Section 2.03.   Assumed Liabilities .................................................13

Section 2.04.   Excluded Liabilities .................................................13

Section 2.05.   Purchase Price Deposit. ..........................................15

Section 2.06.   Purchase Price..........................................................15

Section 2.07.   Allocation of Purchase Price....................................16

Section 2.08.   Withholding Tax.......................................................16

Section 2.09.   Third Party Consents ...............................................16

Section 2.10.   Contract Designation Rights. ...................................16

ARTICLE III CLOSING....................................................................................17

Section 3.01.   Closing......................................................................17

Section 3.02.   Closing Deliverables.................................................17

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ...............19

Section 4.01.   Organization and Qualification of Seller .................19

Section 4.02.   Authority of Seller ...................................................19

Section 4.03.   No Conflicts; Consents ............................................19

Section 4.04.   Financial Statements ................................................20

Section 4.05.   Intentionally Omitted................................................20

Section 4.06.   Absence of Certain Changes, Events and Conditions................20

Section 4.07.   Assigned Contracts. .................................................21

Section 4.08.   Title to Purchased Assets.........................................22

Section 4.09.   Condition and Sufficiency of Assets.........................22

Section 4.10.   Real Property. ..........................................................22

i

PFS:006682.0007.978248.1

Section 4.11.    Intellectual Property.................................................................................24

Section 4.12.    Customers and Suppliers ...........................................................................25

Section 4.13.    Legal Proceedings; Governmental Orders ...............................................25

Section 4.14.    Compliance With Laws; Permits ..............................................................26

Section 4.15.    Environmental Matters .............................................................................26

Section 4.16     Employment Matters .................................................................................28

Section 4.17     Taxes..........................................................................................................28

Section 4.18.    Employee Benefits.....................................................................................29

Section 4.19.    Brokers ......................................................................................................30

Section 4.20.    Manufacturing and Marketing Rights.......................................................30

Section 4.21.    Exclusive Representations and Warranties................................................30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER......................30

Section 5.01.    Organization of Buyer ..............................................................................30

Section 5.02.    Authority of Buyer.....................................................................................30

Section 5.03.    No Conflicts; Consents .............................................................................30

Section 5.04.    Brokers ......................................................................................................31

Section 5.05.    Legal Proceedings.....................................................................................31

ARTICLE VI COVENANTS ............................................................................................31

Section 6.01.    Employees and Employee Benefits ...........................................................31

Section 6.02.    Intentionally Omitted.................................................................................32

Section 6.03.    Non-competition; Non-solicitation ...........................................................32

Section 6.04.    Books and Records ....................................................................................33

Section 6.05.    Public Announcements ..............................................................................34

Section 6.06.    Bulk Sales Laws ........................................................................................34

Section 6.07.    Receivables................................................................................................34

Section 6.08.    Transfer Taxes ...........................................................................................34

Section 6.09.    Tax Clearance Certificates........................................................................34

Section 6.10.    Further Assurances ...................................................................................34

Section 6.11.    Access to Information.................................................................................35

ii

Section 6.12.    Conduct of Business Pending Closing ................................................... 35

Section 6.13.    Bankruptcy Covenants .......................................................................... 36

Section 6.14.    Notice of Certain Events ....................................................................... 36

Section 6.15.    Governmental Approvals and Consents ................................................ 37

Section 6.16.    Closing Conditions ............................................................................... 39

Section 6.17.    Possession of Purchased Assets ........................................................... 39

Section 6.18.    Use of Name ......................................................................................... 39

ARTICLE VII INDEMNIFICATION ....................................................................... 39

Section 7.01.    Survival ................................................................................................. 39

Section 7.02.    Indemnification By Seller ..................................................................... 40

Section 7.03.    Indemnification By Buyer ..................................................................... 41

Section 7.04.    Indemnification Procedures .................................................................. 42

Section 7.05.    Payments ............................................................................................... 44

Section 7.06.    Tax Treatment of Indemnification Payments ........................................ 44

Section 7.07.    Effect of Investigation .......................................................................... 44

Section 7.08.    Exclusive Remedies .............................................................................. 44

ARTICLE VIII CONDITIONS TO CLOSING ........................................................ 45

Section 8.01.    Conditions to Obligations of All Parties ............................................... 45

Section 8.02.    Conditions to Obligations of Buyer ...................................................... 45

Section 8.03.    Conditions to Obligations of Seller ...................................................... 47

ARTICLE IX TERMINATION PROCEDURES ...................................................... 48

Section 9.01.    Termination ........................................................................................... 48

Section 9.02.    Purchase Price Deposit ......................................................................... 50

ARTICLE X MISCELLANEOUS ............................................................................ 50

Section 10.01.    Expenses ............................................................................................. 50

Section 10.02.    Notices ................................................................................................ 50

Section 10.03.    Interpretation ...................................................................................... 51

Section 10.04.    Headings ............................................................................................. 52

Section 10.05.    Severability ......................................................................................... 52

iii

Section 10.06.    Entire Agreement...................................................................................52

Section 10.07.    Successors and Assigns ..........................................................................52

Section 10.08.    No Third-party Beneficiaries ..................................................................52

Section 10.09.    Amendment and Modification; Waiver ...................................................52

Section 10.10.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ............52

Section 10.11.    Specific Performance..............................................................................53

Section 10.12.    Counterparts............................................................................................53

EXHIBITS

Exhibit A       Form of Sale Order
Exhibit B       Form of Bill of Sale
Exhibit C       Form of Assignment and Assumption Agreement
Exhibit D       Term Sheet – Contingent Payment Agreement

PFS:006682.0007.978248.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 12, 2013 (the "Effective Date"), is entered into between KEYWELL L.L.C., an Illinois limited liability company ("Seller"); and KW METALS ACQUISITION LLC, a Delaware limited liability company ("Buyer").

## RECITALS

WHEREAS, Seller is engaged in the business of specialized metals recycling with a focus on stainless steel, titanium and high temperature alloys (the "Business");

WHEREAS, on September 24, 2013 (the "Petition Date"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, II U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), commencing its bankruptcy case under case number 13-37603 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court");

WHEREAS, Seller continues to operate its business and manage its properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Buyer desires to purchase and assume from Seller, and Seller desires to sell, assign, and transfer to Buyer, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities (each as defined below) on the terms and subject to the conditions set forth in this Agreement (the "Sale").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"Accounts Receivable" has the meaning set forth in **Section 2.02(b)**.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affected Assets" has the meaning set forth in **Section 6.14(b)(i)**.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, the Seller's officers and the members of the Seller's board of directors shall not constitute "Affiliates" of the Seller for purposes of **Section 6.03**.

"Agreement" has the meaning set forth in the preamble.

"Annual Financial Statements" has the meaning set forth in **Section 4.04.**

"Approval Motion" shall mean that certain Motion of the Debtor for the Entry of an Order: (A) Approving the Sale Process, Bidding Procedures, Bid Protection, Break-up Fee and Form of Asset Purchase Agreement for the Sale of Certain Assets of the Estate; (B) Scheduling a Public Auction and Authorizing the Sale of the Assets Free and Clear of Liens, Claims, Encumbrances and Interests; and (C) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases [Doc. No. 23] filed in the Bankruptcy Case.

"Assigned Contracts" has the meaning set forth in **Section 2.01(a).**

"Assignment and Assumption Agreement" has the meaning set forth in **Section 3.02(a)(ii).**

"Assignment and Assumption of Lease" has the meaning set forth in **Section 3.02(a)(iv).**

"Assumed Liabilities" has the meaning set forth in **Section 2.03.**

"ATI" has the meaning set forth in **Section 4.12.**

"Atlanta Lease" means that certain Lease, dated December 1, 1994, by and between Herbert Nadel and Keywell Corporation, as amended by that certain First Amendment to Lease, dated April 27, 1999, by and between Herbert Nadel and Seller, as successor in interest by assignment from Keywell Corporation for the facility located at 4650 Stacks Road, Atlanta, Georgia.

"Avoidance Actions" means any and all actual or potential actions to avoid a transfer of property or an obligation incurred by Seller pursuant to any applicable section of the Bankruptcy Code, including, but not limited to, Sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code.

"Balance Sheet" has the meaning set forth in **Section 4.04.**

"Balance Sheet Date" has the meaning set forth in **Section 4.04.**

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" mean any pension, benefit, retirement, compensation, profit-sharing, deferred compensation, incentive, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller for the

2

benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Seller or any spouse or dependent of such individual, or under which Seller has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise.

"Bill of Sale" has the meaning set forth in **Section 3.02(a)(i)**.

"Books and Records" has the meaning set forth in **Section 2.01(j)**.

"Bulk Sales Laws" has the meaning set forth in **Section 6.06**.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Buyer Closing Certificate" has the meaning set forth in **Section 8.03(e)**.

"Buyer Indemnitees" has the meaning set forth in **Section 7.02(a)**.

"Cap" has the meaning set forth in **Section 7.02(b)**.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"Closing" has the meaning set forth in **Section 3.01**.

"Closing Date" has the meaning set forth in **Section 3.01**.

"Closing Payment" has the meaning set forth in **Section 2.06**.

"COBRA" has the meaning set forth in **Section 4.18**.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contingent Payment Agreement" has the meaning set forth in **Section 8.01(d)**.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Cure Costs" means all cash amounts that, pursuant to Section 365 of the Bankruptcy Code, will be required to be paid as of the Closing Date to cure any monetary defaults on the part of Seller under the Assigned Contracts, in each case to the extent such Contract was entered into prior to the commencement of the Bankruptcy Case and as a prerequisite to the assumption of such Assigned

3

Contracts under Section 365 of the Bankruptcy Code; *provided, however*, in the case of any Contract, such Contract is executory.

"Deed" has the meaning set forth in **Section 3.02(a)(iii).**

"Deferred Purchase Price" has the meaning set forth in **Section 2.06.**

"Direct Claim" has the meaning set forth in **Section 7.04(c).**

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"Dollars or $" means the lawful currency of the United States.

"Effective Date" has the meaning set forth in the preamble.

"Employment Loss" has the meaning set forth in **Section 7.02(a)(x).**

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Encumbrance Documents" has the meaning set forth in **Section 4.10(g).**

"Environmental Attributes" means any emissions and renewable energy credits, energy conservation credits, benefits, offsets and allowances, emission reduction credits or words of similar import or regulatory effect (including emissions reduction credits or allowances under all applicable emission trading, compliance or budget programs, or any other federal, state or regional emission, renewable energy or energy conservation trading or budget program) that have been held, allocated to or acquired for the development, construction, ownership, lease, operation, use or maintenance of the Business or the Purchased Assets or as of: (a) the date of this Agreement; and (b) future years for which allocations have been established and are in effect as of the date of this Agreement.

"Environmental Claim" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials at, on, under or migrating from the Real Property; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit that is the subject of an Environmental Notice that relates to the ownership, lease, operation or use of the Purchased Assets.

"Environmental Law" means any applicable Law presently in effect and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use,

4

containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1970, 1977, and 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in **Section 2.02**.

"Excluded Contracts" has the meaning set forth in **Section 2.02(d)**.

"Excluded Liabilities" has the meaning set forth in **Section 2.04**.

"Excluded Real Property" has the meaning set forth in **Section 2.02(e)**.

"Final Order" means any order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as to which the time to file an appeal, a motion for rehearing or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Financial Statements" has the meaning set forth in **Section 4.04**.

"FIRPTA Certificate" has the meaning set forth in **Section 8.02(l)**.

"Frewsburg Equipment" means all furniture, fixtures, equipment, machinery, tools, vehicles, rail cars, office equipment, supplies, computers, telephones and other tangible personal property owned or used by Seller in the operation of the Business and located at Seller's Frewsburg, New York facility, including, without limitation, those items set forth on **Section 2.01(k)** of the Disclosure Schedules."

"GAAP" means United States generally accepted accounting principles in effect from time to time.

5

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Gross Purchase Price" means Fifteen Million Eight Hundred Thousand and No/100 Dollars ($15,800,000).

"Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Hilco Appraisal" means that certain Hilco Appraisal, dated March 20, 2012, conducted by Hilco Appraisal Services, LLC, whereby Hilco inspected and appraised certain machinery and equipment of Keywell LLC on March 5-8, 2012 to provide a disinterested statement of the value of subject machinery and equipment based on the then current market conditions.

"Indebtedness" means, with respect to any Person, without duplication:

(a)     obligations of such Person for borrowed money, or otherwise evidenced by bonds, debentures, notes or similar instruments;

(b)     all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person;

(c)     all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding obligations of such Person to creditors for raw materials, inventory, services and supplies incurred in the ordinary course of such Person's business);

(d)     all obligations of such Person under leases which have been or should be treated, in accordance with GAAP, as capitalized lease obligations of such Person;

(e)     all obligations of others secured by any Lien on property or assets owned or acquired by such Person, whether or not the obligations secured thereby have been assumed;

(f)     all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof);

(g)     all letters of credit issued for the account of such Person (excluding letters of credit issued for the benefit of suppliers to support accounts payable to suppliers incurred in the ordinary course of business); and

6

(h)      all guarantees and arrangements having the economic effect of a guarantee of such Person of any of the foregoing of any other Person.

"Indemnified Party" has the meaning set forth in **Section 7.04**.

"Indemnifying Party" has the meaning set forth in **Section 7.04**.

"Intellectual Property" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered or unregistered, and all registrations and applications for registration of such trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications; and (f) all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing.

"Intellectual Property Assets" means all Intellectual Property owned or used by Seller in the operation of the Business.

"Intellectual Property Licenses" means all licenses, sublicenses and other agreements by or through which other Persons, including Seller's Affiliates, grant Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property.

"Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Interim Financial Statements" has the meaning set forth in **Section 4.04**.

"Inventory" has the meaning set forth in **Section 2.02(c)**.

"Key Fasteners Agreement" means that certain Data Processing Services Agreement dated as of March 26, 2009 by and between Seller and Key Fasteners Corporation, as amended by that certain letter agreement dated May 9, 2013 from Seller to Key Fasteners Corporation, and as further supplemented.

7

"Knowledge of Seller or Seller's Knowledge" or any other similar knowledge qualification, means (a) the actual knowledge of the Seller's Chief Executive Officer and/or Chief Financial Officer after a reasonable internal investigation, and (b) the actual knowledge of all other officers of Seller at or above the level of Senior Vice President, without investigation.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" has the meaning set forth in **Section 4.10(b)**.

"Leases" has the meaning set forth in **Section 4.10(b)**.

"Liabilities" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"Lien" means any lien, mortgage, pledge, hypothecation, security interest, encumbrance, easement, right-of-way, license, encroachment, set-back, servitude, restrictive covenant, consent, option, royalty, put or call right, right of first refusal, voting right, charge, lease, sublease, right to possession or other restrictions or encumbrances or claims of any nature whatsoever.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however*, that "Losses" shall not include special damages, incidental damages, consequential damages (including, without limitation, for lost profit or revenue), punitive damages, exemplary damages, multiple of damages or any recovery based upon the expected revenue or earnings to be derived from Buyer's ownership and operation of the Purchased Assets, except to the extent recovery thereof is actually paid by the Buyer to the claimant in a Third Party Claim.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the value of the Purchased Assets, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"Material Customers" has the meaning set forth in **Section 4.12**.

"Net Purchase Price" has the meaning set forth in **Section 2.06**.

"Ordinary Course" or "Ordinary Course of Business" means the ownership and operation of the Purchased Assets in accordance with Seller's practices and procedures consistent with the period commencing on January 1, 2013 and ending on the Effective Date.

"Owned Real Property" has the meaning set forth in **Section 4.10(a)**.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

8

"Permitted Encumbrances" means easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the Purchased Assets, which do not prohibit or interfere with the current operation of any Real Property and which do not render title to any Real Property unmarketable.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Proprietary Software" means that certain Bytware License Agreement, dated December 1, 2012.

"Purchase Price Deposit" has the meaning set forth in **Section 2.05(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.01**.

"Real Estate Impositions" has the meaning set forth in **Section 4.10(i)**.

"Real Property" means, collectively, the Owned Real Property and the Leased Real Property.

"Rejection Damage Claims" means all claims arising from or related to the rejection of a Contract under Section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of Contracts previously assumed.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Restricted Business" means the specialized metals recycling industry with a focus on stainless steel and high temperature alloys.

"Restricted Period" has the meaning set forth in **Section 6.03(a)**.

"Retrieval Period" has the meaning set forth in **Section 6.17**.

"Sale" has the meaning set forth in the Recitals.

"Sale Hearing" means the hearing scheduled by the Bankruptcy Court to approve the Sale.

9

"Sale Order" means the order of the Bankruptcy Court approving the Sale substantially in the form attached hereto as **Exhibit A**, as a Final Order; *provided, however*, that Buyer shall have the right to waive the finality requirement of the Sale Order and close the transaction in its sole and absolute discretion.

"Seller" has the meaning set forth in the preamble.

"Seller Closing Certificate" has the meaning set forth in **Section 8.02(a)(i)**.

"Seller Indemnitees" has the meaning set forth in **Section 7.03(a)**.

"Seller Information" has the meaning set forth in **Section 6.04(a)(i)**.

"Seller Marks" has the meaning set forth in **Section 6.18**.

"Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxing Authority" means, with respect to any Tax, a Governmental Authority that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity, including, but not limited to, any Governmental Authority that imposes, or is charged with collecting, social security or similar charges or premiums.

"Termination Damages" means the actual damages, reasonable attorneys' fees and the cost of enforcing the provisions of **Section 9.02**, arising from a breach of this Agreement by Buyer resulting in the termination of this Agreement by Seller pursuant to **Section 9.01(e)(ii)(1)**; *provided, however*, that "Termination Damages" shall not include special damages, incidental damages, consequential damages (including, without limitation, for lost profit or revenue), punitive damages, exemplary damages or multiple of damages; *provided, further*, that nothing in this definition or Agreement shall limit or otherwise reduce the damages available to Seller under the Contingent Payment Agreement.

"Termination Damages Cap" has the meaning set forth in **Section 9.02(b)**.

"Termination Date" means January 31, 2014.

"Territory" means the states of New York, North Carolina, and Pennsylvania.

"Third Party Claim" has the meaning set forth in **Section 7.04(a)**.

"Threshold" has the meaning set forth in **Section 7.02(b)**.

10

"Transaction Documents" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Deeds, Assignment and Assumption of Leases, Contingent Payment Agreement, Transition Services Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"Transition Services Agreement" has the meaning set forth in **Section 8.01(e)**.

"Union" has the meaning set forth in **Section 4.16(a)**.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"West Mifflin Lease" means that certain Lease, dated May 1, 1976, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as amended by that certain First Amendment to Lease, dated an unspecified day in August of 1977, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as further amended by that certain Letter Agreement, dated October 22, 1979, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as further amended by that certain Agreement and Assignment of Lease, dated an unspecified day in December of 1987, by and among Vac Air Alloys Corporation, Samuel G. Keywell Company, and Duquesne Slag Products Company, as further amended by that certain Second Amendment to Lease, dated January 1, 1989, by and between Duquesne Slag Products Company and Samuel G. Keywell Company, as successor in interest by assignment from Vac Air Alloys Corporation, as further amended by that certain [missing Third Amendment], and as further amended by that certain Fourth Amendment to Lease, dated May 1, 2007, by and between La Farge Corporation and Seller for the facility located at 890 Noble Drive, West Mifflin, Pennsylvania.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01.    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein and to the maximum extent permissible under Sections 363 and 365 of the Bankruptcy Code, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of Seller's right, title and interest in, to and under the Purchased Assets. The "Purchased Assets" means all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims of Seller related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller (other than the Excluded Assets), including, without limitation, each of the following assets:

(a)    all Contracts, including Intellectual Property Licenses, listed on **Section 2.01(a)** of the Disclosure Schedules (the "Assigned Contracts");

(b)    all Intellectual Property Assets of Seller;

(c)    all furniture, fixtures, equipment, machinery, tools, vehicles, rail cars, office equipment, supplies, computers, telephones and other tangible personal property owned or used by Seller in the operation of the Business, including, without limitation, the Frewsburg Equipment and those items set forth on **Section 2.01(c)** of the Disclosure Schedules;

11

       (d)     all Owned Real Property and Leased Real Property set forth on **Section 2.01(d)** of the Disclosure Schedules;

       (e)     all Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets at any of the Owned Real Property or Leased Real Property included among the Purchased Assets, including, without limitation, those listed on **Section 4.14(b)** and **Section 4.15(b)** of the Disclosure Schedules;

       (f)     all rights to any Actions of any nature available to or being pursued by Seller to the extent related specifically to any of the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

       (g)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

       (h)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

       (i)     all insurance benefits, including rights and proceeds, to the extent related specifically to any of the Purchased Assets or the Assumed Liabilities;

       (j)     originals, or where not available, copies, of all books and records relating specifically to any of the Purchased Assets, including, but not limited to, machinery and equipment maintenance files, rail car maintenance records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licensees (collectively, "Books and Records"); and

       (k)     all intangibles, goodwill and the going concern value of the Seller associated with the Purchased Assets (including all rights associated with the name "Keywell" or any variations thereof).

Notwithstanding the foregoing, title to the Frewsburg Equipment and Assigned Contracts necessary for Seller to perform services under the Transition Services Agreement shall be retained by Seller and shall not pass to Buyer until such time as the Frewsburg Equipment is delivered by Seller to Buyer pursuant to the terms of the Transition Services Agreement upon termination thereof in accordance with its terms; provided, that, upon Buyer's earlier request, Seller shall promptly transfer title to any Frewsburg Equipment identified by Buyer to be relocated or sold prior to the termination of the Transition Services Agreement; provided, further, that all costs associated with the removal and delivery by Seller of the Frewsburg Equipment, including without limitation, additional overhead, subcontractor services, freight and all-risk insurance, shall be borne by Buyer.

       **Section 2.02.   Excluded Assets.**  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

12

(a)      all cash and cash equivalents (including cash used to collateralize obligations under open letters of credit);

(b)      all deposits, rebates, refunds and other return of premiums relating to workers' compensation insurance;

(c)      all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("Accounts Receivable");

(d)      all scrap metal inventory held for resale ("Inventory");

(e)      all Contracts that are not Assigned Contracts (the "Excluded Contracts");

(f)      all Owned Real Property and Leased Real Property not listed on **Section 2.01(d)** of the Disclosure Schedules (the "Excluded Real Property");

(g)      the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(h)      all Benefit Plans and assets attributable thereto;

(i)      any Avoidance Actions;

(j)      any Assigned Contract and rights thereunder which, based upon the objection of a party to an Assigned Contract other than Seller or any of its Affiliates, the Bankruptcy Court has determined shall not be assigned to the Buyer under applicable provisions of the Bankruptcy Code without the consent or approval of the other party thereto; and

(k)      the rights which accrue or will accrue to Seller under the Transaction Documents.

Section 2.03.    **Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following liabilities of Seller (collectively, the "Assumed Liabilities"), and no other Liabilities:

(a)      all liabilities in respect of the Assigned Contracts, including all Cure Costs, but only to the extent that such liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing; and

(b)      those liabilities of Seller set forth on **Section 2.03(b)** of the Disclosure Schedules.

Section 2.04.    **Excluded Liabilities.** Notwithstanding the provisions of **Section 2.03** or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "Excluded Liabilities"). Seller shall remain solely liable and responsible for all Excluded Liabilities. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and

13

the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)     any Liability for (i) Taxes of Seller (or any member or Affiliate of Seller) or relating to the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to **Section 6.08**; or (iii) other Taxes of Seller (or any member or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any member or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)     any Liabilities relating to or arising out of the Excluded Assets;

(d)     any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Seller to the extent such Action relates to such operation on or prior to the Closing Date;

(e)     any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(f)     any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(g)     any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(h)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(i)     any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(j)     any trade accounts payable of Seller, including, without limitation, payables: (i) which constitute intercompany payables owing to Affiliates of Seller and (ii) which constitute debt, loans or credit facilities to financial institutions;

(k)     any Liabilities of the Seller relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Seller' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(l)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary

14

obligations by same), except for indemnification of same pursuant to **Section 7.03** as Seller Indemnitees;

(m)  any Liabilities under the Excluded Contracts or any other Contracts, including Intellectual Property Licenses, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(n)  any Liabilities associated with debt, loans or credit facilities of Seller owing to financial institutions that are not described in **Section 2.03(b)** of the Disclosure Schedules;

(o)  any Liabilities arising from or related to any deferred compensation or related agreements entered into by the Seller with any current or former employees, including without limitation, those Deferred Compensation Agreements set forth in **Section 7.02(a)** of the Disclosure Schedule;

(p)  all Rejection Damage Claims;

(q)  any costs or expenses incurred in connection with or related to the administration of the Chapter 11 Cases, including "allowed administrative expenses" under section 503(b) of the Bankruptcy Code, and professional fees or expenses of any of the Seller, attorneys, accountants or other professional advisors; and

(r)  any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 2.05.  Purchase Price Deposit.**

(a)  _Initial Deposit_.  Pursuant to the Bid Procedures, on the Effective Date, Buyer deposited with Seller, by wire transfer of immediately available funds, as an earnest good-faith money deposit and security for the performance of Buyer's obligations under this Agreement, an amount equal to One Million Fifty Thousand and No/100 Dollars ($1,050,000) (the "Purchase Price Deposit").

(b)  _Application of Deposit_.  At the Closing, the Purchase Price Deposit (and accrued interest thereon, if any) shall be applied toward the Net Purchase Price and in all other events the Purchase Price Deposit shall be distributed in accordance with **Section 9.02**.

**Section 2.06.  Purchase Price.**  The purchase price for the Purchased Assets (the "Net Purchase Price") shall consist of cash in an amount equal to the difference of (i) the Gross Purchase Price, _less_ (ii) the aggregate amount of Cure Costs.  At Closing, Buyer shall pay to Seller by wire transfer of immediately available funds to an account designated in writing by Seller the following amount (the "Closing Payment"): an amount equal to the Net Purchase Price _less_ the Purchase Price Deposit _less_ Six Hundred Thousand and No/100 Dollars (said $600,000 being the "Deferred Purchase Price").  The Deferred Purchase Price shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer in four (4) consecutive annual payments of One Hundred Fifty Thousand and No/100 Dollars ($150,000) each, commencing on the one (1) year anniversary of the Closing Date.

15

**Section 2.07.     Allocation of Purchase Price.** Seller and Buyer agree that the Gross Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) in a manner consistent with the Hilco Appraisal and Seller's internal valuation report, as provided to Buyer prior to the Effective Date, and Section 1060 of the Code and the regulations promulgated thereunder. Neither Seller nor Buyer shall take any position in any Tax Return which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.08.     Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Net Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 2.09.     Third Party Consents.** To the extent that Seller's rights under any Contract constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer under the Bankruptcy Code without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use diligent efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

**Section 2.10.     Contract Designation Rights.**

(a)     Information.  On or prior to the Effective Date, Seller shall have delivered to Buyer Seller's estimate of the amount of the Cure Costs associated with the Assigned Contracts.

(b)     Motions and Notices.  Any motions filed by Seller with, and any proposed orders submitted by Seller to, the Bankruptcy Court seeking authorization to assume and assign the Assigned Contracts shall be in form and substance satisfactory to Buyer in its reasonable discretion. Seller shall consult with, and give due consideration to the views and concerns of, Buyer prior to compromising or commencing any Action with respect to any material payment required to be made under the Bankruptcy Code to effectuate the assumption of any such Contract, including using commercially reasonable efforts to provide five (5) days' notice of any such compromise or Action to Buyer.

(c)     Determination of Assigned Contracts.  Any Contract designated to be assumed by Seller and assigned to Buyer hereunder shall be accompanied by such information or documentation related to "adequate assurance of future performance" as shall be reasonably required in connection with the assumption and assignment of such Contract, and upon Bankruptcy Court approval for the assumption and assignment thereof to Buyer, shall constitute a Purchased Asset hereunder. Any Contract that is not assumed as provided above shall be an Excluded Asset, and shall not constitute a Purchased Asset hereunder. Notwithstanding anything to the contrary set forth in this Agreement, to the extent that, prior to Closing, any Assigned Contract is not subject to an order of the Bankruptcy Court with respect to the assumption and assignment of such Assigned Contract, any Liabilities of

16

Seller related to such Assigned Contract shall be the responsibility of Seller until such Assigned Contract is either assumed by Seller and assigned to Buyer or rejected by Seller.

(d)      Cure Costs.  At Closing, Buyer shall pay or cause to be paid any and all Cure Costs in respect of all Assigned Contracts in accordance with **Section 3.02(c)**, unless other arrangements are agreed to by Seller and the Assigned Contract counterparty in writing.

(e)      Consents.  Nothing in this Agreement shall be construed as an attempt by either Seller to assign any Contract to the extent that such Contract is not assignable under the Bankruptcy Code or otherwise without the Consent of the other party or parties thereto, and the Consent of such other party has not been given or received, as applicable.

(f)      Key Fasteners Agreement.  With respect to the Key Fasteners Agreement, Buyer shall assume the obligations thereunder for a period of one (1) year from the Closing Date. Thereafter, Buyer's sole obligation with respect to Key Fasteners Corporation shall be to (i) provide authorized personnel of Key Fasteners Corporation reasonable access, subject to appropriate safeguards, to Seller's computer system on which Key Fasteners Corporation's information is processed and stored and (ii) make all of the Books and Records (as defined in the Key Fasteners Agreement) available for examination and inspection by duly authorized representatives of Key Fasteners Corporation, upon reasonable notice, at any time during ordinary business hours.

**ARTICLE III**
**CLOSING**

**Section 3.01.    Closing.**  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall be consummated on the second (2nd) Business Day after the date upon which all conditions set forth in **Article VIII** hereof have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place, date and time as the Parties may agree, but in no event later than fifteen (15) business days after the entry of the Sale Order.  The Closing shall take place on the date of this Agreement through an exchange of documents through electronic means followed by overnight delivery, or at such other time and place as mutually agreed to by the parties; *provided*, *however*, that the Closing will be deemed to occur at the offices of Haynes and Boone, LLP located at 2323 Victory Avenue, Suite 700, Dallas, Texas 75219.  The date on which the Closing is to occur is herein referred to as the "Closing Date".

**Section 3.02.    Closing Deliverables**

(a)      At the Closing, Seller shall deliver to Buyer the following:

(i)      a bill of sale in the form of **Exhibit B** hereto (the "Bill of Sale") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii)      an assignment and assumption agreement in the form of **Exhibit C** hereto (the "Assignment and Assumption Agreement") and duly executed by Seller, effecting the assignment to and assumption by Buyer or its designated Affiliate(s) of the Purchased Assets and the Assumed Liabilities;

17

(iii)    with respect to each parcel of Owned Real Property listed on **Section 2.01(d)** of the Disclosure Schedules, a special warranty deed in form and substance reasonably satisfactory to Buyer or its designated Affiliate (each, a "Deed") and duly executed and notarized by Seller;

(iv)    with respect to each Lease for the Leased Real Property listed on **Section 2.01(d)** of the Disclosure Schedules, an Assignment and Assumption of Lease in form and substance reasonably satisfactory to Buyer or its designated Affiliate (each, an "Assignment and Assumption of Lease") duly executed by Seller;

(v)    with respect to the Atlanta Lease and the West Mifflin Lease, extensions of such Leases in form and substance reasonably satisfactory to Buyer or its designated Affiliate duly executed by Seller and the landlords party thereto;

(vi)    the FIRPTA Certificate;

(vii)    a certified copy of the Sale Order;

(viii)    the Seller Closing Certificate;

(ix)    the Contingent Payment Agreement;

(x)    the Transition Services Agreement; and

(xi)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    An amount (by wire transfer of immediately available funds) equal to the Closing Payment;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer or its designated Affiliate;

(iii)    with respect to each Lease for the Leased Real Property listed on **Section 2.01(d)** of the Disclosure Schedules, an Assignment and Assumption of Lease duly executed by Buyer or its designated Affiliate;

(iv)    the Buyer Closing Certificate;

(v)    the Contingent Payment Agreement;

(vi)    the Transition Services Agreement; and

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.

18

(c)     Buyer shall deliver or cause to be delivered the Cure Costs to the applicable Persons under the applicable Assigned Contracts.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller hereby represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01.     Organization and Qualification of Seller.** Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Illinois and has full limited liability company power and authority to own, operate or lease the Purchased Assets and to carry on the Business as currently conducted. **Section 4.01** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified would have a Material Adverse Effect.

**Section 4.02.     Authority of Seller.** Subject to the Bankruptcy Court's entry of the Sale Order, Seller has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting the rights of creditors generally, and general principles of equity, good faith and fair dealing. When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting the rights of creditors generally, and general principles of equity, good faith and fair dealing.

**Section 4.03.     No Conflicts; Consents.** Subject to the Bankruptcy Court's entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, operating agreement or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller; (c) except as set forth in **Section 4.03** of the Disclosure Schedules and except for the entry of the Sale Order by the Bankruptcy Court, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller is bound or to which any of

19

the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

Section 4.04. **Financial Statements**. Complete copies of the financial statements consisting of the balance sheet of the Seller as at December 31 in each of the years 2012, 2011 and 2010 and the related statements of income and retained earnings, members' equity and cash flow for the years then ended (the "Annual Financial Statements"), and financial statements consisting of the balance sheet of the Seller as at June 30, 2013 and the related statements of income and retained earnings, members' equity and cash flow for the six -month period then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements") have been delivered to Buyer. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Annual Financial Statements). The Financial Statements are based on the books and records of the Seller, and fairly present the financial condition of the Seller as of the respective dates they were prepared and the results of the operations of the Seller for the periods indicated. The balance sheet of the Seller as of June 30, 2013 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date". Seller maintains a standard system of accounting for the Seller established and administered in accordance with GAAP.

Section 4.05.   **Intentionally Omitted**.

Section 4.06.   **Absence of Certain Changes, Events and Conditions**. Since the Balance Sheet Date, and other than in the Ordinary Course of Business or as set forth on **Section 4.06** of the Disclosure Schedules, there has not been any:

(a)     material adverse change in Seller's business relationship with Allegheny Technologies Inc.'s Allvac operations;

(b)     non-compliance with any applicable Laws that would have a Material Adverse Effect;

(c)     material undisclosed Liabilities pertaining to the Purchased Assets;

(d)     transfer, assignment, sale or other disposition of any of the Purchased Assets;

(e)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(f)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property Assets or Intellectual Property Licenses included among the Purchased Assets;

20

PFS:006682.0007.978248.1

(g)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(h)     acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

(i)     imposition of any Encumbrance upon any of the Purchased Assets;

(j)     declaration or payment of any dividends or distributions on or in respect of any of Seller's membership interest or redemption, purchase or acquisition of Seller's membership interest;

(k)     material change in any method of accounting or accounting practice for the Seller, except as required by GAAP;

(l)     incurrence, assumption or guarantee of any indebtedness for borrowed money except unsecured current obligations and Liabilities incurred in the Ordinary Course of Business;

(m)     grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law;

(n)     adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant, (ii) Benefit Plan, or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(o)     any loan to, or entry into any other material transaction with, any directors, officers or employees;

(p)     purchase, lease or other acquisition of the right to own, use or lease any property or assets for an amount in excess of $100,000, individually (in the case of a lease, per annum) or $100,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of Inventory or supplies in the Ordinary Course of Business; or

(q)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

### Section 4.07.   Assigned Contracts.

(a)     **Section 4.07(a)** of the Disclosure Schedules contains a complete listing of all material Contracts related to the Business. Materially complete and correct copies of each Assigned Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been delivered to Buyer.

(b)     Seller has not provided or received any notice of any intention to terminate, any Assigned Contract. Other than on account of non-payment to creditors of obligations incurred since January 1, 2013, there are no material disputes pending or threatened under any Assigned Contract.

21

**Section 4.08.   Title to Purchased Assets.**   As of the Effective Date, other than the Permitted Encumbrances and those items set forth in **Section 4.08** of the Disclosure Schedules, Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of any Encumbrances. Subject to the entry of the Sale Order by the Bankruptcy Court, as of the Closing Date, the Seller will have complete and unrestricted power and unqualified right to sell, assign, transfer, convey and deliver the Purchased Assets to the Buyer without penalty or other adverse consequences except to the extent Intellectual Property Assets are not assignable under bankruptcy Law.   Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, subject to the entry of the Sale Order by the Bankruptcy Court, the Buyer will own, with good, valid and marketable title, or lease, under valid and subsisting leases, or otherwise acquire the interests of the Seller in the Purchased Assets, free and clear of any Encumbrances, and without incurring any penalty or other adverse consequence, including any increase in rentals, royalties, or license or other fees imposed as a result of, or arising from, the consummation of the transactions contemplated by this Agreement. All such Purchased Assets (including leasehold interests) will be free and clear of Encumbrances upon Closing except for Permitted Encumbrances.

**Section 4.09.   Condition and Sufficiency of Assets.**   At all times, the Seller has caused the Purchased Assets to be maintained in accordance with commercially reasonable business practice, and except as set forth on **Section 4.09** of the Disclosure Schedules, all the Purchased Assets are in operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which Seller has used them.   Except as set forth on **Section 4.09** of the Disclosure Schedules, the machinery, equipment, vehicles, rail cars and other items of tangible personal property included in the Purchased Assets are in operating condition, ordinary wear and tear excepted, and are adequate for the uses to which they are being put.   To Seller's Knowledge, none of such machinery, equipment, vehicles, rail cars and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets are sufficient for the continued conduct of the Business at the Real Property after the Closing in substantially the same manner as conducted by Seller prior to the Closing.

**Section 4.10.   Real Property.**

(a)   **Section 4.10(a)** of the Disclosure Schedules sets forth each parcel of real property owned by Seller (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "Owned Real Property"), including with respect to each property, the address location and use. Seller has delivered to Buyer copies of the deeds and other instruments (as recorded) by which Seller acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Seller with respect to such parcel. With respect to each parcel of Owned Real Property:

(i)   Seller has good and marketable fee simple title to each parcel of Owned Real Property, free and clear of all Encumbrances, except Permitted Encumbrances;

(ii)   Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(iii)   there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase or lease such Owned Real Property or any portion thereof or interest therein.

22

(b)      **Section 4.10(b)** of the Disclosure Schedules sets forth a list of each parcel of real property leased by Seller (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "Leased Real Property"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "Leases"). Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease:

(i)      such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)      Seller is not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)      Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)      Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)      Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(c)      Seller has not received any written notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty.

(d)      The Real Property is sufficient for the continued conduct of the Business as it pertains to the Purchased Assets after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as it pertains to the Purchased Assets as currently conducted.

(e)      Seller has not granted any unexpired option agreements or rights of first refusal with respect to the lease or purchase of the Real Property or any portion thereof or any other unexpired rights in favor of any third party to lease or purchase or otherwise acquire the Real Property or any portion thereof, which, in each case, would be triggered by this Agreement or the Closing.

(f)      Each parcel of Real Property has direct vehicular and pedestrian access to a public street adjoining the Real Property, or has vehicular and pedestrian access to a public street via an insurable, permanent, irrevocable and appurtenant easement benefiting such parcel of Real Property,

23

and such access is not dependent on any land or other real property interest that is not included in the Real Property.

(g)     The current use and occupancy of the Real Property and the operation of the Seller's Business as currently conducted thereon does not violate in any material respect any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement affecting such Real Property (the "Encumbrance Documents"). Seller has not received any notice of any such violation of any Encumbrance Documents, and, to the Seller's Knowledge, there is no basis for the issuance of any such notice or the taking of any action for any such material violation.

(h)     None of the Real Property improvements encroaches on any land that is not included in the Real Property or on any easement affecting such Real Property, or violates any building lines or set-back lines, and there are no encroachments onto the Real Property, or any portion thereof, that would interfere in any material respect with the use or occupancy of such Real Property or the continued operation of the Seller's Business as currently conducted thereon.

(i)     Each parcel of Real Property is a separate lot for real estate tax and assessment purposes, and no other real property is included in such tax parcel. There are no Taxes, assessments, fees, charges or similar costs or expenses imposed by any governmental authority, association or other entity having jurisdiction over the Real Property (collectively, the "Real Estate Impositions") with respect to any Real Property or portion thereof that are delinquent. There is no pending or, to the Seller's Knowledge, threatened increase or special assessment or reassessment of any Real Estate Imposition for such parcel.

(j)     To the Sellers' Knowledge, none of the Real Property, nor any of the Real Property improvements, is located in a flood hazard area (as defined by the Federal Emergency Management Agency).

### Section 4.11.   Intellectual Property.

(a)     **Section 4.11(a)** of the Disclosure Schedules lists all (i) Intellectual Property Registrations included in the Purchased Assets and (ii) Intellectual Property Assets that are not registered but that are material to the operation of the Purchased Assets. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to such Intellectual Property Registrations.

(b)     Except as set forth in **Section 4.11(b)** of the Disclosure Schedules, Seller owns, exclusively or jointly with other Persons, all right, title and interest in and to the Intellectual Property Assets, free and clear of Encumbrances. Without limiting the generality of the foregoing, Seller has entered into binding, written agreements with every current and former employee of Seller, and with every current and former independent contractor, whereby such employees and independent contractors (i) assign to Seller any ownership interest and right they may have in such Intellectual Property Assets; and (ii) acknowledge Seller's exclusive ownership of all such Intellectual Property Assets. Seller has provided Buyer with true and complete copies of all such agreements. Seller is in

24

full compliance with all legal requirements applicable to such Intellectual Property Assets and Seller's ownership and use thereof.

(c)     **Section 4.11(c)** of the Disclosure Schedules lists all Intellectual Property Licenses required to operate the Business or use the Purchased Assets, all of which are included in the Purchased Assets. Seller has provided Buyer with true and complete copies of all such Intellectual Property Licenses.   All such Intellectual Property Licenses are valid, binding and enforceable between Seller and the other parties thereto, and Seller and such other parties are in full compliance with the terms and conditions of such Intellectual Property Licenses.

(d)     The Intellectual Property Assets (i) as currently or formerly owned, licensed or used by Seller do not (x) with respect to any Intellectual Property Assets owned, created or developed by Seller, including the Proprietary Software, infringe, violate or misappropriate the Intellectual Property of any Person, or (y) with respect to all other Intellectual Property Assets, to the Seller's Knowledge, infringe, violate or misappropriate the Intellectual Property of any Person, and (ii) as proposed to be used by Buyer will not, to the Seller's Knowledge, infringe, violate or misappropriate the Intellectual Property of any Person.   The operation of the Business as currently conducted by Seller does not infringe, violate or misappropriate the Intellectual Property of any Person.   Seller has not received any communication, and no Action has been instituted, settled or, to Seller's Knowledge, threatened that alleges any such infringement, violation or misappropriation, and none of the Intellectual Property are subject to any outstanding Governmental Order.

(e)     **Section 4.11(e)** of the Disclosure Schedules lists all licenses, sublicenses and other agreements pursuant to which Seller grants rights or authority to any Person with respect to any Intellectual Property Assets or Intellectual Property Licenses included in the Purchased Assets. Seller has provided Buyer with true and complete copies of all such agreements. All such agreements are valid, binding and enforceable between Seller and the other parties thereto, and Seller and such other parties are in full compliance with the terms and conditions of such agreements. To the Seller's Knowledge, no Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Intellectual Property Assets.

**Section 4.12.   Customers and Suppliers.**   Section 4.12 of the Disclosure Schedules sets forth the top ten (10) customers of Seller for each of the two most recent fiscal years (collectively, the "Material Customers") and the amount of consideration paid by each Material Customer during such periods.   Seller performed $3,553,000 (comprising 11,406,000 lbs.) of toll processing business for Allegheny Technologies Incorporated and its subsidiaries (collectively, "ATI") during the six months ending on June 30, 2013. Seller has not received any notice, and has no reason to believe, that ATI has ceased, or intends to cease after the Closing, to use the goods or services previously provided by Seller and to be provided by Buyer, or that ATI will not immediately after Closing establish and maintain with Buyer (without reduction) the same relationship existing between ATI and Seller.

**Section 4.13.   Legal Proceedings; Governmental Orders.**

(a)     Except as set forth in **Section 4.13(a)** of the Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.   No event has occurred or

25

circumstances exist that may give rise to, or serve as a basis for, any such Action, other than non-payment to creditors of obligations incurred since January 1, 2013.

(b)    Except as set forth in **Section 4.13(b)** of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Purchased Assets or the Assumed Liabilities. The Seller is in compliance with the terms of each Governmental Order set forth in **Section 4.13(b)** of the Disclosure Schedules. No event has occurred or circumstances exist that may constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

## Section 4.14.    Compliance With Laws; Permits.

(a)    Except as set forth in **Section 4.14(a)** of the Disclosure Schedules, Seller has complied, and is now complying, in all material respects, with all Laws applicable to the Seller or the ownership and use of the Purchased Assets.

(b)    All Permits required for Seller to conduct the Business relating to the Purchased Assets as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 4.14(b)** of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted with the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration. To the Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 4.14(b)** of the Disclosure Schedules.

## Section 4.15.    Environmental Matters.    Except as set forth in the Disclosure Schedules and the Phase I Environmental Site Assessments identified thereon:

(a)    The operations of Seller are currently and have been in compliance in all material respects with all Environmental Laws. Seller has not received from any Person, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)    Seller has obtained and is in compliance with all Environmental Permits (each of which is disclosed in **Section 4.15(b)** of the Disclosure Schedules) and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Seller through the Closing Date in accordance with Environmental Law, and Seller has no Knowledge of any condition, event or circumstance that might prevent or impede, after the Closing Date, the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Seller has undertaken, or will undertake prior to the Closing Date, diligent measures necessary to facilitate transferability of the same, and other than the general lack of transferability of Permits under applicable Laws, Seller has no Knowledge of any condition, event or circumstance that might prevent or impede the transferability of the same, and has not received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

26

(c)     None of the Business or the Purchased Assets or any real property currently or formerly owned, leased or operated by Seller is listed on, or has been proposed for listing on, the National Priorities List under CERCLA, or any similar state list.

(d)     Seller has not Released any Hazardous Materials in contravention of Environmental Law with respect to the Business or the Purchased Assets or any real property currently or formerly owned, leased or operated by Seller, and Seller has not received an Environmental Notice that any of the Business or the Purchased Assets or real property currently or formerly owned, leased or operated by Seller (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Seller.

(e)     **Section 4.15(e)** of the Disclosure Schedules contains a complete and accurate list of all active or abandoned aboveground or underground storage tanks owned or operated by Seller.

(f)     **Section 4.15(f)** of the Disclosure Schedules contains a complete and accurate list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Seller and any predecessors as to which Seller may retain liability, and to the Seller's Knowledge, none of these facilities or locations has been placed or proposed for placement on the National Priorities List under CERCLA, or any similar state list, and Seller has not received any Environmental Notice regarding potential liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Seller.

(g)     Except to the extent set forth in any of the Assigned Contracts, Seller has not retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

(h)     Seller has provided or otherwise made available to Buyer and listed in **Section 4.15(h)** of the Disclosure Schedules: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to any real property currently or formerly owned, leased or operated by Seller which are in the possession or control of Seller related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

(i)     Seller is not aware of or reasonably anticipates, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the Business or the Purchased Assets as currently carried out.

(j)     To the extent it owns any Environmental Attributes, Seller has not entered into any contract or pledge to transfer, lease, license, guarantee, sell, mortgage, pledge or otherwise dispose of or encumber any such Environmental Attributes as of the date hereof, nor does Seller have Knowledge of any condition, event or circumstance that might prevent, impede or materially increase

27

the costs associated with the transfer (if required) to Buyer of any such Environmental Attributes after the Closing Date.

(k)    Seller hereby represents and warrants that it has provided to Buyer copies of all Phase I Environmental Site Assessments identified on the Disclosure Schedules.

### Section 4.16    Employment Matters.

(a)    Except as described on **Section 4.16(a)** of the Disclosure Schedules, Seller is not, and has not been for the past ten years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "Union"), and, except as described on **Section 4.16(a)** of the Disclosure Schedules, there is not, and has not been for the past ten years, any Union representing or purporting to represent any employee of Seller, and, to Seller's Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. In the past ten (10) years, there has never been, nor has there been any overt threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Seller.

(b)    Seller is and has been in compliance in all material respects with the terms of the collective bargaining agreements and other Contracts listed on **Section 4.16(a)** of the Disclosure Schedules and all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of the Seller, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by Seller as consultants or independent contractors of the Seller are properly treated as independent contractors under all applicable Laws. All employees of the Seller classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. Except as set forth in **Section 4.16(b)** of the Disclosure Schedules, there are no Actions against Seller pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Seller, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment related matter arising under applicable Laws.

(c)    Seller has complied with the WARN Act in all material respects.

### Section 4.17    Taxes.    Except as set forth in Section 4.17 of the Disclosure Schedules:

(a)    All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all material respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

28

(b)      Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)      No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)      All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any Taxing Authority have been fully paid.

(e)      Seller is not a party to any Action by any Taxing Authority. There are no pending or threatened Actions by any Taxing Authority.

(f)      There are no Encumbrances for Taxes upon any of the Purchased Assets nor, to Seller's Knowledge, is any Taxing Authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)      Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(h)      Seller is not, and has not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011 4(b).

(i)      None of the Purchased Assets is property that Seller is required to treat as being owned by any other Person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, as amended.

(j)      None of the Purchased Assets is tax-exempt use property within the meaning of Section 168(h) of the Code.

(k)      Since the date of its formation, the Company has been a "partnership" for federal and state income tax purposes and the Company has never been taxable as an "association," "C Corporation" or "S Corporation" for federal or state income tax purposes.

Section 4.18.    Employee Benefits.  There are no pending or, to the Knowledge of Seller, threatened claims by or on behalf of any the Benefit Plans, by any Person covered thereby (other than ordinary claims for benefits submitted by participants or beneficiaries) or any Governmental Authority, and neither Seller nor any Person treated as a single-employer with Seller under Section 414 of the Code has any obligation under any Benefit Plan, or with respect to which Buyer would have any Liability, or that could result in a Lien attaching to the Purchased Assets.  With respect to each Benefit Plan that is a "group health plan" (as defined in Section 4980B(g) of the Code), Seller has provided Buyer with a list of the names and contact information for each individual who: (i) is currently receiving health care continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), (ii) is eligible to receive health care continuation coverage under COBRA and with respect to whom the "election period" (as defined in Section 4980B(f)(5) of the Code) has not expired, or (iii) will otherwise be an "M&A Qualified Beneficiary" (as such phrase is defined in Section 54.4980B-9, Q&A-4 of the Income Tax Regulations) in connection with the transaction contemplated by this Agreement.

29

Section 4.19. **Brokers.** Except for Eureka Capital Markets, LLC, Seller owes no broker, finder or investment banker any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document.

Section 4.20. **Manufacturing and Marketing Rights.** Except as set forth in **Section 4.20** of the Disclosure Schedules, Seller has not granted rights to manufacture, produce, assemble, license, market, or sell its products to any other Person and is not bound by any agreement that affects the Seller's exclusive right to develop, manufacture, assemble, distribute, market or sell its products.

Section 4.21. **Exclusive Representations and Warranties.** Except as expressly set forth in this Article IV, Seller makes no representation or warranty, express or implied, at law or in equity, in respect of Seller, the Business or the Purchased Assets, including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed. Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in this Article IV and other than claims arising from fraud, criminal activity or willful misconduct, Buyer is purchasing the Purchased Assets on an "As-Is, Where-Is" basis.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer hereby represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof.

Section 5.01. **Organization of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

Section 5.02. **Authority of Buyer.** Buyer has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting the rights of creditors generally, and general principles of equity, good faith and fair dealing. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting the rights of creditors generally, and general principles of equity, good faith and fair dealing.

Section 5.03. **No Conflicts; Consents.** Subject to the Bankruptcy Court's entry of the Sale Order, the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated

30

hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, company agreement or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

Section 5.04.    **Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

Section 5.05.    **Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE VI
## COVENANTS

Section 6.01.    **Employees and Employee Benefits.**

(a)    Concurrent with the Closing, Seller shall terminate all employees of the Seller who are actively at work on such date and who Buyer identifies at least ten (10) days prior to the Closing Date as someone to whom Buyer intends to offer employment.  Seller shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this **Section 6.01(a)**.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Seller, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date.

(c)    Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Seller or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Seller which relate to events occurring on or prior to the Closing Date.

(d)    Each employee of the Seller who becomes employed by Buyer, if any, in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and

31