benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(e)    Each employee of the Seller who becomes employed by Buyer in connection with the transaction shall be given service credit based upon the number of years of service for the purpose of eligibility under the group health plan and eligibility and vesting only under the defined contribution retirement plan for his or her period of service with the Seller prior to the Closing Date; *provided, however*, that such service crediting shall be permitted and consistent with Buyer's defined contribution retirement plan.

**Section 6.02.    Intentionally Omitted.**

**Section 6.03.    Non-competition; Non-solicitation.**

(a)    Except under the Transition Services Agreement, for a period of three (3) years commencing on the Closing Date (the "Restricted Period"), Seller shall not (and Seller shall not permit any of its Affiliates to), directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Seller (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Buyer after the Closing), or any other Person who has a material business relationship with the Seller, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)    During the Restricted Period, Seller shall not (and Seller shall not permit any of its Affiliates to) directly or indirectly, hire or solicit any person who is offered employment by Buyer pursuant to **Section 6.01(a)** or is or was employed by the Buyer during the Restricted Period, or encourage any such employee to leave Buyer's employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this **Section 6.03(b)** shall prevent Seller or any of its Affiliates from hiring (i) any employee whose employment has been terminated by Buyer or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)    Seller acknowledges that a breach or threatened breach of this **Section 6.03** would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)    Seller acknowledges that the restrictions contained in this **Section 6.03** are reasonable and necessary to protect the legitimate interests of Buyer in the Purchased Assets and

constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 6.03** should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this **Section 6.03** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(e) Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that nothing contained herein shall prevent, prohibit or otherwise restrict Seller or its executive officers from (i) operating Seller's Business in the ordinary course in or from any location not included in the Territory, including, without limitation, Seller's facility in Carson, California, which such operations may involve the sale of goods to Seller's prior and existing customers, or (ii) from selling its inventory to any Person wherever located, including buyers within the Territory.

### Section 6.04.   Books and Records.

(a) In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall:

(i) retain the Books and Records (including personnel files) and all information of Seller included on any computer or server included in the Purchased Assets (the "Seller Information") relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii) upon reasonable notice, afford the Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), at no cost to Seller, during normal business hours, to such Books and Records and Seller Information. In addition, Buyer shall provide remote electronic access to all Seller Information at all times, and at no cost to Seller, shall back up all such Seller Information on a basis consistent with the back-up protocols utilized by Seller prior to Closing.

(b) In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing, or for any other reasonable purpose, for a period of seven (7) years following the Closing, Seller shall:

(i) retain the books and records (including personnel files) of Seller and its operations for periods prior to the Closing; and

(ii) upon reasonable notice, afford the Buyer's Representatives reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

33

(c)     Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 6.04** where such access would violate any Law.

**Section 6.05.    Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement. The foregoing shall not apply to the filing of the Sale Order or any document with the Bankruptcy Court in connection with the Bankruptcy Case.

**Section 6.06.    Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws (collectively, "Bulk Sales Laws") of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any Bulk Sales Laws of any jurisdiction shall be treated as Excluded Liabilities.

**Section 6.07.    Receivables.** From and after the Closing, if Buyer or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Excluded Asset, Buyer or its Affiliate shall remit such funds or other Excluded Asset to Seller within five Business Days after its receipt thereof. From and after the Closing, if Seller or its Affiliate receives any Purchased Asset or collects any funds relating to any Purchased Asset, Seller or its Affiliate shall remit any such funds or Purchased Assets to Buyer within five Business Days after its receipt thereof.

**Section 6.08.    Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by the party to whom local custom allocates such responsibility. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and the other party shall cooperate with respect thereto as necessary).

**Section 6.09.    Tax Clearance Certificates.** If requested by Buyer, Seller shall notify all of the Taxing Authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax Returns of the transactions contemplated by this Agreement in the form and manner required by such taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate could subject the Buyer to any Taxes of Seller. If any Taxing Authority asserts that Seller is liable for any Tax, Seller shall promptly pay any and all such amounts and shall provide evidence to the Buyer that such Liabilities have been paid in full or otherwise satisfied.

**Section 6.10.    Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

34

**Section 6.11.   Access to Information**.  From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business and the Purchased Assets; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business and the Purchased Assets as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business.  For a period of fifteen (15) days from the Effective Date (i) Seller shall permit Buyer and its Representatives to conduct environmental due diligence of the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Real Property and (ii) Buyer and its Representatives shall finalize Buyer's on-going environmental due diligence investigation of the Real Property.  Any investigation pursuant to this **Section 6.11** shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller.

**Section 6.12.   Conduct of Business Pending Closing**.

(a)   <u>Maintenance of Purchased Assets</u>.  Except as otherwise expressly contemplated by this Agreement, the other Transaction Documents or **Section 6.12(a)** of the Disclosure Schedules or with the prior written consent of Buyer, such consent to be within Buyer's reasonable discretion, during the period from and after the Effective Date until the earlier of termination of this Agreement and the Closing Date, Seller shall conduct the Business in all material respects in the Ordinary Course of Business, including, but not limited to, meeting all post-petition obligations relating to the Business as they become due.  Except as otherwise expressly contemplated by the Transaction Documents or **Section 6.12(a)** of the Disclosure Schedules, or as may be required in connection with or as a result of the Bankruptcy Case, or with the prior written consent of Buyer, such consent to be within Buyer's reasonable discretion, during the period from and after the Effective Date until the earlier of termination of this Agreement and the Closing Date, Seller shall (i) use commercially reasonable efforts to preserve and maintain the Purchased Assets, ordinary wear and tear excepted; (ii) use commercially reasonable efforts to preserve the ongoing operations of the Business related to the Purchased Assets; (iii) maintain the Books and Records in all material respects in the Ordinary Course of Business; (iv) comply in all material respects with all applicable Laws (including Environmental Laws); and (v) not dispose of all or any portion of the Real Property or allow it to go to waste.

(b)   <u>Negative Covenants</u>.  Without limiting the generality of the foregoing, except as otherwise expressly contemplated by this Agreement, the other Transaction Documents, **Section 6.12(b)** of the Disclosure Schedules or with the prior written consent of Buyer, such consent to be within Buyer's reasonable discretion, during the period from and after the Effective Date until the earlier of termination of this Agreement and the Closing Date, Seller shall not do any of the following:

(i)   amend its organizational documents;

(ii)   other than with respect to Permitted Encumbrances, sell, assign, license, transfer, convey, lease or otherwise dispose of any Purchased Assets;

(iii)   incur any Indebtedness if any such Indebtedness is secured by a Purchased Asset other than Indebtedness approved by the Bankruptcy Court on or before the Effective Date;

35

PFS:006682.0007.978248.1

(iv)   other than in accordance with this Agreement, assume or reject or amend, restate, supplement, modify, waive or terminate any Assigned Contract or enter into any settlement of any claim that (i) is outside the Ordinary Course of Business, (ii) delays the Closing, (iii) relates to an Assigned Contract or (iv) subjects Seller to any material non-compete or other similar material restriction with respect to any of the Purchased Assets that would be binding on Buyer following the Closing;

(v)   enter into any material Contract related to the Purchased Assets and the Business conducted with respect to the Purchased Assets; or

(vi)   agree to take any of the foregoing actions.

### Section 6.13.   Bankruptcy Covenants.

(a)   <u>Bankruptcy Court Approval.</u>

(i)   Seller shall serve (A) the applicable Taxing Authority in each jurisdiction where the Purchased Assets are subject to Tax, (B) each party to the Assignment Contracts and (C) any party who may have a Lien on any of the Purchased Assets, with a copy of the Approval Motion (along with a copy of the proposed Sale Order) at least twenty-five (25) calendar days prior to the Sale Hearing.

(ii)   Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order on or before December 12, 2013, or such other time as the Parties may mutually agree.

(iii)   If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), Seller shall diligently defend against such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion; *provided* that Seller consults with Buyer at Buyer's reasonable request regarding the status of any such proceedings or Actions.

(iv)   Seller shall obtain Buyer's approval, such approval to be given by Buyer in Buyer's reasonable discretion, regarding the form of the Sale Order, any other orders it seeks in the Bankruptcy Court and the bankruptcy proceedings in connection therewith and obtain Buyer's consent, such consent to be given by Buyer in Buyer's reasonable discretion, to any requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court, as applicable. Seller further covenants and agrees that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court for confirmation or sanction shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, but not limited to, any transaction contemplated by or approved pursuant to the Sale Order.

### Section 6.14.   Notice of Certain Events.

36

(a)     From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 8.02** to be satisfied;

(ii)    any notice or other communication from any Person not filed in the Bankruptcy Court alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)   any notice or other communication from any Governmental Authority not filed in the Bankruptcy Court in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced outside of the Bankruptcy Court or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 4.13** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this **Section 6.14** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including **Section 7.02** and **Section 9.01(d)**), and shall not have any effect for purposes of determining whether Buyer is entitled to indemnification pursuant to **Article VII** (subject in all cases, however, to **Section 7.07**); *provided, however*, that if the information entitles Buyer to terminate this Agreement in accordance with **Section 9.01(d)** as a result of such disclosure then:

(i)     if the information relates to the Seller's inability to deliver title or possession to any of the Purchased Assets at or after Closing as provided herein (the "Affected Assets"), then at the option of Buyer in its sole and absolute discretion, (A) Buyer may reduce the Net Purchase Price by an amount equal to (1) to the extent such Affected Assets are listed on and valued in the Hilco Appraisal, the "orderly liquidation value" of such Affected Assets as set forth on the Hilco Appraisal, (2) to the extent such Affected Assets are not listed on and valued in the Hilco Appraisal and are not rail cars, the value of such Affected Assets as set forth on Seller's internal valuation report, as provided to Buyer prior to the Effective Date and (3) to the extent such Affected Assets are rail cars, the value of such Affected Assets as set forth on **Section 6.14(b)** of the Disclosure Schedules, or (B) Buyer may terminate this Agreement in accordance with **Section 9.01(d)**; or

(ii)    if the information relates to anything other than the information contemplated by the foregoing **Section 6.14(b)(i)**, then Buyer and Seller shall negotiate in good faith for a period of ten (10) days following receipt of such information by Buyer (or such shorter period as may remain prior to the Closing Date) to reach a mutually agreeable resolution, following which, absent an agreed resolution, the parties shall have such rights available to them under this Agreement, including Buyer's right to terminate this Agreement pursuant to **Section 9.01(d)**.

**Section 6.15.     Governmental Approvals and Consents.**

37

(a)    Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    Seller shall give all notices required under the Bankruptcy Code in order to assume and assign the Assigned Contracts.

(c)    Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use all commercially reasonable efforts to:

(i)    respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any other Transaction Document;

(ii)    avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any other Transaction Document; and

(iii)    in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any other Transaction Document has been issued, to have such Governmental Order vacated or lifted.

(d)    All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Seller with Governmental Authorities in the Ordinary Course of Business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(e)    Without limiting the foregoing, Buyer shall use diligent efforts to obtain prior to Closing any and all Permits and other approvals of Governmental Authorities necessary to operate the Business and the Purchased Assets.

38

(f)    Notwithstanding the foregoing, nothing in this **Section 6.15** shall require, or be construed to require, Buyer or any of its Affiliates to agree to: (i) sell, hold, divest, discontinue or limit, before or after the Closing Date, any assets, businesses or interests of Buyer or any of its Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests which, in either case, could reasonably be expected to result in a Material Adverse Effect or materially and adversely impact the economic or business benefits to Buyer of the transactions contemplated by this Agreement and the other Transaction Documents; or (iii) any material modification or waiver of the terms and conditions of this Agreement.

**Section 6.16.    Closing Conditions.** From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VIII** hereof.

**Section 6.17.    Possession of Purchased Assets.** After the Closing, Seller shall provide to Buyer and its Representatives, for a period of ninety (90) days (the "Retrieval Period"), full and free access to the Excluded Real Property in order to retrieve and take full possession of any tangible personal property included in the Purchased Assets located on the Excluded Real Property. Until Buyer takes possession of any of the Purchased Assets located on the Excluded Real Property, Seller shall use commercially reasonable efforts to protect, preserve and maintain the Purchased Assets. Any tangible personal property included in the Purchased Assets which Buyer fails to retrieve from the Excluded Real Property and take possession of during the Retrieval Period shall be deemed to be abandoned immediately following the expiration of the Retrieval Period.

**Section 6.18.    Use of Name.** Seller hereby agrees that upon the Closing, Buyer shall have the sole right to the use of the name Keywell or similar names, and any service marks, trademarks, trade names, d/b/a names, fictitious names, domain names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, or otherwise used in the Business, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"). Within two (2) Business Days of the Closing, Seller shall change its name to no longer include the name Keywell or any variation thereof. Seller shall not, and shall not permit any Affiliate to, use such name or any variation or simulation thereof or any of the Seller Marks. If requested by Buyer, Seller agrees to take all action and execute all documents reasonably necessary to allow Seller to use, and operate the Business following the Closing Date under, the Seller Marks.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01.    Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is one hundred twenty (120) days from the Closing Date; *provided, that* the representations and warranties in **Section 4.01, Section 4.02, Section 4.08** and **Section 4.19, Section 5.01, Section 5.02** and **Section 5.04** shall survive indefinitely, the representations and warranties in **Section 4.17** shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days and the representations and warranties set forth in **Section 4.15** shall survive until the date that is twelve (12) months from the Closing Date. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the

39

expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

### Section 7.02.    Indemnification By Seller.

(a)    Subject to the other terms and conditions of this **Article VII**, Seller hereby agrees to indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "Buyer Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses actually incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(i)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(ii)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement;

(iii)    any Excluded Asset or any Excluded Liability;

(iv)    any Liability based upon, resulting from or arising out of the operations, properties, assets or obligations of Seller or any of its Affiliates (other than the Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date;

(v)    any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any Person with Seller or either of J. Mark Lozier or Joel D. Tauber (or any Person acting on their behalf) in connection with any of the transactions contemplated by this Agreement or any Transaction Document, including, without limitation, Eureka Capital Markets, LLC;

(vi)    any product or component thereof manufactured by or shipped, or any services provided by, Seller, in whole or in part, prior to the Closing Date;

(vii)    any matter disclosed in **Section 7.02(a)** of the Disclosure Schedules;

(viii)    any deferred compensation agreements entered into by the Seller, including without limitation, those Deferred Compensation Agreements set forth in **Section 7.02(a)** of the Disclosure Schedule.

(ix)    any noncompliance with any Bulk Sales Laws; or

(x)    any liability under the WARN Act or any similar state or local Law that may result from an "Employment Loss", as defined by 29 U.S.C. sect. 2101(a)(6), caused by any action of Seller prior to the Closing, by Buyer's decision not to hire previous employees of Seller.

40

(b)      The Buyer Indemnitees shall not be entitled to recover (i) under **Section 7.02(a)(i)** until the total amount which the Buyer Indemnitees would recover under **Section 7.02(a)(i)**, but for this **Section 7.02(b)**, exceeds $100,000 (the "Threshold") and then Seller shall be liable for, and the Buyer Indemnitees shall be entitled to recover, the total aggregate amount of all such Losses including the Threshold amount; (ii) to the extent the Losses are covered by insurance held by Buyer and Buyer receives cash proceeds from such insurance (less any applicable deductible); (iii) to the extent aggregate Losses under **Section 7.02(a)(i)** exceed $3,125,000 (the "Cap"); (iv) to the extent recovery is made pursuant to any of the other Transaction Documents; or (v) for a claim for indemnification that is initiated after the applicable survival period; *provided, however,* the limitations set forth in **Sections 7.02(b)(i)** and **(iii)** shall not apply to any claims under **Section 7.02(a)(i)** for breaches of representations and warranties set forth in **Section 4.01**, **Section 4.02**, **Section 4.08**, **Section 4.17** and **Section 4.19**; *provided, further, however,* that the foregoing limitations shall not apply to claims arising from fraud, criminal activity or willful misconduct.

### Section 7.03.    Indemnification By Buyer.

(a)      Subject to the other terms and conditions of this **Article VII**, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "Seller Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(i)      any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(ii)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement;

(iii)      any Assumed Liability;

(iv)      any Liability based upon, resulting from or arising out of the operations, properties, assets or obligations of Buyer or any of its Affiliates (including the Purchased Assets) conducted, existing or arising on or after the Closing Date;

(v)      any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any Person with Buyer (or any Person acting on its behalf) in connection with any of the transactions contemplated by this Agreement or any Transaction Document;

(vi)      any product or component thereof manufactured by or shipped, or any services provided by, Buyer, in whole or in part, on or after the Closing Date;

(vii)      any compensation agreements entered into by the Buyer; or

41

(viii)   any liability under the WARN Act or any similar state or local Law that may result from an "Employment Loss", as defined by 29 U.S.C. sect. 2101(a)(6), caused by any action of Buyer after the Closing, by Buyer's decision to terminate employees of Seller it hires.

(b)   The Seller Indemnitees shall not be entitled to recover (i) under **Section 7.03(a)(i)** until the total amount which the Seller Indemnitees would recover under **Section 7.03(a)(i)** but for this **Section 7.03(b)**, exceeds the Threshold and then Buyer shall be liable for, and the Seller Indemnitees shall be entitled to recover, the total aggregate amount of all such Losses including the Threshold amount; (ii) to the extent the Losses are covered by insurance held by Seller and Seller receives cash proceeds from such insurance (less any applicable deductible); (iii) to the extent aggregate Losses under **Section 7.03(a)(i)** exceed the Cap; (iv) to the extent recovery is made pursuant to any of the other Transaction Documents; or (v) for a claim for indemnification that is initiated after the applicable survival period; *provided, however*, the limitations set forth in **Sections 7.03(b)(i)** and **(iii)** shall not apply to any claims under **Section 7.03(a)(i)** for breaches of representations and warranties set forth in **Section 5.01**, **Section 5.02**, and **Section 5.04**.

Section 7.04.   **Indemnification Procedures.** The party making a claim under this **Article VII** is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this **Article VII** is referred to as the "Indemnifying Party".

(a)   **Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third Party Claim") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 15 calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is prejudiced by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; *provided, that* if the Indemnifying Party is Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by on or behalf of a Person that is a customer of Buyer unless such Third Party Claim relates to Seller and arose prior to the Effective Date, or (y) seeks an injunction or other equitable relief against the Indemnified Party.  In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 7.04(a)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, *provided, that* if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees

42

and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 7.04(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of **Section 6.04**) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

In the event the claim for indemnification arises under **Section 4.15**, and a Governmental Authority requires that any remedial activity be performed in order to satisfy Seller's indemnification obligations, Buyer and Seller will coordinate to implement reasonable cost effective measures required to meet the minimum requirements to comply with applicable Environmental Laws.

(b)     **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 7.04(b)**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within fifteen days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 7.04(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     **Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 15 days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is prejudiced by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist

43

the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30 day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

Section 7.05. **Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VII**, the Indemnifying Party shall satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such 15 Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to the prime rate of interest as announced from time to time in the Midwest edition of the *Wall Street Journal* plus five percent (5%) per annum, compounded annually. Such interest shall be calculated daily on the basis of a 360 day year and the actual number of days elapsed, and shall be compounding. The Buyer Indemnitees shall be entitled to (but shall not be required to) set-off any amounts due or payable to any of the Buyer Indemnitees by Seller pursuant to this **Article VII** against any amounts otherwise due and payable by any of the Buyer Indemnitees or any of their Affiliates to Seller, including, without limitation, the Contingent Payment Agreement. The exercise of such right of set-off by a Buyer Indemnitee in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under this Agreement or any other instrument or agreement, including, without limitation, the Contingent Payment Agreement.

Section 7.06. **Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Gross Purchase Price for Tax purposes, unless otherwise required by Law.

Section 7.07. **Effect of Investigation.** The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives); *provided, however*, (a) in the case of Buyer, Buyer shall not be entitled to indemnification for any breach of any representation or warranty if, as of the Closing Date, (i) Pelham Smith had actual knowledge that any such representation or warranty was breached by Seller and (ii) Pelham Smith had actual knowledge of the magnitude of Losses that would result from such breach, and (b) in the case of Seller, Seller shall not be entitled to indemnification for any breach of any representation or warranty if, as of the Closing Date, (i) J. Mark Lozier or Joel D. Tauber had actual knowledge that any such representation or warranty was breached and (ii) J. Mark Lozier or Joel D. Tauber had actual knowledge of the magnitude of Losses that would result from such breach.

Section 7.08. **Exclusive Remedies.** Subject to **Section 6.03** and **Section 10.11**, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in

44

this **Article VII**. Without limitation of the foregoing, other than any claims for indemnification pursuant to **Article VII**, Buyer hereby waives, releases and agrees not to make any claim or bring any contribution, cost recovery or other action against Seller or any of its successor or assigns under Environmental Laws or any similar federal, state or local law or regulation now existing or hereafter enacted. Nothing in this **Section 7.08** shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's fraudulent, criminal or intentional misconduct.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01.   Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)   No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)   This Agreement shall continue to remain in full force and effect.

(c)   The Bankruptcy Court shall have entered the Sale Order; *provided, however,* that Buyer shall have the right to waive the finality requirement of the Sale Order and close the transaction in its sole and absolute discretion.

(d)   Buyer and Seller shall have entered into a Contingent Payment Agreement, substantially in accordance with the terms set forth in the Term Sheet – Contingent Payment Agreement attached hereto as **Exhibit D**, and such other terms as Buyer and Seller shall mutually determine in good faith (the "Contingent Payment Agreement").

(e)   Buyer and Seller shall have entered into a transition services agreement pursuant to which Seller would provide to Buyer services related to cobbling, cleaning and other miscellaneous services necessary for Buyer to provide tolling services to customers from Seller's Frewsburg, New York facility for a period of twelve (12) months on terms mutually acceptable to Buyer and Seller (the "Transition Services Agreement").

**Section 8.02.   Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's written waiver, at or prior to the Closing, of each of the following conditions:

(a)   Other than the representations and warranties of Seller contained in **Section 4.01, Section 4.02, and Section 4.19**, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except

45

those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in **Section 4.01**, **Section 4.02**, and **Section 4.19** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     All Assigned Contracts shall be assigned to Buyer pursuant to the Sale Order.

(e)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

(g)     Buyer shall have received an owner's title insurance policy with respect to each Owned Real Property listed on **Section 2.01(d)** of the Disclosure Schedules, issued by a nationally recognized title insurance company reasonably acceptable to Buyer, written as of the Closing Date, insuring Buyer in such amounts and together with such endorsements, and otherwise in such form, as Buyer shall reasonably require.  The costs of such title insurance policy shall be paid by such party as to whom local custom allocates such responsibility.   Such title insurance policy shall insure fee simple title to each Owned Real Property listed on **Section 2.01(d)** of the Disclosure Schedules, free and clear of all Encumbrances other than Permitted Encumbrances and those listed on **Section 2.01(d)** of the Disclosure Schedules. Buyer shall have received (at Seller's expense) an appropriately certified ALTA/ACSM Land Title Survey showing no Encumbrances other than the Permitted Encumbrances and those listed on **Section 2.01(d)** of the Disclosure Schedules, and otherwise in form and substance reasonably satisfactory to Buyer, for each of the Owned Real Properties listed on **Section 2.01(d)** of the Disclosure Schedules.

(h)     All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form reasonably satisfactory to Buyer, of the release of such Encumbrances.

(i)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in **Section 8.02(a)** and **Section 8.02(b)** have been satisfied (the "Seller Closing Certificate").

(j)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the Manager of Seller authorizing the execution, delivery and performance of

46

this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(k)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(l)     Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "FIRPTA Certificate") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

(m)     The Sale Order shall be in substantially the form attached hereto.

(n)     The Sale Order shall provide that Buyer is a good faith purchaser and no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(o)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(p)     Seller shall provide evidence to Buyer that Seller has served (i) the applicable Taxing Authority in each jurisdiction where the Purchased Assets are subject to Tax, (ii) each party to the Assignment Contracts and (iii) any party who may have a Lien on any of the Purchased Assets, with a copy of the Approval Motion (along with a copy of the proposed Sale Order) at least twenty-five (25) calendar days prior to the Sale Hearing.

(q)     Seller shall not have received any notice of, nor obtained any reason to believe that, ATI has ceased, or intends to cease after the Closing, to use the goods or services previously provided by Seller and to be provided by Buyer, or that ATI will not immediately after Closing establish and maintain with Buyer (without reduction) the same relationship existing between ATI and Seller.

(r)     Seller shall have entered into extensions for the Atlanta Lease and the West Mifflin Lease with the respective landlords thereto, in each case, on terms reasonably acceptable to Buyer.

Section 8.03.     **Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's written waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in **Section 5.01**, **Section 5.02** and **Section 5.04**, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of

PFS:006682.0007.978248.1

which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in **Section 5.01, Section 5.02** and **Section 5.04** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    The Sale Order shall provide that Buyer is a good faith purchaser and no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)    Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(e)    Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 8.03(a)** and **8.03(b)** have been satisfied (the "Buyer Closing Certificate").

(f)    Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the Managers of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(g)    Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(h)    Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**ARTICLE IX**
**TERMINATION PROCEDURES**

**Section 9.01.    Termination.** This Agreement may be terminated and the Sale contemplated in this Agreement may be abandoned at any time prior to the Closing Date, notwithstanding the fact that any requisite authorization and approval of the Sale shall have been received, as follows:

(a)    by the mutual written consent of Buyer and Seller, such consent to be within each such Party's reasonable discretion;

(b)    by Buyer or Seller, if the Closing has not occurred by the Termination Date; *provided, however,* that the right to terminate this Agreement under this **Section 9.01(b)** shall not be

48

available to any Party whose breach of this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur by such date;

(c)    by Buyer or Seller, if there shall be any Law that makes consummation of the Sale illegal or otherwise prohibited or if any Governmental Order shall have been issued restraining, enjoining or otherwise prohibiting the consummation of the Sale and such Governmental Order shall have become final and non-appealable; *provided, however,* that the right to terminate this Agreement under this **Section 9.01(c)** shall not be available to any Party whose breach of this Agreement shall have been the cause of, or shall have resulted in the Law, Governmental Order or other action that restrains, enjoins or prohibits the consummation of the Sale;

(d)    by (i) Buyer, if (1) there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VIII** and such breach, inaccuracy or failure has not been cured by Seller within fifteen (15) days of Seller's receipt of written notice of such breach from Buyer or (2) any of the conditions set forth in **Section 8.01** or **Section 8.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Termination Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or (ii) Seller, if (1) there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VIII** and such breach, inaccuracy or failure has not been cured by Buyer within fifteen (15) days of Buyer's receipt of written notice of such breach from Seller or (2) any of the conditions set forth in **Section 8.01** or **Section 8.03** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Termination Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; *provided, however,* that the right to terminate this Agreement pursuant to this **Section 9.01(d)** shall not be available to any Party who at such time is in breach of any of its material obligations hereunder;

(e)    by Buyer, if the Purchased Assets become part of an estate in a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of the Purchased Assets; or

(f)    by Buyer, if the Sale Order has not been entered by the Bankruptcy Court on or before December 12, 2013.

In the event of termination of this Agreement as permitted by this **Section 9.01**, this Agreement shall become void and of no further force and effect, except for the provisions of **Section 2.05** (relating to the Purchase Price Deposit), **Section 9.02** (relating to the Purchase Price Deposit), and **Article X**, and nothing in this Agreement shall be deemed to release or relieve any Party from any Liability for any fraud or willful breach by such Party of the terms and provisions of this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, except in the event of fraud or willful breach by Seller, (i) Seller's aggregate Liability for money damages in the event that the Closing has not occurred or does not occur for any reason whatsoever, without regard to whether Buyer elects to terminate this Agreement pursuant to this **Section 9.01**, shall be limited to Five Hundred Thousand and no/100 Dollars ($500,000) if and to the extent payable in accordance with

49

**Section 9.02**, and such amount shall be the sole and exclusive remedy of Buyer, whether at Law or in equity, in the event that Closing has not occurred or does not occur for any reason whatsoever.

### Section 9.02.   Purchase Price Deposit.

(a)   <u>Purchase Price Deposit</u>.  In the event that this Agreement is terminated pursuant to **Section 9.01(b)**, **(c)**, **(d)(i)**, **(e)**, or **(f)** the Purchase Price Deposit shall be repaid to Buyer within five (5) Business Days after the date of such termination.

(b)   <u>Buyer's Breach; Seller's Remedies</u>.  In the event Seller terminates this Agreement pursuant to **Section 9.01(d)(ii)(1)**, then Buyer shall indemnify Seller and shall hold Seller harmless from any actual Termination Damages; provided, however that Seller shall not be entitled to recover, and Buyer shall have no obligation to indemnify Seller, to the extent such Termination Damages exceed Five Million and No/100 Dollars ($5,000,000.00) (the "<u>Termination Damages Cap</u>").  Upon the final, non-appeal determination of the amount of the Termination Damages by a court of competent jurisdiction, Seller shall apply the Purchase Price Deposit against the Termination Damages and disburse and return to Buyer the balance thereof, if any.  Notwithstanding anything in this Agreement to the contrary, Seller agrees that (i) the indemnification contemplated by this **Section 9.02(b)** constitutes the sole and exclusive remedy of Seller, whether at Law or in equity, in the event that this Agreement is terminated under such circumstance, except in the event of Buyer's fraud, and (ii) under no circumstances shall Seller recover Termination Damages of an amount in excess of the Termination Damages Cap.

(c)   <u>Expenses</u>.  Except as set forth above in this **Section 9.02**, all fees and expenses incurred in connection with this Agreement and the other Transaction Documents shall be paid by the party incurring such expenses, whether or not the Sale is consummated.  Buyer, however, reserves the right to seek allowance and payment of an administrative expense claim under Section 503(b) of the Bankruptcy Code.

(d)   <u>Survival</u>.  This **Section 9.02**, and the rights and obligations created hereunder, shall survive termination of this Agreement.

### ARTICLE X
### MISCELLANEOUS

**Section 10.01.  Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred; *provided, however,* Seller shall pay all amounts payable to Eureka Capital Markets, LLC; and *provided further, however,* Buyer reserves the right to seek allowance and payment of an administrative expense claim under Section 503(b) of the Bankruptcy Code.

**Section 10.02.  Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the

50

recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.02**):

| | |
|---|---|
| If to Seller: | KEYWELL L.L.C.<br>11900 South Cottage Grove Avenue<br>Chicago, Illinois 60628<br>E-mail: jmlozier@keywell.com<br>Attention:  Chief Executive Officer |
| with a copy to: | Patzik, Frank & Samotny Ltd.<br>150 South Wacker Drive<br>Suite 1500<br>Chicago, Illinois 60606<br>E-mail: sprebish@pfs-law.com<br>Attention:     Steven M. Prebish, Esq. |
| If to Buyer: | KW Metals Acquisition LLC<br>c/o Prophet Equity LP<br>1460 Main Street, Suite 200<br>Southlake, Texas 76092<br>E-mail: psmith@prophetequity.com<br>Attention: Pelham Smith |
| with a copy to: | Haynes and Boone, LLP<br>2323 Victory Avenue, Suite 700<br>Dallas, Texas 75219<br>E-mail: dennis.cassell@haynesboone.com<br>Attention:  Dennis R. Cassell |

     **Section 10.03.  Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  In the event of any inconsistency between the provisions of this Agreement and the terms of the Approval Order or the Sale Order, the Sale Order shall control.

51

PFS:006682.0007.978248.1

**Section 10.04. Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05. Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 6.03(d)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06. Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07. Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, and permitted successors and assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08. No Third-party Beneficiaries.** Except as provided in **Article VII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09. Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     This Agreement shall be governed by, and construed in accordance with, the Bankruptcy Code and, to the extent not inconsistent with the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without

52

giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)     EACH PARTY HERETO CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AS THE SOLE JUDICIAL FORUM FOR THE ADJUDICATION OF ANY MATTERS ARISING UNDER OR IN CONNECTION WITH THE AGREEMENT. AFTER SELLER IS NO LONGER SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THEN ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 10.11.  Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12.  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

PFS:006682.0007.978248.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

KEYWELL L.L.C.

By: _____
Name: _____ J. MARK LOZ___
Title: _____ PRESIDENT / CEO

KW METALS ACQUISITION LLC

By: _____
Name: _____
Title: _____

[Signature Page to the Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**KEYWELL L.L.C.**

By: _____
Name: _____
Title: _____

**KW METALS ACQUISITION LLC**

By: _____
Name: *PELHAM SMITH*
Title: *MANAGING DIRECTOR*

[Signature Page to the Asset Purchase Agreement]

**Exhibit A**

Form of Sale Order

**Exhibit B**

Form of Bill of Sale

**EXHIBIT B**

**FORM OF BILL OF SALE**

THIS BILL OF SALE (this "<u>Bill of Sale</u>") is dated as of _____ __, 2013, and made and delivered pursuant to that certain Asset Purchase Agreement, dated as of December 12, 2013 (the "<u>Purchase Agreement</u>"), by and between Keywell L.L.C., an Illinois limited liability company ("<u>Seller</u>"), and KW Metals Acquisition LLC, a Delaware limited liability company ("<u>Buyer</u>").  The terms of the Purchase Agreement, including, but not limited to, Seller's representations, warranties, covenants, agreements and indemnities, are incorporated herein by reference, and capitalized terms not otherwise defined in this Bill of Sale shall have the meanings given to such terms in the Purchase Agreement.

1.     <u>Sale</u>.  FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, Seller hereby irrevocably and unconditionally grants, sells, assigns, transfers, conveys and delivers to Buyer all of Seller's legal and beneficial right, title and interest in and to the Purchased Assets (including, without limitation, each of the Assigned Contracts) other than the Frewsburg Equipment (collectively, the "<u>Transferred Assets</u>"), effective as of 9:00 a.m. on _____, 2013 TO HAVE AND TO HOLD THE SAME, unto Buyer, its successors and assigns forever.

2.     <u>No Excluded Assets</u>.  Notwithstanding anything herein to the contrary, this Bill of Sale does not grant, sell, assign, transfer, convey or deliver title to any assets other than the Transferred Assets, including, without limitation, the Excluded Assets and the Frewsburg Equipment, all of which shall remain the property of Seller in accordance with the terms of the Purchase Agreement.

3.     <u>Further Documents and Instruments</u>.  From time to time, as and when requested by Buyer, Seller shall execute and deliver, or cause to be executed and delivered, all such documents and instruments as Buyer or its successors and permitted assigns may reasonably deem necessary or desirable to sell, transfer, convey and assign more effectively to Buyer the Transferred Assets.

4.     <u>Representations and Warranties</u>.  Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.

5.     <u>Power of Attorney</u>.  Pursuant to the Purchase Agreement, Seller shall take such further actions as may be reasonably required to carry out the provisions hereof and to consummate and make effective the sale of the Transferred Assets.  Without limiting the foregoing, subject to the approval of the Bankruptcy Court, for the sole and limited purpose of effecting the transfer to Buyer of the Transferred Assets, Seller hereby constitutes and appoints Buyer the true and lawful agent and attorney in fact of Seller, with full power of substitution and resubstitution, in whole or in part, in the name and stead of Seller but on behalf and for the benefit of Buyer and its successors and assigns, from time to time:

(a)     to demand, receive and collect any and all of the Transferred Assets and to give receipt and releases for and with respect to the same, or any part thereof;

(b)     to institute and prosecute, in the name of the Seller or otherwise, any and all proceedings at law, in equity or otherwise, that Buyer or its successors or assigns may deem proper in order to collect or reduce to possession any of the Transferred Assets and in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be; and

(c)    to do all things legally permissible, required or reasonably deemed by Buyer to be required to recover and collect the Transferred Assets and to use Seller's name in such manner as Buyer may reasonably deem necessary for the collection and recovery of same.

Seller hereby declares that the foregoing powers are coupled with an interest and are and shall be irrevocable by Seller.

6.    <u>Successors and Assigns</u>.  All of the terms and provisions of this Bill of Sale shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and permitted assigns, whether so expressed or not.

7.    <u>Inconsistencies</u>.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

8.    <u>Severability</u>.  If any provision of this Bill of Sale or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

[SIGNATURE PAGE FOLLOWS]

PFS:006682.0007.974421.4

**IN WITNESS WHEREOF**, Seller has executed this Bill of Sale as of the date first written above.

**KEYWELL L.L.C.,**
an Illinois limited liability company


By:      _____
Name:  _____
Title:   _____

[Signature Page to Bill of Sale]

**Exhibit C**

Form of Assignment and Assumption Agreement

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of _____, 2013 by and between KEYWELL L.L.C., an Illinois limited liability company ("Assignor"), and KW METALS ACQUISITION LLC, a Delaware limited liability company ("Assignee").

**W I T N E S S E T H:**

WHEREAS, Assignor and Assignee entered into that certain Asset Purchase Agreement dated as of December 12, 2013, (the "Asset Purchase Agreement"), in connection with the sale of the Purchased Assets of Assignor; and

WHEREAS, in order to consummate the transactions contemplated by the Asset Purchase Agreement, the Assignor and Assignee desire to enter into this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1.      Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Asset Purchase Agreement.

2.      Effective as of the date hereof, Assignor has assigned, sold, transferred and delivered, and by these presents does hereby assign, sell, transfer and deliver unto Assignee, and Assignee's successors and assigns, all of Assignor's right, title, benefits, privileges and interest, if any, in and to the Purchased Assets (collectively, the "Assigned Assets").

3.      Notwithstanding anything to the contrary in this Agreement, the Asset Purchase Agreement or in any other document delivered in connection herewith or therewith, the Assigned Assets being transferred pursuant to this Agreement shall expressly exclude the Excluded Assets.

4.      Effective as of the date hereof and subject to the terms, conditions and limitations of the Asset Purchase Agreement, Assignee assumes and agrees to pay and perform all of the Assigned Assets and the Assumed Liabilities in accordance with the terms thereof. Except as specifically stated above in this Section 4, Assignee assumes no other debt, liability or obligation, including without limitation, the Excluded Liabilities, of the Assignor, other than the Assumed Liabilities, and it is expressly understood and agreed that all such debts, liabilities and obligations and the Excluded Liabilities shall remain the sole responsibility and obligation of Assignor.

5.      The terms of the Asset Purchase Agreement, including, but not limited to, each party's representations, warranties, covenants, agreements and indemnities are incorporated herein by this reference. Each party hereto acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

6.      The Assignee is authorized to execute and deliver such letters, notices, acknowledgements or other instruments and documents as shall be necessary or desirable to notify any third parties of this assignment and assumption of the Assigned Assets.

PFS:006682.0007.974422.3

7.      The parties hereby agree from time to time to execute and deliver such further and other transfers, assignments and documents and do all matters and things which may be convenient or necessary to more effectively and completely carry out the intentions of this Agreement.

8.      All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective administrators, personal representatives, legal representatives, heirs, successors and permitted assigns, whether so expressed or not.

9.      No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Assignor and Assignee.

10.      This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page Follows]

PFS:006682.0007.974422.3

**IN WITNESS WHEREOF**, Assignor and Assignee have executed and delivered this Assignment and Assumption Agreement the day and year first above written.

**ASSIGNOR:**

**KEYWELL L.L.C.,**
an Illinois limited liability company

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**KW METALS ACQUISITION LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to Assignment and Assumption Agreement]

**Exhibit D**

<u>Term Sheet – Contingent Payment Agreement</u>

**Term Sheet**
**Contingent Payment Agreement**

Following is a summary of terms to be included in the Contingent Payment Agreement (the "Agreement") referenced in that certain Asset Purchase Agreement (the "APA") dated as of December 12, 2013 between KEYWELL L.LC., an Illinois limited liability company ("Seller"), and KW METALS ACQUISITION, LLC, a Delaware limited liability company ("Buyer"). Capitalized terms used but not defined herein shall have the meaning assignment to them in the APA.

1. For purposes hereof, "ATI Tolling Business" means toll processing for Allegheny Technologies Inc. and its subsidiaries and Affiliates, including, but not limited to, ATI-Richland Operations, ATI Wah Chang, ATI Lockport, ATI Allvac, and ATI Brackenridge.

2. Following the Closing, Buyer shall use commercially reasonable efforts to service and operate the ATI Tolling Business in a manner intended to maximize EBITDA, including, without limitation, performing the ATI Tolling Business at such locations within Buyer's operations and in such manner at such locations as is intended to maximize the EBITDA of the ATI Tolling Business.

3. Seller shall be entitled to receive a payment equal to thirty percent (30%) of Buyer's EBITDA generated solely from the ATI Tolling Business (the "Contingent Payment") during (a) the one-year period following the Closing (the "First Measurement Period"), (b) the one-year period immediately following the First Measurement Period (the "Second Measurement Period"), (c) the one-year period immediately following the Second Measurement Period (the "Third Measurement Period") and (d) the one-year period immediately following the Third Measurement Period (the "Fourth Measurement Period", and, each of the First Measurement Period, Second Measurement Period, Third Measurement Period and Fourth Measurement Period, a "Measurement Period").

4. Buyer shall conduct all ATI Tolling Business through a separate subsidiary or division and shall maintain separate books and records for such subsidiary or division which shall reflect the operations of the ATI Tolling Business only.

5. On or before the date which is 45 days after the last day of each Measurement Period (each such date, an "Calculation Delivery Date"), Buyer shall prepare and deliver to Seller a written statement (in each case, a "Calculation Statement") setting forth in reasonable detail its calculation of Buyer's EBITDA attributable solely to the ATI Tolling Business for the applicable Measurement Period and its calculation of the resulting Contingent Payment (in each case, a "Calculation"). In the event the Calculation shows that Seller is entitled to the Contingent Payment, Buyer shall deliver the Contingent Payment with the Calculation.

6. Seller shall have 30 days after receipt of the Calculation Statement for each Measurement Period (in each case, the "Review Period") to review the Calculation Statement and the Calculation set forth therein. Prior to the expiration of the Review Period, Seller may object to the Calculation set forth in the Calculation Statement for the applicable Measurement Period by delivering a written notice of objection (a "Calculation Objection Notice") to Buyer. Any Calculation Objection Notice shall specify the items in the applicable Calculation disputed by Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If Seller fails to deliver a Calculation Objection Notice to Buyer prior to the expiration of the Review Period, then the Calculation set forth in the Calculation Statement shall be final and binding on the parties. If Seller timely delivers a Calculation Objection Notice, Buyer and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of Buyer's EBITDA attributable solely to the ATI Tolling Business and the Contingent Payment for the applicable Measurement Period. If Buyer and Seller are unable to reach agreement within 20 days after such a Calculation Objection Notice has been given, all unresolved disputed items shall be promptly referred to the Accounting Firm. The Accounting Firm shall be directed to render a written report on the unresolved disputed items with respect to the applicable Calculation as promptly as practicable, but in no event greater than 30 days after such submission to the Accounting Firm, and to resolve only those unresolved disputed items set forth in the Calculation Objection Notice. If unresolved disputed items are submitted to the Accounting Firm, Buyer and Seller shall each furnish to the Accounting Firm such work papers, schedules and other documents and information relating to the unresolved disputed calculations as the Accounting Firm may reasonably request or any party shall elect. The Accounting Firm shall resolve the disputed calculations based solely on the applicable definitions and other terms in the Agreement and the presentations by Buyer and Seller, and not by independent review. The resolution of the disputes and the calculation of Buyer's EBITDA attributable solely to the ATI Tolling Business that is the subject of the applicable Calculation Objection Notice by the Accounting Firm shall be final and binding on the parties. The fees and expenses of the Accounting Firm shall be borne by Seller and Buyer in proportion to the amounts by which their respective calculations of Buyer's EBITDA attributable solely to the ATI Tolling Business differ from Buyer's EBITDA attributable solely to the ATI Tolling Business as finally determined by the Accounting Firm.

7. Buyer's obligation to pay each of the Contingent Payments to Seller in accordance with the Agreement is an independent obligation of Buyer and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Contingent Payment and the obligation to pay a Contingent Payment to Seller shall not obligate Buyer to pay any preceding or subsequent Contingent Payment.

8. Buyer shall make the work papers, back-up materials and financial statements used in preparing the Calculation Statement, and the books, records, and financial staff of Buyer, available to Seller and its accountants and other representatives at reasonable

times and upon reasonable notice at any time during (A) the review by Seller of the Calculation Statement and (B) the resolution by the parties of any objections thereto. Seller will make the work papers and back-up materials used in preparing any objection to the Calculation Statement available to Buyer and its accountants and other representatives at reasonable times and upon reasonable notice at any time during the resolution by the parties of such objection.

9. The parties understand and agree that (i) the contingent rights to receive any Contingent Payments shall not be represented by any form of certificate or other instrument, and do not constitute an equity or ownership interest in Buyer, (ii) Seller shall not (in the absence of a recorded judgment rendered by a court of competent jurisdiction related to Buyer's failure to pay one or more required Contingent Payments), have any rights as a security holder of Buyer as a result of its contingent right to receive any Contingent Payments hereunder, and (iii) except as provided in the Agreement for late payment or as otherwise provided by law, no interest is payable with respect to any Contingent Payments.

10. Other than obligations of good faith and fair dealing, Seller disclaims any covenant or obligations that might otherwise be implied under applicable law related to the Contingent Payments that are not otherwise expressly provided in the Agreement, and Seller acknowledges that there can be no assurance that the performance of the ATI Tolling Business will entitle Seller to receive all or any portion of any Contingent Payments and that Buyer has not promised or projected any specific amount.

11. Seller acknowledges Buyer's right to offset claims for indemnification made by Buyer pursuant to and in accordance with Section 7.06 of the APA and the Rail Car Purchase Agreement against Contingent Payments.

12. For purposes of the Agreement, EBITDA means, with respect to any Measurement Period, Buyer's net income before interest, income taxes, depreciation and amortization attributable solely to the ATI Tolling Business for such period, determined in accordance with GAAP and in accordance with Seller's historical accounting principles, practices, methodologies and policies. For purposes of all Calculations, (a) Buyer's EBITDA attributable solely to the ATI Tolling Business shall include all EBITDA of Buyer and its Affiliates attributable solely to the ATI Tolling Business, and (b) the selling, general and administrative expenses charged to the ATI Tolling Business shall not exceed those charged by Seller in respect of its tolling business and specifically, but without limitation, shall not include any allocation of overhead or other expenses of Buyer or any of its other divisions or subsidiaries which are not incurred specifically and necessarily for the conduct of the ATI Tolling Business.

13. "Accounting Firm" means an agreed upon independent accounting firm of recognized standing which neither Buyer nor Seller use as their principal auditors.

## SECTION 2.01(a)

## ASSIGNED CONTRACTS

1. <u>2826 Top Hill Road, Indian Trail, NC</u>. Commercial Lease Agreement dated May 15, 2009, by and between Ty-Par Realty, Inc. and Keywell L.L.C, as amended by that certain Amendment #1 to Commercial Lease Agreement dated August 12, 2009, that certain Amendment #2 to Commercial Lease Agreement dated September 16, 2010, and that certain Amendment #3 to Commercial Lease Agreement dated December 29, 2011.

2. <u>24175 Northwestern Highway, Suites 100 and 120, Southfield, MI</u>. Lease dated April 20, 2001, by and between Keywell L.L.C. and KDB, L.L.C., as amended by that certain Amendment to Lease Agreement dated April 6, 2006, that certain Amendment 2 to Lease Agreement dated May 29, 2007, and that certain Amendment 3 to Lease Agreement dated August 8, 2011.

3. <u>1157 Curtis Street, Monroe, NC</u>. Lease Agreement dated April 22, 2010, by and between CJMJ, LLC and Keywell L.L.C.

4. <u>1873 Lyndon Boulevard, Falconer, NY</u>. Lease dated October 1, 2011, by and between Community Development Association LLC and Keywell L.L.C, as amended by that certain Amendment 1 of Lease dated February 13, 2012, that certain Amendment 2 of Lease dated September 1, 2012, and that certain Amendment 3 of Lease dated January 7, 2013.

5. <u>890 Noble Drive, West Mifflin, Pennsylvania</u>. Lease, dated May 1, 1976, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as amended by that certain First Amendment to Lease, dated an unspecified day in August of 1977, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as further amended by that certain Letter Agreement, dated October 22, 1979, by and between Duquesne Slag Products Company and Pittsburgh Alloys, Inc., as further amended by that certain Agreement and Assignment of Lease, dated an unspecified day in December of 1987, by and among Vac Air Alloys Corporation, Samuel G. Keywell Company, and Duquesne Slag Products Company, as further amended by that certain Second Amendment to Lease, dated January 1, 1989, by and between Duquesne Slag Products Company and Samuel G. Keywell Company, as successor in interest by assignment from Vac Air Alloys Corporation, as further amended by that certain La Farge Corporation letter dated April 30, 2008, and as further amended by that certain Fourth Amendment to Lease, dated May 1, 2007, by and between La Farge Corporation and Keywell L.L.C.

6. <u>4650 Stacks Road, Atlanta, GA</u>. Lease dated December 1, 1994, by and between Herbert Nadel and Keywell Corporation, as amended by the certain First Amendment to Lease dated April 27, 1999, by and between Herbert Nadel and Keywell L.L.C., as successor in interest by assignment from Keywell Corporation, as amended.

7. Maintenance Agreement by and between Keywell L.L.C. and Carolina Industrial Trucks, Inc. with respect to serial number P1F2-9H4271.

[Schedules to Asset Purchase Agreement]

PFS:006682.0007.974424.7

8. Maintenance Agreement by and between Keywell L.L.C. and Carolina Industrial Trucks, Inc. with respect to serial number UG1F2-9L2624.

9. Integrity Networks WiMAX Circuit Proposal and Quote dated as of August 31, 2011.

10. Seller's rights and obligations, solely with respect to equipment (including maintenance) under lease schedules number 8, 11, 12, 13, 14 and 16 of that certain Master Lease Agreement dated July 29, 2010, by and between Keywell L.L.C. and Toyota Motor Credit Corporation, as successor in interest pursuant to assignment by Jamestown Industrial Trucks, Inc.

11. Product Agreement dated April 20, 2009, by and between Strate Welding Supply Co., Inc. and Keywell L.L.C., with respect to oxygen purchases for the Frewsburg location.

12. Product Agreement dated April 20, 2009, by and between Strate Welding Supply Co., Inc. and Keywell L.L.C., with respect to argon purchases for the Frewsburg location.

13. Product Agreement dated June 12, 2012, by and between Strate Welding Supply Co., Inc. and Keywell L.L.C, with respect to oxygen purchases for the Falconer, NY location.

14. Subject to Section 2.10(f) of this Agreement, the Data Processing Services Agreement dated as of March 26, 2009, by and between Keywell L.L.C. and Key Fasteners Corporation, as amended by that certain letter agreement dated May 9, 2013 from Keywell L.L.C. to Key Fasteners Corporation, and as further supplemented.

15. Business Class Service Order Agreement dated March 27, 2012, by and between Keywell L.L.C. and Comcast Cable Communications.

16. Statement of Lease/Rental Agreement by and between Keywell L.L.C. and A-Verdi Storage Containers.

17. Contract and Agreement dated January 23, 2009, by and between Keywell L.L.C. and SETCO, Inc. d/b/a SETCO Solid Tire.

18. License Agreement between Keywell L.L.C. and T.L. Ashford & Associates, Inc.

19. Limited Use License Agreement of Computer Keyes.

20. IBM Rational HATS 5250 Applications.

21. IBM Rational Developer for SOA Construction on System.

22. Cleo Communications, Inc. Software End-User License Agreement.

23. IBM License Agreement for Machine Code.

24. ProData Computer Service, Inc. Software License Agreement.

25. Various IBM Software with respect to the IBM 525 Proofs of Entitlement.

[Schedules to Asset Purchase Agreement]

26. Various IBM Software with respect to the IBM 720 Proofs of Entitlement.

27. Visions Solutions Mimix Professional v7.1 license.

28. Hawkeye Information Systems, Inc. Software License Agreement.

29. Bytware License Agreement, dated December 1, 2012.

30. Railcar Lease Agreement dated August 27, 2013, by and between Keywell L.L.C. and Audubon Metals L.L.C.

31. Railcar Lease Agreement with Goodman Services, Inc., as modified by that certain written email agreement dated as May 24, 2011.

32. Railcar Lease, dated April 1, 2011, by and between Keywell L.L.C. and Millis Industries Inc.

33. Master Lease Number 590086L dated July 7, 2011, between TCF Equipment Finance, Inc. and Keywell L.L.C., as amended by that certain Amendment to Master Lease dated July 7, 2011, between TCF Equipment Finance, Inc. and Keywell L.L.C.

34. Full Maintenance Agreement dated July 25, 2011 between Keywell L.L.C. and PennWest Industrial Trucks, LLC.

35. Rental Agreement dated June 1, 2010, by and between Pure Water Technology of Western New York and Keywell L.L.C.

36. Rental Agreement, dated July 15, 2008, by and between Pure Water Technology-PA and Keywell L.L.C.

37. Letter Agreement, dated September 18, 2013, by and between Keywell L.L.C. and SA Recycling LLC

38. Track-It! Software Agreement with BMC Software.

39. Microsoft Windows 2003 Licenses with Microsoft – VAR: CDW Direct LLC.

40. Microsoft SQL Server 2005 License with Microsoft – VAR: CDW Direct LLC.

41. Microsoft Windows 2012 Licenses with Microsoft – VAR: CDW Direct LLC.

42. Mochasoft Unlimited Company Licenses with MochaSoft Aps.

43. Portable Unit Lease with Mr. John of Pittsburgh.

44. Server License with Redhat – VAR: CDW Direct LLC.

45. Tank Rental Lease with Roberts Oxygen Company Inc.

[Schedules to Asset Purchase Agreement]

46. FactoryTalk Transaction Manager Agreement with Rockwell Automation.

47. Trailer Lease with Secrest Wrecker Service Inc.

48. VMWare ESXi License with VMWare – VAR: CDW Direct LLC.

49. Oxygen Tank Lease with West Penn Laco Inc. with respect to West Mifflin, PA.

50. Railcar Lease Agreement dated as of October 16, 2013, by and between Keywell L.L.C. and Cronimet Corporation USA.[1]

---

[1] Entered into post-petition, subject to assignment only.

[Schedules to Asset Purchase Agreement]

## SECTION 2.01(c)

### OTHER TANGIBLE PERSONAL PROPERTY

1. The equipment listed in Section 6.0 (Asset Exhibits) of the appraisal, dated March 20, 2012, performed by Hilco Appraisal Services, LLC attached hereto as Annex 2.01(c)(1), pages 37 to 40 and pages 58 to 83.

2. The equipment listed on Annex 2.01(c)(2) attached hereto, other than that identified as Frewsburg Equipment.

3. The capital lease equipment listed on Annex 2.01(c)(3) attached hereto, other than that identified as Frewsburg Equipment.

4. The equipment listed on Annex 2.01(c)(4) attached hereto, other than that identified as Frewsburg Equipment.

5. Rail cars with KEYX Numbers 5001, 5003, 5008, 5010, 5011, 5015, 5019, 5027, 5029, 5032, 5047, 5049, 5050, 5057, 5071, 5074, 5075, 5080, 5088, 5089, 5092, 5106, 5108, 5113, 5116 and 5117.[2]

6. Rail cars with KEYX Numbers 5079, 7386 and 7485.[3]

7. Rail cars listed on Annex 2.01(c)(5) attached hereto.

8. The assets listed on Annex 2.01(c)(6) attached hereto.

---

[2] These rail cars are leased by Seller to Audubon Metals L.L.C. pursuant to that certain Railcar Lease Agreement dated August 27, 2013, by and between Keywell L.L.C. and Audubon Metals L.L.C. Rail car with KEYX Number 5001 was damaged. Rail car with KEYX Number 5001 remains subject to the lease agreement; however, Seller will lease rail car with KEYX Number 5018 in the place of the damaged rail car.

[3] These rail cars are leased by Seller to Goodman Services, Inc. pursuant to that certain Railcar Lease Agreement with Goodman Services, Inc., as modified by that certain written email agreement dated as May 24, 2011.

[Schedules to Asset Purchase Agreement]

Annex 2.01(c)(1)

(see attached)

**Hilco** Appraisal Services, LLC
Machinery and Equipment Valuation



APPRAISAL

# Keywell LLC

- Forced Liquidation Value
- Orderly Liquidation Value

Report Date:     March 20, 2012
Effective Date:   March 8, 2012

PROJECT TEAM

| | |
|---|---|
| Appraiser | Derek Brennan, CEA |
| Appraiser | Loe Anders, CEA, CSA |
| Appraiser | Jim Amann, CEA |
| Appraiser | Lucas D. Evans, CEA, CSA |
| Appraiser | Brian M. O'Neill, CEA |
| Appraiser | Lynn Schroeder, CSA |
| Peer Review Appraiser | Edward J. Cervac, CEA |
| Relationship Manager | Adam Evans |
| | aevans@hilcoappraisal.com |

# Hilco Appraisal Services, LLC

## Company Overview

| | |
|---|---|
| Company Name | Keywell LLC |
| Industry | Scrap Processor |
| NAICS Code | 423930 |
| Headquarters | Chicago, IL |
| # Locations | 10 |
| Website | www.keywell.com |

## Primary Contact Information

| | |
|---|---|
| Client Information | Ms. Audrey A. Pengelly<br>Executive Vice President<br>Bank of America, N.A.<br>Chicago, IL 60603 |
| Company Information | Ms. Karen Beninato<br>Senior Vice President / Corporate Controller<br>Chicago, IL 60628 |
| Peer Review Appraiser Information | Edward J. Cervac, CBA<br>Vice President<br>ecervac@hilcoappraisal.com<br>(847) 849-2935 |

## Appraisal Overview

| | |
|---|---|
| Valuation Approach | Forced Liquidation Value, Orderly Liquidation Value |
| Liquidation Time Frame | FLV – 3 Months, OLV – 6 Months |
| Date of Engagement | March 1, 2012 |
| Inspection Dates | March 5 - 8, 2012 |
| Effective Date of Report | March 8, 2012 |
| Excluded Equipment | Assets identified as subject to a financing agreement with other lenders, a capital lease or an operating lease have been excluded from this appraisal report. |

| Cost Approach Used: | No | Onsite: | Yes | Desktop: | No |
|---|---|---|---|---|---|

## Highlights

### State of the Industry

The Recyclable Material Wholesaling industry will continue expanding over the next five years, growing at an average annual rate of 6.1% to $91.5 billion by 2017. Strong global growth over the period will boost demand for scrap metal and other recyclables, leading to higher prices for the industry's products.... Pg.14

### Machinery Values

Please note, the (129) open top gondola rail cars comes to $2,212,500 and accounts for 33.3% of the gross FLV and $2,455,500 which accounts for 31.7% of the gross OLV.... Pg.15

### Collateral Review Recommendation

It is recommended that a desktop appraisal be conducted in 6 months and a site inspection appraisal in 12 months.

**Keywell LLC  |  March 20, 2012**

# dashboard

## Summary Total Liquidation Values

| VALUE | FLV | OLV | REF |
|---|---|---|---|
| Total Gross Value | $ 6,639,750 | $ 7,725,200 | Pg. 5 |
| Total Cost of Liquidation | (774,850) | (1,869,865) | Pg. 8 |
| Total Net Value | $ 5,864,900 | $ 5,855,335 | Pg. 8 |

## Net Values as a Percentage of Gross                     Pg. 8

Forced Liquidation Value                    Orderly Liquidation Value

**88%**                                    **75%**

## Quantity and Percentage of Assets by Asset Class

| ASSET CLASS | QTY. | % OF QTY | $ FLV | % FLV | $ OLV | % OLV |
|---|---|---|---|---|---|---|
| Prod. Equip. | 25 | 9.7% | 753,050 | 11.3% | 910,250 | 11.8% |
| Prod. Support | 63 | 24.5% | 900,500 | 13.6% | 1,132,000 | 14.7% |
| Material Handling | 71 | 27.6% | 1,603,500 | 24.2% | 1,842,700 | 23.9% |
| Rolling Stock | 24 | 9.3% | 2,488,000 | 37.5% | 2,762,250 | 35.8% |
| Test & Measure | 33 | 12.8% | 734,875 | 11.1% | 890,375 | 11.5% |
| General Plant Support | 41 | 16.0% | 159,825 | 2.4% | 187,625 | 2.4% |
| **Total Assets** | **257** | **100%** | **$ 6,639,750** | **100%** | **$ 7,725,200** | **100%** |

## Total Percentage of Asset Classes by Quantity and Value          Pg. 5



■ % of Quantity    ▨ % of Forced    ▨ % of Orderly

**Keywell LLC** | March 20, 2012

**Hilco** Appraisal Services, LLC

Table of Contents

**1.0  Project Overview**

    1.1  Engagement Summary    ·              2

    1.2  Facilities Summary                     3

**2.0  Value Conclusions**

    2.1  Location Summary by Asset Class      5

    2.2  Net Liquidation Value Calculations     8

    2.3  Occupancy Cost                    9

    2.4  Direct Liquidation Costs           10

**3.0  Overviews**

    3.1  Company Overview                12

    3.2  Industry Overview                12

    3.3  Equipment Disposition Overview     14

    3.4  Changes Since Last Appraisal       16

**4.0  Statements and Conditions**

    4.1  Certification of Appraisal          19

    4.2  Definitions of Value               21

    4.3  Approaches to Value             22

    4.4  Statement of Conditions         23

    4.5  Methodology                  25

    4.6  Glossary                       26

**5.0  Qualifications**

    5.1  Resumes                       29

**6.0  Asset Exhibits**

    6.1  Asset List(s)                   37

    6.2  Photographs                85

**Keywell LLC**  |  March 20, 2012